M. ELIZABETH DAY (SBN 177125)
eday@feinday.com
IAN N. FEINBERG (SBN 88324)
ifeinberg@feinday.com
DAVID ALBERTI (SBN 220265)
dalberti@feinday.com
CLAYTON THOMPSON (SBN 291331)
ctompson@feinday.com
JAKE ZOLOTOREV (SBN 224260)
yzolotorev@feinday.com
**FEINBERG DAY ALBERTI &
THOMPSON LLP**
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Tel:  650.618.4360
Fax:  650.618.4368
*Attorneys for Plaintiffs*
Nagravision SA and OpenTV, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAGRAVISION SA and OPENTV, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NFL ENTERPRISES, LLC, <br><br> Defendant. | CASE NO. 2:17-CV-03919-AB-SK <br><br> **PLAINTIFFS NAGRAVISION SA AND OPENTV, INC.'S OPPOSITION TO MOTION TO DISMISS** <br><br> Date:     August 4, 2017 <br> Time:    10:00 a.m. <br> Courtroom:  7B <br> Judge:    Hon. Andre Birotte Jr. |

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ....................................................... 1

II.  ARGUMENT ................................................................................... 2

   A.   NFLE Ignores the Specific Technological Innovations and Fails to
   Overcome Plaintiffs' Factually Supported Allegations ................................. 2

      1.   NFLE Overgeneralizes Plaintiffs' Inventions ............................ 4

      2.   NFLE Ignores the Claimed Technological Structure ................................. 5

      3.   NFLE Offers Only Conclusions that the Claims Are Conventional While
      Ignoring the Inventive Aspects ................................... 6

      4.   NFLE's Motion Is Premature ..................................... 7

      5.   NFLE Makes No Preemption Argument ................................ 8

   B.   Count 2: The '729 Patent Claims Patent-Eligible Subject Matter........... 9

      1.   The Technological Improvement Claimed by the '729 Patent Is Directed to
      Encoding Specific Types of Digital Television Data ......................... 9

      2.   The '729 Patent Provides an Inventive Concept of Using an Address Signal
      to Correlate Video Segment Tagging with Database Indicators .................... 11

   C.   Count 4: The '033 Patent Claims Patent-Eligible Subject Matter. ....... 14

      1.   The Technological Improvement Claimed by the '033 Patent Links
      Different Television Data Streams with Specific Relational Metadata........... 14

      2.   The '033 Patent Provides an Inventive Concept of Using a Relationship
      Identifier to Link Different Types of Metadata ................................ 17

   D.   Count 5: The '169 Patent Claims Patent-Eligible Subject Matter. ....... 18

      1.   Another District Court Has Already Mooted an *Alice* Challenge to the '169
      Patent Due to a Need for Claim Construction ................................ 18

      2.   The Technological Improvement Claimed by the '169 Patent is Directed to
      Automatically Managing Essential Interactive Television Resources ............ 19

      3.   The '169 Patent Provides an Inventive Concept of Managing Multiple
      Broadcasts Based on an Unambiguous Scripting Language .......................... 22

   E.   Count 6: The '888 Patent Claims Patent-Eligible Subject Matter......... 24

      1.   The Technological Improvement Claimed by the '888 Patent Creates a New
      Type of Data Used for Digital and Interactive Television .............................. 24

      2.   The '888 Patent Provides an Inventive Concept of Creating a Framework
      Definition to Manage the Omnimedia Stream................................. 27

i

1

**F. Count 7: The '736 Patent Claims Patent-Eligible Subject Matter.** ......... 29

2

3

1. The Technological Improvement Claimed by the '736 Patent Is Directed to Establishing a Communications Link with a Viewer Based on a Signal in the Television Broadcast Stream ............................................................................. 29

4

2. The '736 Patent Provides an Inventive Concept ....................................... 31

5

**G. Count 8: The '172 Patent Claims Patent-Eligible Subject Matter.** ....... 33

6

7

1. The Technological Improvement Claimed by the '172 Patent Is Directed to Limiting Information Distribution on a Communications Network Based on Geographic Location ........................................................................................ 33

8

2. The '172 Patent Claims an Inventive Solution ......................................... 37

9

**III. CONCLUSION** ................................................................................................ 40

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS– 2:17-CV-3919-AB-SK

# TABLE OF AUTHORITIES

**Cases**

*Activision Publ'g, Inc. v. xTV Networks Ltd.*,
   No. 16-737, 2016 WL 6822751 (C.D. Cal. July 25, 2016) ..................................13

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
   — U.S. —, 134 S.Ct. 2347 (2014) ............................................................. passim

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................3

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) .............................................................6, 7, 12, 28

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................3

*Bilski v. Kappos*,
   561 U.S. 593 ......................................................................................13, 20

*Brown v. Elec. Arts, Inc.*,
   724 F.3d 1235 (9th Cir. 2013) .....................................................................3

*Cahill v. Liberty Mutual Ins. Co.*,
   80 F.3d 336 (9th Cir. 1996) ........................................................................3

*Cal. Inst. Tech. v. Hughes Commc'ns, Inc.*,
   59 F. Supp. 3d 974 (C.D. Cal. 2014) .......................................................5, 26, 35

*CalAmp Wireless Networks Corp. v. ORBCOMM, Inc.*,
   No 16-cv-906, 2017 WL 536833 (E.D. Va. Feb. 9, 2017) .................................16

*CG Tech. Dev., LLC v. Bwin.party (USA), Inc.*,
   2016 WL 6089696 (D. Nev. Oct. 18, 2016) ...................................................6, 16

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014) ............................................................... passim

*Diamond v. Diehr*,
   450 U.S. 175 (1981) ..............................................................................4, 6, 12

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) ............................................................... passim

*Evolved Wireless, LLC v. Apple Inc.*,
   No. 15-cv-542, 2016 WL 6440137 (D. Del. Oct. 31, 2016) ..............................25

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
   839 F.3d 1089 (Fed. Cir. 2016) ..................................................................16

*Groundswell Techs., Inc. v. Synapsense Corp.*,
   No. 15-6024, 2016 WL 6661177 (C.D. Cal. Apr. 28, 2016) ....................... passim

*InfoGation Corp. v. ZTE Corp.*,
   No. 16-cv-01901 2017 WL 1135638 (S.D. Cal. Mar. 27, 2017) ........................35

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66 (2012) ...................................................................................8

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS– 2:17-CV-3919-AB-SK

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016).................................................................. passim
*Modern Telecom Sys. v. Lenovo Inc.*,
  No. 14-cv-1266, 2015 WL 7776873 (C.D. Cal. Dec. 2, 2015) ...........................38
*Nomadix, Inc. v. Hosp. Core Servs. LLC*,
  No. 14-cv-08256, 2015 WL 1525537 (C.D. Cal. Apr. 3, 2015) ...........................8
*OpenTV, Inc. v. Netflix, Inc.*,
  76 F. Supp. 3d 886 (N.D. Cal. 2014) ....................................................................18
*Personalized Media Commc'ns, LLC v. Funai Elec. Co.*,
  No 16-cv-105, 2017 WL 957719 (E.D. Tex. Feb. 22, 2017 ................................25
*Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*,
  223 F. Supp. 3d 1026 (C.D. Cal. 2016) .................................................9, 12, 14, 34
*Signal IP, Inc. v. Am. Honda Motor Co.*,
  No. 14-cv-02454, 2016 WL 1693091 (C.D. Cal. Mar. 22, 2016)....................5, 10
*SiRF Tech., Inc. v. Int'l Trade Comm'n*,
   601 F.3d 1319 (Fed. Cir. 2010)............................................................................38
*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  179 F. Supp. 3d 339 (D. Del. 2016) ......................................................................35
*SZ DJI Tech.*, 2016 WL 8931302
  No. 16-cv-595, (C.D. Cal. Oct. 13, 2016).........................................14, 17, 24, 38
*TeleSign Corp. v. Twilio, Inc.*,
  No. 15-cv-3240,  2016 WL 7209434 (C.D. Cal. Mar. 9, 2016)............................8
*Timeplay, Inc. v. Audience Entm't LLC*,
  2015 WL 9695321 (C.D. Cal. Nov. 10, 2015) ............................................ passim
*Trading Techs. Int'l, Inc. v. CQG, INC.*,
  2017 WL 192716 (Fed. Cir. Jan. 18, 2017) ................................................2, 6, 40
*Transp. Techs., LLC v. Los Angeles Cty. Metro. Transportation Auth.*,
  No. 15-cv-6423,  2016 WL 7444679 (C.D. Cal. July 22, 2016)....................32, 39
*Vehicle IP, LLC v. AT&T Mobility LLC*,
  No 09-cv-1007, 2016 WL 5662004 (D. Del. Sept. 29, 2016)..............................36
*X One, Inc. v. Uber Techs., Inc.*,
  No. 16-cv-06050, 2017 WL 878381 (N.D. Cal. Mar. 6, 2017) ...........................38

**\*\*\* All emphasis added to quotations unless otherwise indicated \*\*\***

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS– 2:17-CV-3919-AB-SK

## I.  PRELIMINARY STATEMENT

NFLE's Motion to Dismiss adds to the rising tide of premature, pro-forma "abstract idea" motions resulting from the Supreme Court's 2014 *Alice* decision. Plaintiffs' patents claim inventions that undeniably embody technical improvements to the interactive digital video and TV systems that existed when these patents were filed.  Indeed, those inventions formed the basis for Nagravision and OpenTV's (collectively "Plaintiffs") pioneering role and success in the field of digital television.  The Court should not allow NFLE to casually dismiss Plaintiffs' innovation.

NFLE asserts that all six patents are ineligible, abstract ideas under 35 U.S.C. § 101 because, according to NFLE, they are directed to well-known and fundamental ideas performed by humans, and rely on broad, result-focused, functional language that fails to provide detail as to how any of the abstract ideas are implemented.  Dkt. 23 ("Motion") at 2.[1]  But NFLE is incorrect:  the claim language solves particular, technical problems unique to each technical field. When focused on the actual claim language (not NFLE's mischaracterization of the inventions), NFLE cannot satisfy its burden under 35 U.S.C. § 101.

Moreover, rather than seriously engage on the technological substance of these patents, NFLE supports its arguments with counsel's empty rhetoric, e.g., that the patents are directed to abstract ideas akin to collecting information, or telling a student where to find a sports magazine.  But gross overgeneralizations are not enough to invalidate a patent.  Plaintiffs' allegations are based on the words of the patents themselves—the problems they solve, the solutions they teach, and

---

[1] NFLE noticed its motion for July 31, 2017.  According to the Court's website, on and after July 31, 2017, all hearings will be heard on the corresponding Friday.  Plaintiffs believe that the hearing date on this motion is now August 4, 2017, and Plaintiffs' opposition is due July 14, 2017.  *See* L.R. 7-9.  NFLE's notice of non-opposition is incorrect (*See* Dkt. 25), and Plaintiffs are submitting a response thereto along with this Opposition.

1  the claims as written—while NFLE's arguments mischaracterize each claim by

2  disembodying the inventions from the explicit words of the patents.  If anything, it

3  is NFLE's arguments that are abstract—untethered from the facts or anything else

4  concrete or specific.

5       The six patents at issue are directed to statutory subject matter under § 101,

6  not the abstract mischaracterizations that NFLE advances in its motion.  NFLE's

7  motion to dismiss counts 2 and 4-8 of Plaintiffs' complaint should be denied.

8  **II.    ARGUMENT**

9       **A.    NFLE Ignores the Specific Technological Innovations and Fails to
              Overcome Plaintiffs' Factually Supported Allegations**

10

11      Plaintiffs' complaint offers well-pleaded allegations that each patent claims

12  a specific technological improvement rooted in specific technology and directed to

13  solving a specific problem involving interactive and digital television.  These

14  inventions were new concepts, especially when they were first claimed well over a

15  decade ago.  *Trading Techs. Int'l, Inc. v. CQG, INC.*, 675 Fed. Appx. 1001, at 1004

16  (Fed. Cir. Jan. 18, 2017) ("We agree with this conclusion…the graphical user

17  interface system of these two patents ***is not an idea that has long existed***, the

18  threshold criterion of an abstract idea and ineligible concept….").

19      The '729 patent claims a new way of encoding specific indicators with a

20  video stream.  Compl., ¶¶ 48-50.  The '033 patent claims a new way to use digital

21  and computer-processed relational metadata to improve content delivery.  *Id.* at ¶¶

22  91-93.  The '169 patent claims an automatic control over broadcast data and

23  resource management for improving interactive television functionality by using

24  encoded prerequisite directives.  *Id.* at ¶¶ 114-116.  The '888 patent claims a new

25  "omnimedia" data type that is used to combine audio, video and metadata data

26  streams into a broadcast stream.  *Id.* at ¶¶ 137-139.  The '736 patent claims a new

27  way to connect television viewers with online content providers.  *Id.* at ¶¶ 160-162.

28  The '172 patent claims a unique way to limit distribution of information on a

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS– 2:17-CV-3919-AB-SK

1  communication network based on geographic location.  *Id.* at ¶ 182.  For each

2  invention, Plaintiffs allege that a person of skill in the art would understand these

3  inventions are directed to specific and tangible technological improvements and

4  that each claimed solution is rooted in modern technology.  Plaintiffs provide

5  extensive factual support in their complaint and the patents themselves (which are

6  attached to the complaint) factually support these allegations.

7       At the pleading stage, the Court must construe the complaint in the light

8  most favorable to Plaintiffs and accept all factual allegations and all reasonable

9  inferences from those allegations as true.  *Cahill v. Liberty Mutual Ins. Co.*, 80

10  F.3d 336, 337-38 (9th Cir. 1996); *Brown v. Elec. Arts, Inc.,* 724 F.3d 1235, 1247-

11  48 (9th Cir. 2013).  Here, the patents must be found eligible at this early stage if

12  Plaintiffs' allegations are "plausible on [their] face." *Bell Atlantic Corp. v.*

13  *Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the

14  plaintiff pleads factual content that allows the court to draw the reasonable

15  inference" in the non-movant's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

16       Plaintiffs allege that each of the patents claim specific improvements to

17  technology and solve problems unique to digital and interactive television content

18  and communications.  The patents themselves support these allegations, both in the

19  written descriptions and the claims, and therefore must be accepted as true.  The

20  Supreme Court and Federal Circuit have explained that whatever else may pass the

21  § 101 threshold, specific improvements to technology or solutions that are rooted

22  in technology are eligible.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. —,

23  134 S.Ct. 2347, 2359 (2014) (inquiring whether the invention improves "the

24  functioning of the computer itself" or effects "an improvement in any other

25  technology or technical field"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d

26  1245, 1257 (Fed. Cir. 2014) (inventions "rooted in computer technology in order to

27  overcome a problem specifically arising in" a technological realm are patent-

28  eligible); *Trading Techs.*, 675 Fed. Appx. at 1003 ("Precedent has recognized that

3

specific technologic modifications to solve a problem or improve the functioning of a known system generally produce patent-eligible subject matter."). Therefore, the Court should deny NFLE's motion to dismiss.

NFLE complains that Plaintiffs included additional support for their allegations in the complaint after they voluntarily refiled the case in this District.[2] After NFLE filed its Section 101 brief on five of the six patents at issue in this motion, OpenTV sought the opinions of well-credentialed experts.[3] Those opinions fully supported OpenTV's allegations and Plaintiffs have incorporated them into the complaint as evidence of how one of skill in the art would understand the patents. Ultimately, however, the discussion in the Eastern District of Texas is of little consequence, because the allegations are now part of the complaint here and must be accepted as true because they are supported by factual content.

Because NFLE repeats many arguments for each patent, Plaintiffs address them summarily below before turning to the specifics of each patent.

### 1.   NFLE Overgeneralizes Plaintiffs' Inventions

First, for *Alice*-step one, NFLE describes each invention in the most general terms, "at such a high level of abstraction and untethered from the language of the claims [to] all but ensure" that the claims will fail § 101. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (*quoting Alice*, 134 S. Ct. at 2354) (stating that "we tread carefully in construing this exclusionary principle [of laws of nature, natural phenomena, and abstract ideas] lest it swallow all of patent law"); *Diamond v. Diehr*, 450 U.S. 175, 189 n. 12, (1981) (cautioning that overgeneralizing claims, "if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of

---

[2] Plaintiffs originally filed this matter in the Eastern District of Texas. After the Supreme Court's decision in *TC Heartland*, Plaintiffs voluntarily dismissed and refiled here.

[3] Plaintiff OpenTV, Inc. is the assignee of the five patents at issue in NFLE's first section 101 motion filed in the Eastern District of Texas.

4

1    nature which, once known, make their implementation obvious"). As these courts

2    warn, abstractness can always be found by overgeneralizing. And yet, NFLE

3    tramples this fundamental caution of *Alice* and *Diamond* throughout its motion—

4    describing inventions as generically as possible, and dismissing technological

5    underpinnings as mere "verbiage." This is fundamentally improper.

6            This Court has stated that "the court must identify the **purpose** of the claim–

7    in other words, what the claimed invention is trying to achieve–and ask whether

8    that **purpose** is abstract." *Groundswell Techs., Inc. v. Synapsense Corp.*, No. 15-

9    6024, 2016 WL 6661177, at *5 (C.D. Cal. Apr. 28, 2016) (quoting *Cal. Inst. Tech.*

10   *v. Hughes Commc'ns, Inc.*, 59 F. Supp. 3d 974, 991 (C.D. Cal. 2014)); *see also*

11   *Timeplay, Inc. v. Audience Entm't LLC*, No. 15-cv-05202, 2015 WL 9695321, at

12   *4 (C.D. Cal. Nov. 10, 2015). While NFLE recites the proper inquiry (Dkt. 23 at

13   3), it merely pays it lip service, and in actuality defines the claims at the highest

14   level of generality possible, ignoring the patent and the pleadings. Here, the

15   inventions are directed to improving digital television transmissions and creating

16   more effective, more flexible digital content.

17               2.    NFLE Ignores the Claimed Technological Structure

18          Second, NFLE argues that each invention is purely "functional" and ignores

19   all of the structural elements in each claim. NFLE makes this argument under

20   *Alice*-step one for all of the patents, in order to undermine the specific

21   technological limitations, before it ever addresses *Alice*-step two. But a functional

22   claim is not, *per se*, abstract. This Court's discussion in *Signal IP, Inc. v. Am.*

23   *Honda Motor Co.*, No. 14-cv-02454, 2016 WL 1693091, at *7 (C.D. Cal. Mar. 22,

24   2016), is instructive. There, the Court noted that even though a claim was "not

25   limited to a physical structure or to a particular application" it could still be

26   characterized at a "detailed level" as a tangible invention. In particular, the

27   claimed method required different types of data, each with certain characteristics,

28   to be transmitted over a communications network. The Court found that "[t]his

1   suggests that improving communications through the method taught in claim 6 has

2   a *more tangible form and is not merely a generic implementation of an abstract*

3   *idea*." *Id.*

4           Here, many of the claims have structural elements or particular applications,

5   but all require specific improvements to digital television transmissions in a

6   tangible form and all are patent-eligible.  NFLE cannot "strip away" the limitations

7   it does not like or fail to meaningfully address them.  *See DDR Holdings*, 773 F.3d

8   at 1256; *Timeplay*, 2015 WL 9695321, at *6 (C.D. Cal. Nov. 10, 2015); *Trading*

9   *Techs.*, 675 Fed. Appx. at 1003 ("Abstraction is avoided or overcome when a

10  proposed new application or ***computer-implemented function*** is not simply the

11  generalized use of a computer as a tool to conduct a known or obvious process, but

12  instead is an improvement to the capability of the system as a whole."); *CG Tech.*

13  *Dev., LLC v. Bwin.party (USA), Inc.*, No. 16-cv-00871, 2016 WL 6089696, at *5

14  (D. Nev. Oct. 18, 2016) ("The integration of the ***non-abstract function***…for which

15  the computer is used renders the invention as a whole patentable even if certain

16  elements might not be separately patentable.").

             3.    NFLE Offers Only Conclusions that the Claims Are
17                 Conventional While Ignoring the Inventive Aspects

18

19          Third, NFLE makes generic, unsupported conclusions that the claim

20  limitations individually are merely uses of conventional, routine computer

21  technology.  *Alice*-step two asks whether there is "[a]n inventive concept that

22  transforms the abstract idea into a patent-eligible invention" by adding

23  "significantly more than the abstract idea itself" beyond "simply be[ing] an

24  instruction to implement or apply the abstract idea on a computer."  *Bascom Glob.*

25  *Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016);

26  *DDR Holdings*, 773 F.3d at 1257-58.  NFLE cannot simply ignore the

27  technological limitations that it believes, without evidence or support, are generic.

28  "The proposition that a court should 'dissect the claims into old and new elements

                                         6

1   and then ignore the presence of the old elements in the analysis' was specifically

2   rejected by the Supreme Court in *Diamond v. Diehr*." *Timeplay*, 2015 WL

3   9695321, at *9 (quoting *Diehr*, 450 U.S. at 188).

4        NFLE must engage the claims as they are written—not as it wants them to

5   be.  If it did, NFLE could not escape the inevitable conclusion that each claim adds

6   "significantly more" to the vague concepts NFLE identifies as the abstract idea.

7   NFLE cannot, at the second step, dismiss any computer-based limitation as

8   "verbiage" or "prolix" based on its own conjecture.  NFLE musters no evidence to

9   support its conventionality arguments other than its own biased hindsight,

10  influenced by almost two decades of innovation since the priority dates of the

11  inventions. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1315

12  (Fed. Cir. 2016) (finding "no record evidence supports" defendant's conclusions);

13  *Bascom*, 827 F.3d at 1350 ("On this limited record, this specific method of filtering

14  Internet content cannot be said, as a matter of law, to have been conventional or

15  generic."); *Timeplay*, 2015 WL 9695321, at *6.  Conclusions and rhetoric are not

16  enough for a 12(b)(6) movant to prevail.

17            4.    NFLE's Motion Is Premature

18        NFLE bears a heavy burden to prove that Plaintiffs' patents are invalid at

19  any stage in the litigation.[4] *Groundswell Techs.*, 2016 WL 6661177, at *3

20  ("Defendants still bear the burden of establishing that the claims are patent-

21

22  [4] There is a disagreement in the Central District whether the clear and convincing
    standard should apply to a motion to dismiss under Section 101. *See Groundswell*
23  *Techs.*, 2016 WL 6661177, at *3; *Wolf v. Capstone Photography, Inc.*, No. 2:13-
    09573, 2014 WL 7639820, at *5 (C.D. Cal. Oct. 28, 2014) ("Put differently, prior
24  to claim construction, a patent claim can be found directed towards patent
    ineligible subject matter if the only plausible reading of the patent must be that
25  there is clear and convincing evidence of ineligibility.") (internal quotations
    omitted).  Because the parties dispute the meaning and scope of the claims, which
26  are undergirded by factual inquiries, Plaintiffs submit that the clear and convincing
    standard should apply to a motion to dismiss under Section 101.
27

28

1  ineligible under § 101…in applying § 101 jurisprudence at the pleading stage, the

2  Court construes the patent claims in a manner most favorable to Plaintiff.").  Here,

3  there is a stark dispute as to the nature of each of these patents, making claim

4  construction a necessity in order to determine whether these inventions are, as

5  NFLE's attorneys argue, simply about collecting and organizing data, or whether,

6  as Plaintiffs allege, they are directed to tangible, specific improvements for digital

7  television content and distribution.  *See TeleSign Corp. v. Twilio, Inc.*, No. 15-cv-

8  3240,  2016 WL 7209434, at *2 (C.D. Cal. Mar. 9, 2016) ("The Court finds a

9  similar situation here, as almost every aspect of the patents is hotly disputed by the

10  parties. The Court therefore finds that claim construction is necessary before the

11  Court can determine patent eligibility under § 101."); *Nomadix, Inc. v. Hosp. Core

12  Servs. LLC*, No. 14-cv-08256, 2015 WL 1525537, at *2 (C.D. Cal. Apr. 3, 2015).[5]

13             5.    NFLE Makes No Preemption Argument

14         Finally, NFLE's motion is most telling for what *it does not say*.  NFLE fails

15  to address preemption—except for a conclusory statement concerning the '172

16  patent.  This is fatal at this stage.  *Mayo Collaborative Servs. v. Prometheus Labs.,

17  Inc.*, 566 U.S. 66, 85 (2012) (§ 101 embodies "a concern that patent law not inhibit

18  further discovery by improperly tying up the future use of laws of nature ... [or] the

19  basic tools of scientific and technological work").

20         This fundamental flaw undermines NFLE's entire motion.  NFLE's

21  purported abstract concept is so disembodied from the actual claim limitations,

22  there is no risk that Plaintiffs' inventions will "disproportionately [tie] up the use

23  of" any underlying abstract idea.  *See Alice*, 134 S.Ct. at 2354–55 (citing *Mayo*,

24

_____

25  [5] For the Court's convenience, Plaintiffs provide a copy of a letter the parties
    submitted to the Eastern District of Texas concerning the need for claim
26  construction for the '033 patent, the '169 patent and the '736 patent. *See*
    Attachment A.  In addition, Plaintiffs believe claim construction is necessary for
27  the '172 patent for at least the following terms: "location information,"
    "first/second communication units" and "first/second information."
28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS– 2:17-CV-3919-AB-SK

566 U.S. at –, 132 S.Ct. at 1294, 1303).  Either the claim is not directed to an abstract idea at all and NFLE loses at step one, or, because NFLE's description of the patent is so divorced from the actual limitations, the claims are eligible because they add something more to the idea besides the rote functionality that NFLE identifies.  *See McRO*, 837 F.3d at 1316 ("By incorporating the specific features of the rules as claim limitations, claim 1 ... does not preempt approaches that use rules of a different structure or different techniques.").  Here, each of the claims recites a specialized procedure or specialized program for accomplishing inventive ways to improve interactive and digital television that require specific structures and processes to operate.  These inventions do not present any danger that they will tie up all future uses of what NFLE contends are the basic ideas of organizing or collecting data.

**B.    Count 2: The '729 Patent Claims Patent-Eligible Subject Matter.**

   1.    The Technological Improvement Claimed by the '729 Patent Is Directed to Encoding Specific Types of Digital Television Data

NFLE claims that the '729 patent is directed to nothing more than "retrieving and inserting data into a presentation."  Dkt. 23 at 5.  In reality, the '729 patent is directed to encoding content identification tags and markers for video-segment information into a digital television data stream.  Compl., ¶¶ 48-50.  OpenTV's allegations are based on the statements in the patent itself, including the claims, and therefore must be accepted as true.  *See, e.g.*, '729 patent, Abstract; *id.* at 1:21-38 ("The present invention pertains generally to video systems and more particularly to control of displayed video information."); *id.* at 1:48-50; claim 1 ("What is claimed is: A method of generating and inserting indicators into a video stream."); *see also Enfish*, 822 F.3d at 1337 ("[O]ur conclusion that the claims are directed to an improvement of an existing technology is bolstered by the specification's teaching…."); *Timeplay*, 2015 WL 9695321, at *6 (reviewing the "Background of the Invention" to determine the claim's purpose and rejecting

9

"Defendant's purported 'abstract idea' [that was] far more general than anything claimed"); *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*, 223 F. Supp. 3d 1026, 1032 (C.D. Cal. 2016) (reviewing Abstract to determine claim's purpose and finding that defendant "frames the issue too generally").

NFLE has not shown that such a particularized technological solution is abstract—especially at the time of invention, around at least August 25, 2000. Compl., ¶ 50.  At that time, interactive digital television was a relatively new technology and the patent offered a new and specific improvement to the video broadcast space.  *Id.*  The prior art allowed only for tag marking of entire program streams.  '729 patent, 1:25-25, 42-45.  But the '729 invention improves that technology by providing a repeatable and efficient mechanism to encode content with a video stream based on the time code synchronized with the video stream:

> The present invention overcomes the disadvantages and limitations of the prior art by providing a system and method in which video indicators, such as tags and markers, can be generated and inserted in a video signal....

'729 patent, 1:42-62; *see id.* at 2:63-3:4; *see also*, '729 patent, Fig. 3, 5:10-7:22. Because the purpose of this invention is to improve digital television technology in a specific way, the patent is not abstract.  *Timeplay*, 2015 WL 9695321, at *5 (discussing numerous Federal Circuit cases and finding that "these cases appear to distinguish between *patents claiming improvements to modern technology* and those claiming well-known concepts untethered to any particular technology or technological environment).

By every measurement, this idea is not abstract.  Inserting indicators into a video stream is not a mathematical algorithm, a fundamental economic idea, or a longstanding commercial practice.  *See DDR Holdings*, 773 F.3d at 1257 ("Here, we note that the '399 patent's asserted claims do not recite a mathematical algorithm.  Nor do they recite a fundamental economic or longstanding commercial practice."); *Timeplay*, 2015 WL 9695321, at *7 ("Even under

1   Defendant's 'constructions,' the claims do not recite mathematical formulae,

2   algorithms, computer software, or fundamental business practices such as risk

3   hedging or intermediated settlement that run a significant risk of preemption even

4   when limited to the world of computing."); *Signal IP*, 2016 WL 1693091, at *6.

5   At the time of the invention, providing segment-specific encoded video stream

6   tagging was not common.  Compl., ¶ 50.

7        Nor can the idea be practiced in the human mind.  Compl., ¶ 50.  NFLE

8   focuses on isolated parts of the specification that discuss how a user can manually

9   identify tags or segments.  But the *claimed* invention requires a specific computer

10  process to properly apply and encode the tags, correlate the information stored with

11  the proper segment and transmit that data, and then decode and generate the

12  appropriate addresses for the user.  *Id.* at ¶ 48; *see* '729 patent, Fig. 3, 5:10-7:22.

13       There is no evidence to support NFLE's argument that the patent is just

14  directed to inserting information in a presentation.  Instead, based on the written

15  description and the claims, claim 1, for example, is directed to a concrete

16  technological improvement for encoding content identification tags and markers

17  for video-segment information into a digital television data stream.

18            2.   The '729 Patent Provides an Inventive Concept of Using an
19                 Address Signal to Correlate Video Segment Tagging with
20                 Database Indicators

21       NFLE argues the claims do not contain the "how."  Even if the Court were

22  to accept that the patent's purpose is nothing more than retrieving and inserting

23  data into a presentation, the claims, by their terms, require significantly more than

24  that, and recite the "how" of the invention.  Claim 1 uses a time code generator and

25  an address generator to correlate specific information within an input video stream.

26  The address is used as an index into a database.  The database provides an

27  indicator to an encoder which generates an output consisting of the video stream

28  encoded with the indicator.  Compl., ¶ 49; '729 patent, claim 1.  These limitations

1    show that the invention is necessarily rooted in modern technology (e.g., time code

2    generators, address generators, databases and encoders) to solve a problem

3    specially arising in the realm of digital television transmission.  *See DDR*

4    *Holdings*, 773 F.3d at 1257.  These limitations also provide the requisite "how"—

5    regardless of whether the patent is directed to retrieving and inserting data into a

6    presentation (according to NFLE) or generating and inserting indicators into a

7    video stream (according to the complaint's allegations, the specification, and the

8    claims).  Even if some of the individual elements were known, their combination in

9    the specific claimed way was inventive and patentable.  Compl., ¶¶ 48, 49; *See*

10   *Bascom*, 827 F.3d at 1350; *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*,

11   223 F. Supp. 3d 1026, 1033–34 (C.D. Cal. 2016) (finding a patent eligible where it

12   claimed known elements but was used to enhance performance of the underlying

13   technology).  These components operating together in this novel way allow for

14   different video streams to be encoded in a variety of ways, each providing a unique

15   user experience that is an inventive solution that improves this specific technology.

16        But even if NFLE were correct that the patent is directed to an abstract idea

17   of inserting data into a presentation, then the claim would be similar to that in

18   *Diamond v. Diehr*, where the patent claimed the use of an "admittedly well-known

19   mathematical equation" but did "not seek to pre-empt the use of that equation."

20   *Diehr*, 450 U.S. at 187.  Rather, the patent applied that equation to a very specific

21   process.  Similarly, here (and for all of the patents), if the Court were to agree with

22   NFLE's broad characterization of the claim, the limitations narrowly apply that

23   broad idea to very specific process that requires a time code generator and an

24   address generator to correlate specific information within an indexed database and

25   are therefore patent-eligible.

26        NFLE does not even try to argue that there is any preemption concern.

27   Obviously, there are nearly infinite other ways to just input data into a presentation

28   beyond what is claimed here.  Instead, NFLE contends that the patent does not

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS– 2:17-CV-3919-AB-SK

1    sufficiently explain to one of skill in the art how to implement the address

2    generator, time code generator, indexed database, etc.  Dkt. 23, at 5 ("The claim

3    does not specify how any of the claimed functions…are accomplished."); *id.* at 7

4    ("It also does not specify how the time code is generated or synchronized with the

5    video stream…how the address generator decodes…how the address signal is

6    supplied…").  These questions are not appropriate for a Section 101 inquiry,

7    especially at the pleading stage.  These are questions specifically addressed by

8    Section 112, concerning enablement, indefiniteness, and written description, after

9    the claims have been construed.  *Bilski v. Kappos*, 561 U.S. 593, 602, 609 (2010)

10   (stating that Sections 102, 103, and 112 "serve a critical role" in ensuring an

11   invention is patentable).

12        What is important here is that claim 1 provides a tangible and inventive

13   solution.  Even if Section 112 issues were appropriate here (they are not), the

14   patent provides significant implementation details that NFLE conveniently

15   neglects to discuss.  For example, the patent explains the means by which the

16   encoded indicators are accessed in a preferred embodiment ('729 patent, 5:21-46),

17   provides exemplar computer code of this functionality and lists examples of how

18   the video stream can be encoded with tags and markers ('729 patent, 5:59-6:38).

19        NFLE's reliance on *Activision Publ'g, Inc. v. xTV Networks Ltd.*, No. 16-

20   737, 2016 WL 6822751 (C.D. Cal. July 25, 2016) is also misplaced.  There, the

21   invention was directed to simply using generic computer technology to speed up

22   copying information.  *Id.* at *6.  Here, the invention is about doing something

23   new—encoding digital television streams with indicators based on the stream

24   timing data .  And unlike in *Activision*, here the claims do in fact alter the structure

25   of the digital content in a very precise way by transforming a video signal with

26   indicators that can be used to provide additional content to the user, thereby

27   enriching the viewing experience in a novel manner. *See id.* at *12 (finding that the

28   claim failed the transformation prong of the machine or transformation test).

Even if, as NFLE incorrectly contends, the invention is nothing more than inserting data into a presentation, then the claim here clearly adds "something more" because the express language of the claim recites a detailed technical interchange between the different elements of the invention.  NFLE has failed to meet its burden to show patent ineligibility.

### C. Count 4: The '033 Patent Claims Patent-Eligible Subject Matter.

#### 1. The Technological Improvement Claimed by the '033 Patent Links Different Television Data Streams with Specific Relational Metadata

NFLE argues that claim 27 of the '033 patent is directed to simply "taking an action based on relationship information."  Dkt. 23, at 10.  Again, this ignores Plaintiffs' factually supported allegations.  The claim is directed to solving the technological problem of how to use relational metadata in order to appropriately relate two or more data streams in a more flexible, effective manner for incorporating relational metadata into interactive program streams.  Compl., ¶ 92; *see* '033 patent, Abstract ("A method and mechanism for delivering and processing relational metadata in a television system…."); *id.* at Field of Invention; *id.* at 2:63-4:2; *id.* at claim 27 ("A computer readable storage medium…execut[ed] to receive relationship metadata corresponding to a broadcast signal…."); *see Timeplay*, 2015 WL 9695321, at *6; *Polaris Innovations*, 223 F. Supp. 3d at 1032; *SZ DJI Tech*, 2016 WL 8931302, at *3 (reviewing specification characterization of the invention).  Because NFLE has not (and cannot) show that Plaintiffs' allegations are not well-pled or that using relational metadata to improve digital television streams is abstract, NFLE's argument must fail.

Again, NFLE ignores the relevant time frame of the early 2000s when this invention was conceived.  As described in the Background, at that time metadata's usefulness was limited—especially considering the new opportunities being afforded by digital television.  '033 patent, 2:56-57.  Instead of simply describing information about just one piece of data (the conventional use of metadata), the

1  '033 patent invents a new use for metadata that describes a relationship between

2  two or more sets of data and encodes that within a video stream.  Compl., ¶¶ 91,

3  92; *see, e.g.*, '033 patent, Fig. 2, 8-10, 6:27-7:17, 10:53-16:63.  This might seem

4  simple in hindsight, but the relational metadata actually had to be linked to the

5  different sets so that they could be associated in the morass of digitized signals that

6  was being broadcast.  NFLE dismisses "relational metadata" as merely

7  complicated words—an invitation to the Court to ignore the actual invention (and

8  shows the untimeliness of NFLE's motion before *Markman*).  But its dismissals

9  aside, NFLE must deal with the technology as explained on the face of the patent.

10  Here, the words are complicated because the technology is complicated.

11  This is similar to the Federal Circuit's decision in *Enfish*, where the court

12  noted that the claimed self-referential database model "function[ed] differently

13  than conventional database structures."  *Enfish*, 822 F.3d at 1337.  Unlike

14  conventional logical models, the self-referential model could store all data entities

15  in a single table and define the table's columns by rows in that same table.  *Id.* at

16  1332.  The self-referential model improved the functioning of a computer by

17  permitting "faster searching of data," "more effective storage of data," and "more

18  flexibility in configuring the database."  *Id.* at 1333.  Here, the relational metadata

19  instruction allows for better and more effective use of the increased network

20  bandwidth and more flexibility in providing interactive content to a user.

21  NFLE's newspaper-editor analogy has no relationship to the actual

22  invention, but only to NFLE's own overly broad view of the patent, and does not

23  accurately account for the software and computerized elements in the claims.  A

24  newspaper editor is not a computer-readable storage medium comprising program

25  instructions.  A newspaper cannot issue a correction contemporaneously with the

26  version you are currently reading, nor could the same newspaper correct itself

27  several hours after you originally read it.  A newspaper, once received, is static.

28  The print, the pictures, the layout cannot change at all.  Nor does a newspaper

"broadcast" anything, let alone two different sets of data along with corresponding relationship data, and it does not account for an executable set of software instructions. Here, the invention is concerned with "automatically" performing a function. "[P]rocesses that automate tasks that humans are capable of performing are patent eligible if properly claimed." *McRO*, 837 F.3d at 1313. *See* '033 patent, Abstract (describing actions as "automatically performed"); *id.* at 3:5-7, 27-30. Editors are not automatons that automatically draft corrections after receiving a letter.

NFLE cites to easily distinguishable cases where patents claimed broad steps that involved receiving information and analyzing it, *with nothing more*. In *FairWarningIP*, the patent was generally directed to analyzing records of human activity and was merely collecting information. *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016).[6] In that case, there was nothing more, "such as identifying a particular tool for presentation." *Id.* Here, there is significantly more including a specific tool for the improvement—relational metadata and its corresponding structure. Like in *McRO*, there is an automatic use of a particular type of data. *See McRO*, 837 F.3d at 1314. The data must be of a specific type—a relational metadata instruction—it must be used in a specific way—as part of a program handling interactive television streaming—and it must contain additional information about the relationship, the linked data sets, and the action to be taken.

---

[6] Similarly, in *CalAmp Wireless Networks Corp. v. ORBCOMM, Inc.*, No. 2017 WL 536833, at *3 (E.D. Va. Feb. 9, 2017), the district court found that the patent was directed to nothing more than simple collecting and comparing of location information, which has been a human process for centuries and is therefore easily distinguishable. The case, here, however, is more akin to *CG Tech. Dev., LLC v. Bwin.party (USA), Inc.*, which also involved location information like in *CalAmp*, but the claim improved the "function of determining the mobile gaming device location via computer." 2016 WL 6089696, at *5.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.   <u>The '033 Patent Provides an Inventive Concept of Using a Relationship Identifier to Link Different Types of Metadata</u>

The inventive concept of the '033 Patent is to create a new type of metadata (a relational metadata instruction that is a specific type of data itself) that includes components that define a relationship between at least two other sets of data being used to deliver interactive television signals along with program instructions that allow for a host of functionality.  Compl., ¶¶ 91-92.  The '033 patent offers a hardware and software architecture that specifically incorporates components for injecting relational metadata into a programming stream and appropriately processing it.  '033 patent, Figs. 2, 8-10, 10:53-13:15.  But to actually use relational metadata, the metadata needs an "identifier" that links the metadata to the appropriate data sets, and a link to the appropriate set or sets of data.  '033 patent, 8:65-10:24.  The patent also discloses a relational-metadata processing engine that can manage this operation seamlessly to the end-user.  '033 patent, Fig. 9, 12:21-59; 14:20-15:64.  NFLE does not address these specific limitations or teachings at all.

If the patent is directed to nothing more than taking an action based on a relationship, then the claims add significantly more to this idea and do not threaten to preempt it all.  In *SZ DJI Tech.*, 2016 WL 8931302, the Court found that the patent at issue was "significantly narrower" than the defendant's purported abstract idea because it "address[ed] specific challenges" and its limitations were only directed towards solving those problems.  *Id.* at *7.  Here too, claim 27 is significantly narrower based on its limitations.  NFLE argues that the patent is not limited to any type of specific information, which is incorrect because the "information" is limited to a specific type of data (a relational metadata instruction) that is received from television data streams.  The '033 patent explicitly provides the type of actions one may take based on the identified relationship in the final limitation of claim 27.  '033 patent, claim 27, 18:67-19:2

17

(limiting the initiating action to "a summary, a correction, a repeat, a highlight, more detailed content, related text, and a related icon").  The '033 invention is limited to specific software because, by the terms of the claims, the software must be able to perform the limitations as stated.

NFLE also argues that metadata, by itself, cannot be inventive.  But this is not simply post-solution activity used by a generic, abstract claim as in the inapposite cases cited by NFLE.  Here, the *new type* of metadata is the essence of the invention—and the patent is not claiming just any metadata, but a very specific type of relational metadata that only has applicability to the specific field of interactive television broadcast signals.  This is likely why NFLE once again avoids the issue of preemption.  If the patent actually were directed to taking an action based on generic relationship data, this claim is narrowly tailored to a minuscule subset of such activity.  NFLE has failed to meet its burden to show patent ineligibility.

    **D.**    **Count 5: The '169 Patent Claims Patent-Eligible Subject Matter.**

        1.    <u>Another District Court Has Already Mooted an *Alice* Challenge to the '169 Patent Due to a Need for Claim Construction</u>

As an initial matter, this patent has already been challenged under *Alice* in another proceeding, and that court rejected the defendant's assertion that claim construction was not necessary.  Specifically, in *OpenTV, Inc. v. Netflix, Inc.*, 76 F. Supp. 3d 886, 890-892 (N.D. Cal. 2014).  Netflix argued for summary judgment that the '169 patent was abstract and patent ineligible.  *Id.* at Dkt No. 50.  Netflix contended, as NFLE does here, that "[o]n its face, this claim is directed to an abstract idea" and that there is nothing that could not be performed in the mind of a person, or perhaps on pen and paper.  *Id.*  The court held that it would be premature to decide this question without claim construction because "this is not clearly an instance where the patentee is merely attempting to claim a computer-based implementation of a long-established concept or practice" and that "the

patent appears to be directed at providing a technological solution to a problem that arises in the computer/interactive television context."  *OpenTV, Inc.*, 76 F. Supp. 3d at 890-892.  As properly construed, the claims are rooted in complex technology and overcome a discrete technical problem.

> 2.   The Technological Improvement Claimed by the '169 Patent is Directed to Automatically Managing Essential Interactive Television Resources

NFLE argues that the '169 patent is directed to nothing more than "not beginning a presentation until certain resources are required."  Dkt. 23, at 16. Based on the evidence, however, Plaintiffs allege that the '169 patent is directed toward improving interactive television functionality through creating and controlling interactive television distribution.  Compl., ¶ 115; '169 patent, Title; *id.* at Abstract ("A method and mechanism for enabling the creation and/or control of interactive television content using declarative-like directives such as HTML, scripting languages, or other languages."); *id.* at Field of the Invention ("The invention relates generally to interactive television systems and more particularly to a system and method for creating and controlling interactive television content."); *id.* at claim 1.

NFLE has not shown that improving interactive television distribution is abstract.  The patent claims priority to at least June 30, 2001.  Compl., ¶ 116. Controlling digital and interactive television distribution was not a basic or longstanding economic or business practice.  It cannot be practiced in the human mind and requires specific technology to manage the distribution.  Based on NFLE's complete failure to address the allegations as stated, its motion must fail.

The specificity of this invention is made clear by understanding the particular problems in the prior art that the invention overcame.  The state of television broadcast in 2001 was that many transmissions were inefficiently broadcast in a cyclical or repeating format, referred to as a "carousel," discussed at

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS– 2:17-CV-3919-AB-SK

1   length in the specification.  *See, e.g.*, '169 Patent, 1:43-67.  This convention was

2   used, at that time, because it was too burdensome to ensure that end users had all

3   the necessary information, so it was looped and therefore assumed that the user

4   would eventually receive the data.  The various types of hardware and digital

5   signals that were being used further complicated this problem:

6       As television receivers become more sophisticated, and include the
        ability to access a wider range of data and resources, efforts have been
7       made to develop mechanisms to handle these additional resources. For
        example, the DVB MHP 1.1 specification and DAVIC 1.4.1 Part 9
8       specification define a URL scheme to access broadcast
        services….***Unfortunately, such schemes may not work on ATSC***
9       ***networks or other networks that define different or even proprietary***
10      ***signaling formats. Therefore, a new more flexible scheme is desired***.

11

12  '169 patent, 2:17-30 (emphasis added).  There was thus a critical need in 2001 for

13  "a new more flexible scheme" to allow reliable delivery of interactive

14  presentations to users and to ensure that a program had the required resources to

15  play before it started.  '169 patent, Abstract, Fig. 5, 2:28-29, 2:40-47.  This

16  invention is directed to solving that unique network transmission problem

17  applicable to interactive digital television.

18      Indeed, this patent is similar in nature to the patents considered by this Court

19  in *Timeplay*, 2015 WL 9695321, where the defendant argued that the patent was

20  "nothing more than the abstract idea of allowing multiple people to play a game

21  together on a shared display using generic computer and communications

22  hardware."  *Id.* at *2.  Here, according to NFLE, the patent is nothing more than

23  distributing a presentation for multiple people on a shared communications

24  network.  But in *Timeplay*, the Court found that the patent is designed to solve a

25  problem particularly originating in this space and that "Defendant has not pointed

26  to any authority compelling the conclusion that such an idea, which is by definition

27  limited to the field of multi-player gaming and which requires the use of multiple

28  hardware components–unlike the claims in *Bilski* and *Alice* which, at least in

20

theory, could be performed without a computer—is "abstract" within the meaning of Section 101." *Id.* at *6-8.

NFLE offers no evidence or support for its argument.  In fact, NFLE entirely ignores the background of the invention and the technological problems the invention overcame, opting instead to frame the invention as a simple rhetorical question: "do I have everything I need to get started?"  The claim is not directed to plays, orchestral performances, or other live human events wherein humans control the action and provide the resources manually.  None of the fanciful analogies on which NFLE relies actually address the import of the technological solution— ensuring efficient and reliable display of interactive, digital television content. "The Federal Circuit has cautioned that courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims."  *SZ DJI Tech.*, 2016 WL 8931302, at *2 (quoting *McRO*, 837 F.3d at **7); *Enfish*, 822 F.3d at 1337 ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.").

Even if the claim were only about asking if you have necessary resources, here the specific context is essential: it is a computer communicating with one or more other computers regarding whether necessary resources are present.  The invention is not merely using technology to do something—it is using technology to overcome a problem germane only to that technology.  The computer has to understand what a prerequisite resource is and what it means to possess that resource.  Compl., ¶ 115.  If a person rhetorically asks herself "do I have everything I need to proceed?" she will understand the question based on all the foundations of language and assumptions already present in her mind.  A computer has no such foundation or set of assumptions.  The problem is amplified enormously when that computer must then talk to and direct one or more other devices.  This is a very narrow issue unique to this technological space.

Finally, the automatic nature of the invention easily distinguishes this case from *Ultramercial*, which merely facilitated a user engaging in classic economic activity but on a computer.  This Court discussed *Ultramercial* as holding that an abstract concept is one that "has no particular concrete or tangible form."  *SZ DJI Tech.*, 2016 WL 8931302, at *2.  Here, the invention's specific form requires an inventive computer system which identifies, in advance, the specific presentation-related resources that the system will need to play the content efficiently and reliably, and it is improved so that it can, ***on its own***, identified content steams from proceeding through an automatic control over the whole process.

The patent itself states the invention is not conventional, but an innovative improvement to the prior art that allowed for greater flexibility based on the network architectures and formats.  '169 patent, 2:16-29.  Based on the procedural posture and NFLE's failure to substantively engage with the invention as written, NFLE's motion to dismiss should be denied.

> 3. The '169 Patent Provides an Inventive Concept of Managing Multiple Broadcasts Based on an Unambiguous Scripting Language

NFLE's argument that the claims do not specify "how" the invention works also ignores the claim limitations as written and the immense teachings in the specification.  The '169 patent describes a particular solution that requires automatic creation and parsing of directives, which are encoded with the video and audio stream, that would indicate the need for prerequisite resources and delaying the content presentation until those (required) resources are delivered.  Compl., ¶ 114.  These "directives" and "prerequisite directives" enable efficient and reliable display of content by identifying (in advance) the specific resources that the system will need to reliably and effectively communicate what particular resources are prerequisites.  *See, e.g.*, '169 patent at Fig. 5, 2:40-47.

Any arguments that the patent needs to teach more at this stage are both

22

legally wrong, as explained above, and contradicted by the immense detail in the fifty-one column specification that includes numerous source code examples and teachings.  *Id.* at cols. 9-13 (providing a detailed description of how to apply the described scripting language for tuning and stream selection); cols. 13-23 (describing the scripting language for how to control the display and provide output of content); cols. 23-34 (describing how to obtain non-audio/video resources); cols. 34-42 (describing how user interaction can be supported).

Many of the sections include detailed code-based examples providing additional support for the described embodiments.  There are over thirty-five source code examples in the specification that detail the underlying flexible approach, such things as "URL Used for Tuning and Stream Selection," "A/V MIME Types," "TVPipe Object," "TVComponent Object," "Obtaining Non-AV Resources," "Access to Broadcast Resources," "farPrefetch Method," "TVLink Object," "Protecting Access to Key Resources," "Showstopper and Prefetch Requirements," and "Path Segments."  *See, e.g.,* '169 patent, Figs. 1-5, 9:45-10:17, 10:44-54, 13:5-62, 23:30-24:60, 31:35-32:47, 44:31-46:53, 47:23-50:45, 51:17-56. The specification and evidence confirm that the claims contain inventive concepts. *Enfish*, 822 F.3d at 1337; *McRO*, 837 F.3d at 1315.  NFLE's arguments that the claim limitations are too broadly claimed only suggest a need for claim construction.  Based on the pleadings and the factual evidence the claimed solution is tangible and specific.

If the claim is merely directed to the basic concept of asking if you have what you need, then the claim and specification leave no doubt that the invention is only a very limited way of doing that and only in the technological space of digital television distribution.  The '169 patent does not append conventional computer components to a long-standing or fundamental idea, but provides a specific technological improvement that allows for flexible control to automatically distribute and manage resources and is patent-eligible.  NFLE has failed to meet its

burden to show patent ineligibility.

**E.   Count 6: The '888 Patent Claims Patent-Eligible Subject Matter.**

1. <u>The Technological Improvement Claimed by the '888 Patent Creates a New Type of Data Used for Digital and Interactive Television</u>

NFLE argues that the '888 patent is simply directed to organizing and combining media information for transmission. Dkt. 23, at 21. Again, this ignores much of the specifics of the invention; it does not account for the fact that it is directed to interactive television or that it must be used on a variety of different devices. Compl., ¶ 137. The '888 patent is directed to the creation of an "omnimedia" data stream that takes "a variable number of disparate streams of data" and packages them together into one coherent package. '888 patent, Abstract. Thus, the invention is directed to creating digital transmission formats that allow for transmitting a combination of different data streams as one stream. Compl., ¶ 138. This allegation is based on the intrinsic evidence. *See, e.g.*, '888 patent, Title ("System And Method For Providing An Omnimedia Package."); *id.* at Field of Invention ("The present invention relates to enhanced multimedia television and more particularly to a system and method for organization, combination, transmission and reception of media from a range of sources wherein the media may comprise a plurality of video streams, audio streams, and other information, such as may be accessed via the Internet."); claim 1 ("A method for producing a broadcast stream that contains various stream types of audio content, video content, and metadata content…."). NFLE offers no evidence or even argument that a specific claimed method for creation of a new type of digital content stream was a well-known or long-standing economic or business practice at the time of the invention in November 2000. Compl., ¶ 139. Similarly, there is no way for someone to create and distribute a broadcast stream, which includes video, audio and metadata components only in their mind.

24

1    The '888 invention is also meaningfully directed only to the digital

2  television space.  It is not insignificant pre- or post-solution activity.  NFLE's

3  arguments are similar to those rejected in *SZ DJI Tech.*,

4  2016 WL 8931302 (C.D. Cal. Oct. 13, 2016) where the Court found that based on

5  the claim language and patent specification, the defendant's "characterization of

6  the invention...also ignores the stated purpose of the invention, which is to provide

7  solutions to several problems faced specifically in UAV technology." *Id.*  Here,

8  NFLE also neglects to address either the claim's actual purpose or the fact that the

9  solution is directed to the creation of this omnimedia stream, which, for example,

10  requires a framework definition that could account for a variety of input and output

11  video, audio and metadata formats such that the resulting omnimedia broadcast

12  stream can be used by different customers which may have different equipment

13  requirements.  Compl., ¶ 137; '888 patent, 1:63-2:64.  To account for the variety of

14  different stream types, the invention converts the input streams to useable output

15  formats, packages the resulting omnimedia stream, and sends it to receivers that

16  check which stream types available in the omnimedia stream they are compatible

17  with.  *Id.*  Just saying "organize and distribute the data" does not sufficiently

18  account for the technological hurdles that need to be overcome and would leave

19  one with a useless jumble of digital information.  Unlike NFLE's flawed analogy,

20  the invention provides something tangible and useful.  *Evolved Wireless, LLC v.*

21  *Apple Inc.*, No. 15-cv-542,  2016 WL 6440137, at *7 (D. Del. Oct. 31, 2016)

22  ("Because the '916 and '481 patents are directed to technological improvements

23  resolving specific problems in a wireless communications system, the court finds

24  that they claim patent-eligible subject matter under § 101."); *Personalized Media*

25  *Commc'ns*, *LLC v. Funai Elec. Co.*, No 16-cv-105, 2017 WL 957719, at *2 (E.D.

26  Tex. Feb. 22, 2017. ("The Court finds, however, that the [patents] address a

27  specific technological problem rooted in signal transmission and

28  processing…correctly identifying the content of different media received in

1   multiple signals to produce a coordinated presentation using two of the received
2   media…[and] a process of matching a 'signal processing scheme' to the variable
3   format of a received digital signal to output television programming.").

4        NFLE's *own description* recognizes that the '888 patent is not directed to an
5   abstract idea.  Something that combines and organizes media information for
6   transmission necessarily requires a tangible device to effect that transmission and
7   implicitly requires an architecture that would allow for data to be packaged,
8   distributed, received, and understood in a usable way.  NFLE's motion includes
9   quotes from the specification that prove this point.  Dkt. 23, at 22-23 (quoting '888
10  patent, 1:50-55, which describes the invention as "a transmission system to
11  organize and transmit a related set of media and for a display platform to organize
12  and render related media information in a manner that reflects the available media
13  and the capabilities of the platform.").  Thus, NFLE concedes that this invention
14  provides significantly more than merely "organizing" and "combining."

15       Nor is this invention like the claims at issue in *Digitech*, or NFLE's other
16  cited cases where abstract ideas that were ***all*** that was claimed.  In *Signal IP, Inc.*,
17  2016 WL 1693091, at *8, the Court explained that "*Digitech* concluded that the
18  patent simply sought to claim a process for combining the two data sets into a
19  single data set…is not patent eligible," if that was all it claimed:

20       Claim 6 of the '775 Patent is different.  It includes specific limitations
         that recite a specific process for transforming two types of data into a
21       single, efficient data stream by use of a 'message rate interval' and
22       fragmentation of messages.  For these reasons, the '775 Patent, both in
         the written description and in the claims, sets forth and addresses a
23       technical problem and its solution."  *Id.*
24

25  *See also Hughes*, 59 F. Supp. 3d at 987 ("This simplistic take on *Digitech* would
26  eviscerate all software patents, a result that contradicts Congress's actions and the
27  Supreme Court's guidance that software may be patentable if it improves the
28  functioning of a computer.").  Nor is it like *Electric Power* where the claims

26

1    vaguely were directed to collecting "information" and nothing more.  In *Electric*

2    *Power*, the Federal Circuit said the question cannot be just whether an invention

3    "select[s] information" but on "any requirements for *how* the desired result is

4    achieved."  As described below, the how is explicitly laid out in the claim.

5    NFLE also cites this Court's decision in *Groundswell Techs.*, 2016 WL

6    6661177.  But there, the patent was merely directed to using technology to speed

7    up what had already been done—adding information to maps.  Id. at *2, *8

8    (finding that the incorporated technology did nothing more than "function solely as

9    an obvious mechanism for permitting a solution to be achieved more quickly, i.e.,

10   through the utilization of a computer for performing calculations").  Here,

11   however, the technology is an integral component to providing an entirely new

12   type of digital television data.  Moreover, the patent at issue in *Groundswell* did

13   not contain any inventive concept or meaningfully limit the invention.  *Id*.  This is

14   not the case with the '888 invention which creates a new type of digital data stream

15   that is created from disparate video, audio and multimedia data types that are

16   converted into formats useable by receivers with different capabilities via a

17   framework definition and data type conversion technology, and are transmitted to

18   receivers with varied capabilities, making it possible for each receiver to operate

19   on stream types it is capable of handling.  The patent is not only claiming a new

20   type of data but also a specific process to create it and the ability to stream it to a

21   variety of receivers with differing capabilities.  This is not abstract.

22           2.      The '888 Patent Provides an Inventive Concept of Creating a
                     Framework Definition to Manage the Omnimedia Stream
23

24   NFLE asks the Court to ignore the claim's specificity as "prolix."  But the

25   Court cannot ignore the claims as written.  Even if the Court accepts NFLE's

26   description that the patent is directed to organizing and combining media

27   information for transmission and that this is abstract, claim 1 requires specific

28   technological components (video, audio, and metadata streams that may be

27

converted; a "framework definition;" a combined "broadcast stream") that work together in specific ways to compare and convert the video, audio, and metadata streams into a single, cohesive stream that can be transmitted to a "plurality of receivers." This inventive detail transforms any alleged abstract idea into a patent-eligible invention. For example, the "framework definition" contributes to management of otherwise disparate and potentially incompatible data types such that they can be compared and converted, making them useable by a variety of receivers with different capabilities. *Bascom*, 827 F.3d 1341 at 1350–51 ("[T]he inventors recognized there could be a filter implementation ***versatile enough that it could be adapted to many different users' preferences*** while also installed remotely in a single location.") (emphasis added).

NFLE assiduously avoids any discussion of the "framework definition" in its argument despite the fact that it is a claim limitation, because that limitation helps prove this patent "focus[es] on a specific means or method that improves the relevant technology." *McRO*, 837 F.3d at 1314. As another example, the creation and transmission to receivers of a menu descriptive of the audio, video and metadata content, and having receivers check which stream types are useable are not conventional operations. The claimed "framework definition" and the data type comparison, conversion, packaging and transmission steps allow these packaged streams to be created and transmitted to a variety of different devices. '888 patent, 6:45-8:18 (discussing the framework definition and providing a source code example); Fig. 2, 8:20-9:67.

NFLE argues that the claim fails because it is not tied to specific structures or machines. The Court rejected a similar argument in *Signal IP, Inc.*, 2016 WL 1693091, at *7-8, for the same reason the Court rejected the analogy to *Digitech*:

> Although not tied to specific structures or machines, claim 6 *contains meaningful limitations that represent sufficiently-inventive concepts*. These include the combination of two different types of data streams…to ensure an efficient transmission of both types of data.

> This particular method of packaging data is not necessary or obvious for achieving data transmission…the method claims an inventive concept in the realm of data communications over a single communication link, rendering the claim patent-eligible. *Id* at *8.

Packaging multiple different types of data through a particular framework definition also ensures efficient transmission of more data and improves data transmission using very specific steps, rendering claim 1 patent-eligible. NFLE has failed to meet its burden to show patent ineligibility.

**F.    Count 7: The '736 Patent Claims Patent-Eligible Subject Matter.**

   1.    <u>The Technological Improvement Claimed by the '736 Patent Is Directed to Establishing a Communications Link with a Viewer Based on a Signal in the Television Broadcast Stream</u>

NFLE argues that Claim 8 of the '736 patent is directed to nothing more than indicating information is available and accessing that information. That incorrectly ignores the intrinsic evidence. Claim 8 is directed to overcoming the technological problem of how to provide a direct communication link with an online information provider and a user that is facilitated through a video program data stream but that is not ultimately controlled by a broadcast or cable television operator. Compl., ¶ 161; '736 patent, Abstract; *id.* at 1:6-12 ("The present invention relates to an electronic information access system and more specifically to a media online services access system which provides direct, automated access to an online information provider through an address embedded in an electronic signal which carries a program segment (e.g., through television, radio, or a pre-recorded video or audio medium)."); claim 8 ("A method of providing to a user of online information services automatic and direct access to online information through a link provided in a video program…."). NFLE has not addressed the true nature of the claim and thus its motion to dismiss fails.

NFLE's oversimplification benefits from hindsight. This invention dates to the early days of digital and interactive television, having been filed in 1996 but

1   claiming priority to September 1995, and references services such as Prodigy,

2   America Online, and Compuserve that seem arcane now.  Compl., ¶ 162; '736

3   patent, 1:34-40.  At the time, however, this was cutting-edge technology that was

4   offering a wholly new model for viewing and processing data.  There were very

5   few people with Internet access, and broadcast television was very different than

6   what we now experience.  *Id.*  The central problem at issue was not just how to

7   indicate that information was available, as NFLE would have the Court believe,

8   but how to allow someone other than the "broadcast or cable television operator"

9   to disseminate information.  '736 patent, 1:23-26 ("In such systems, the selection

10   of information services has been entirely within the control of the broadcast or

11   cable television operator.").  This had not been done before.  "No system yet exists

12   which provides automated and direct user access to online information providers

13   through an address embedded in a video or audio program signal."  *Id.* at 1:29-33;

14   2:23-57; 2:63-67 ("By contrast, the present invention facilitates direct automated

15   user access to an unlimited number of online information providers through

16   provider addresses which are embedded in the electronic signal which carries an

17   video or audio program.").  NFLE cannot point to any evidence to support its claim

18   that this idea was abstract in 1995.

19       The Federal Circuit's opinion in *DDR Holdings* is on point.  The invention

20   here is "not merely [] the performance of some business practice known from the

21   pre-Internet world along with the requirement to perform it on the Internet," but

22   instead is "rooted in computer technology in order to overcome a problem

23   specifically arising in the realm" of interactive television networks.  *See DDR*

24   *Holdings*, 773 F.3d at 1257.  There, a user could access a third-party's information

25   on a website without leaving the website itself.  *Id.*  Here, a viewer can establish

26   contact with an information provider based on the signal in the broadcast stream.

27       NFLE makes the same type of analogies that were unpersuasive in *DDR*

28   *Holdings*.  NFLE compares the invention to a librarian directing a student to a

1   book.  In *DDR Holdings*, the defendant compared the invention to a store-within-a-

2   store, an advertisement at a physical location.  But just as the invention in *DDR*

3   *Holdings* had no equivalent in the brick and mortar context, here there is no

4   equivalent in the television space.  First, merely pointing a student to a book does

5   not automatically deliver information, nor can student instantaneously receive a

6   catalog or updated pricing information.  The patent's own terms actually

7   distinguish it from this analogy:

8       At the same time, some television and radio broadcasters have begun
9       announcing an Internet address for viewer inquiries during the course
        of program transmission.  Access to this Internet address requires the
10      user to utilize his or her computer.  No system yet exists which
        provides automated and direct user access to online information
11      providers through an address embedded in a video or audio program
12      signal.

13  '736 patent, 1:25-33.  Here, there also is no possibility that the student will be

14  "suddenly and completely" transported to the resource, especially if it is a third-

15  party resource like the type of information that is discussed in the '736 patent.

16  *DDR Holdings*, 773 F.3d at 1258.

17      The factual evidence confirms that the '736 patent is directed to an

18  improvement in technology, which is necessarily rooted in interactive television

19  and computer network technology, and overcomes a problem specifically arising in

20  the realm of computer networks—namely, how to establish a direct link between a

21  user and another party based on the video program stream.

22              2.      The '736 Patent Provides an Inventive Concept

23      If the '736 patent is only directed to "linking to information," then clearly

24  the patent provides something more to this abstract concept.  A television signal

25  operating in its normal, expected manner does not transmit a signal that can be

26  used to create a separate transmission between an information provider and the

27  user.  But here, the claimed invention provides an interactive communication

28  mechanism within a video program signal that allows the viewer to be able to

31

1   access additional information from another party so that the user has direct access

2   to the information.  Taken together as an ordered combination, these claims recite

3   an invention that is "not merely the routine or conventional use" of a television

4   signal, but transforms it into a true interactive experience.  *See DDR Holdings*, at

5   773 F.3d at 1258-59.

6        NFLE argues that the "link" claimed in the '736 patent is just a conventional

7   Internet link.  First, NFLE has not offered any evidence that there was such a thing

8   as a conventional hyperlink in the mid-1990s such that it could be considered a

9   long-standing, fundamental, or routine concept.  *Transp. Techs., LLC v. Los*

10  *Angeles Cty. Metro. Transportation Auth.*, No. 15-cv-6423, 2016 WL 7444679, at

11  *6 (C.D. Cal. July 22, 2016) ("Considering only the allegations contained in the

12  pleadings and documents attached to the pleadings for purposes of this Motion,

13  there is no record of the technology described in the '101 Patent being well-known

14  at the time of filing.").  Second, the claimed link is not conventional because it is

15  not found on a webpage.  Instead, it is included with a video program stream.  This

16  was and is an unconventional use of video programming and an unconventional

17  placement for a hyperlink.  In any event, NFLE focuses too much on the "Internet"

18  to prove abstractness.  It is not the "use of the Internet" that makes the claim

19  inventive.  It is providing a new way to automatically and directly interact with

20  third parties while watching television based on the video program stream but

21  independent of broadcast and cable news operators' control.  This is not "a

22  situation where general-purpose computer components are added post-hoc to a

23  fundamental economic practice or mathematical equation." *Enfish*, 822 F.3d at

24  1339.

25       Like all the inventions at issue, the invention of the '736 patent does not

26  simply use a computer to automate what was done previously, but rather does

27  something new and expands the functionality of television program signals.  NFLE

28  has failed to meet its burden to show patent ineligibility.

### G.   Count 8: The '172 Patent Claims Patent-Eligible Subject Matter.

1.   The Technological Improvement Claimed by the '172 Patent Is Directed to Limiting Information Distribution on a Communications Network Based on Geographic Location

NFLE argues that claim 19 of the '172 patent is directed to limiting access to information based on location.  Dkt. 23, at 31.  This ignores a crucial aspect that the purpose of the claim is about "limiting distribution of information on a *communication network* based on geographic location."  '172 patent, Title; *id.* at Field of Invention ("The present invention relates, generally, to a system, process and article of manufacture for limiting the distribution of information on a *communications network* based on geographic location…."); Compl., at ¶ 182.  In particular, the purpose of claim 19 is to improve communications over a specific type of a communications network, the Internet.  '172 patent, claim 19 ("A method for controlling *communications* between *first and second communications units* coupled for communication over the *Internet*….").

The Background of the Patent begins by explaining the enormous potential this new, expanded marketplace and network to distribute content, which stresses the unique need for content providers to be able to meaningfully limit the distribution of any digital content in a globally accessible medium

> By employing the internet or web, companies and groups of all sizes
> and individuals may have, in effect, a world-wide market in which to
> distribute information, products and services through the internet or
> web… However, such a geographically expansive marketplace can be
> problematic for providers of some products and services. Consider,
> for example, a company or individual involved in the business of
> selling a product or service, but which is constrained under statute or
> contract to a limited geographic sales region…

'172 patent, 1:17-2:2.  In order to control the distribution of content to particular geographic regions the invention employs specific technology to calculate the geographic location of a requesting user device and enforcing content distribution rules governed by the location information of the requesting user device.  *Id.* at

33

2:30-61.  For this reason the '172 patent is classified under the International Classification of H04B7/185, which corresponds to "Network architectures or network communication protocols for network security for controlling access to network resources."  It was not an abstract, well-known or conventional practice to limit distribution of content on a communications network at the time of invention, and it was certainly not conventionally known to do so in order to control communications between communication units on the Internet, within specific geographic areas, as claim 19 expressly requires.  NFLE refuses to meaningfully engage the technological nature of the invention because to do so would require it to admit that the purpose of claim 19 is to provide "a specific improvement to computer functionality" through enhanced network capability, instead of being "merely a conduit for the abstract idea."  *See Polaris*, 223 F. Supp. 3d at 1033.

Instead, NFLE focuses on the invention's use of geographic location data arguing that it is nothing more than an abstract concept of knowing where someone is.  But the patent claims much more here—it employs geographic location data to control the distribution of content to individual user devices.  In one preferred embodiment GPS satellite data is used to calculate the location information of individual user devices.  '172 patent, Fig. 1, 2:31-61.  This aspect of the claim is actually more directed to the specific inventive concept claim 19 as discussed below, but nevertheless also highlights that the patent is not directed to any longstanding idea.  Compl., ¶ 182.  Location systems such as GPS satellites, for example, were only available for civilian use starting in the mid to late 1990s.  More generally, the "location information" in claim 19 is not mere geographic data, but is received over the Internet and corresponds to a communication unit coupled to that electronic network.  *Id.*; '172 patent, claim 19.  It could not have been conventional to practice this idea circa November 2000, at the time of the invention, and there is no evidence, from NFLE, that improving Internet computer networks or using geographic data to do so, was a fundamental business practice.

*Timeplay, Inc.*, 2015 WL 9695321, at *7 ("The claims of the '124 Patent do not embody, much less recite, any of the categories of ideas held by the Supreme Court to be 'abstract'...the claims do not recite mathematical formulae, algorithms, computer software, or fundamental business practices.").  Further, claim 19 is not directed to a mere idea that can be practiced in the human mind.  It requires specific components coupled to a specific type of communications network.

NFLE makes a conclusory statement that restricting the invention's application to a communications network or involving geographic data does not change the analysis.  Dkt. 23, at 32.  On the contrary, these are precisely the technical aspects of the claim that are material to patent eligibility.  Using new technology to provide specific improvements for computer and digital networks, so that the system can automatically determine whether particular communications units (and their users) can access certain types of data based on their location, is specifically rooted in technology and requires a tangible, specific process.  In *InfoGation Corp. v. ZTE Corp.*, No. 16-cv-01901, 2017 WL 1135638, at *1 (S.D. Cal. Mar. 27, 2017), the court examined a mobile navigation patent that provided certain real-time information to a user's location as determined by their mobile device.  *Id.*  The court found that the patent was not directed to an abstract idea, but "[r]ather the claim is directed to improving an existing technological process, specifically *how an online server communicates* in real-time with a local mapping database within a mobile navigation system."  *Id.* at *6; *see Hughes Commc'ns Inc.*, 59 F. Supp. 3d at 987 ("[S]ome abstract ideas may become patentable if they are tied to uniquely designed machines with specific purposes."); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 179 F. Supp. 3d 339 (D. Del. 2016) (finding that patents related to monitoring and surveillance of computer networks for intrusion detections were not ineligible).  Here too, the purpose of claim 19 is to improve how an Internet server communicates with user devices.

In both of the cases on which NFLE relies, the claims simply tether an

35

abstract idea to a computer technology—they did not effect an improvement in the technology itself.  Dkt. 23 at 33-34.  Here, however, improving how an Internet communications server can function is central to the purpose of the claims as explained by the written description.  Indeed, the specificity of this invention is highlighted by NFLE's inapposite examples, comparing the invention to a newspaper restricting advertisements or a sports-broadcast being blocked out for a region.  The purpose of this invention is not to halt access broadly to an entire area, but to determine if one individual or user's communications unit is within that area and act accordingly for each separate request.  '172 patent, 1:64-2:2 ("Thus, in a number of contexts, there is a need in the industry for a system by which a provider of a service or product on the internet or web may readily limit access to the product or service, based on the geographic region ***in which the user requesting the product or service is located***."); *id.* at 5:9-51.  A sports broadcast is blacked out because affiliates in certain regions are told not to show it.  The patent, however, is directed to a different paradigm where the determination is made separately for each individual user.  *Id.*; Compl., ¶ 182 ("The server may then perform another specialized routine to deny information to the user computer based on the geographic location, or to provide over the Internet communication network only certain information to the restricted region computer.").  As such, the geographic location of the user can change and access to content within the precise location area of the user as she continues to move about can be controlled automatically and intelligently.  This is a problem unique to the Internet where a user's location often varies.  For example, someone who is in Los Angeles may be able to access certain NFL content over a network, but if they travel to someplace outside that region location-based restrictions, contractual or otherwise, may restrict content accessibility for that same user with the same communications unit (e.g., computer or smart phone).

   Claim 19 is not directed to an abstract idea but, rather, to a specific

technological system designed to improve information distribution on an Internet communications network.  *See Vehicle IP, LLC v. AT&T Mobility LLC*, No. 09-cv-1007 2016 WL 5662004, at *5 (D. Del. Sept. 29, 2016).

2.    The '172 Patent Claims an Inventive Solution

Having misunderstood the purpose of the invention, NFLE compounds its error by mischaracterizing the inventive solution.  Claim 19 is not directed to conventional technology or well-understood activity.  As explained above, the application of digital geographic data was not conventional at the time of the invention; location detection, such as GPS, was not made available for civilian use until nearly contemporaneously with this patent, and the Internet itself came into widespread use only a few years before the filing date.  *See, e.g.*, '172 patent at 1:18-20 ("The internet and world wide web have opened *vast new global marketplaces and opportunities…*").  The complaint's allegations and the patent itself demonstrate an improvement to Internet communications network technology by selectively leveraging geographic location data that is distributed over the network.  Compl., ¶ 182; '172 patent, 2:43-45 ("The geographic position information is used to determine whether or not the processor requesting the information is within a restricted (or limited) or non-restricted region."); claim 19 ("receiving location information over the Internet with the first communications unit, the location information corresponding to the geographic location of the second communications unit").  The specification provides a fulsome description that enables and teaches how to seamlessly use this new technology through specialized comparison routines.  *See, e.g.*, '172 patent, 6:57-7:67.

This new technology, including the recent advances in using automatically determined geographic data distributed over communications networks (such as GPS information or other electronically-derived and delivered location information) was inventive and effects an improvement in this technical field. *See Alice*, 134 S.Ct. at 2359 (internal citations omitted).  The '172 patent sets forth and

37

addresses a technical problem and its solution "in order to overcome a problem specifically arising in the realm of computer networks." *See DDR Holdings*, 773 F.3d at 1257.  The Federal Circuit has explained that a process, such as this, that necessarily integrates this very technology, is inventive.  In *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010), the court explained that a "GPS receiver" was "integral to each of the claims at issue." *Id.* at 1332.  The Court focused on the fact that the "methods at issue could *not be performed* without the use of a GPS receiver," and there was no evidence that "the calculations ... can be performed entirely in the human mind."  *Id.* at 1332–33.  Here, too, the inclusion of the location data (GPS generated or otherwise) is integral to the claimed method.  This data plays "a significant part in permitting the claimed method to be performed"—indeed, it is essential to the inventive concept—"rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *See Groundswell Techs.*, 2016 WL 6661177, at *8; *see SZ DJI Tech.*, 2016 WL 8931302, at *5 ("Here, the claims of the '506 Patent are specifically tied to a system for controlling a UAV that is integral to tracking targets by processing target information and adjusting the UAV and an imaging device according to certain parameters."); ."); *Modern Telecom Sys. v. Lenovo Inc.*, No. 14-cv-1266, 2015 WL 7776873, at *11 (C.D. Cal. Dec. 2, 2015); *X One, Inc. v. Uber Techs., Inc.*, 16-cv-06050, 2017 WL 878381, at *17 (N.D. Cal. Mar. 6, 2017) (claim directed to solving "problems in the conventional GPS tracking technology" were patent eligible).

Claim 19 provides an ordered combination that uses communication devices, the Internet, and geographic location data sent over the network, in order to decide how information should be controlled and distributed on a per device basis.  Other than NFLE's supposition, there is nothing establishing that this combination of new technologies is conventional.  Based on this record, NFLE's motion must fail:

38

1
2
3
4
5
6

Considering only the allegations contained in the pleadings and documents attached to the pleadings for purposes of this Motion, there is no record of the technology described in the '101 Patent being well-known at the time of filing or simply involving performance of "well-understood, routine, and conventional activities commonly used in the industry"….Thus, on the face of the '101 Patent, the claims are directed to a new means for traffic monitoring and for the automatic identification of a vehicle as it passes through a toll gate, which is an improvement on existing systems.

7

*Transp. Techs.*, 2016 WL 7444679, at *6.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

NFLE argues the Court should ignore this inventive ordered combination because the patent states that any geographic signal could be used or because any data processing may be used.  Dkt. 23, at 34.[7]  But that does not negate the evidence that using communications unit location data to manage communications over the Internet was new at the time of the invention.  It is allowable and common for a patentee to not limit her invention to the known methods of the day.  *Polaris Innovations*, 223 F. Supp. 3d at 1033–35 ("But though these individual components themselves function as they otherwise would…[t]he patents thus claim the enhanced performance [based on new combination of otherwise known components].").  More importantly, NFLE improperly frames the inquiry to avoid addressing whether the claims "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery."  *McRO*, 837 F.3d at 1314.  The claim limitations are the unique and specific computerized tools of the inventive concept; they are not an echo of any abstract idea and do not merely invoke generic processes or machinery.  NFLE cannot substantively engage with the role played by this combination of specific technology without conceding

26
27
28

---

[7] At best, NFLE's argument highlights the need for claim construction, including the scope of "location information," "first/second communication units" and "first / second information."

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS– 2:17-CV-3919-AB-SK

1 that the invention actually claims a concrete method to improve computer network

2 communications through digital geographic data.

3   Nor should the claim be undone because it requires specialized software and

4 comparison routines. "Software can make non-abstract improvements to computer

5 technology just as hardware improvements can, and sometimes the improvements

6 can be accomplished through either route." *Enfish*, 822 F.3d at 1335; *id.* at 1339

7 ("Much of the advancement made in computer technology consists of

8 improvements to software that, by their very nature, may not be defined by

9 particular physical features but rather by logical structures and processes.");

10 *Trading Techs.*, 675 Fed. Appx. at 1005 ("For some computer-implemented

11 methods, software may be essential to conduct the contemplated improvements.)"

12   Based on the evidence before the Court, including the complaint's

13 allegations, the '172 patent claims an inventive concept in the realm of data

14 communications by using geographic location data to direct content on a per

15 device basis.

**III. CONCLUSION**

17   For the reasons above, Plaintiffs respectfully request that the Court deny

18 NFLE's Rule 12(b)(6) motion to dismiss for failure to state a claim.

Dated:  July 14, 2017    FEINBERG DAY ALBERTI &
              THOMPSON LLP

              By: */s/ Elizabeth Day*
               Elizabeth Day

              Attorneys for Plaintiffs
              NAGRAVISION SA AND OPENTV, INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on June 20, 2017, the foregoing document was electronically filed with the Clerk of the Court for the UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA, using the Court's Electronic Case Filing (ECF) system. The ECF system routinely sends a "Notice of Electronic Filing" to all attorneys of record who have consented to accept this notice as service of this document by electronic means. Any party not receiving the Court's electronic notification will be sent a copy of the foregoing document.

July 14, 2017

/s/ Elizabeth Day

Elizabeth Day

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS– 2:17-CV-3919-AB-SK