1   M. ELIZABETH DAY (SBN 177125)
    eday@feinday.com
2   MARC BELLOLI (SBN 244290)
    mbelloli@feinday.com
3   DAVID ALBERTI (SBN 220265)
4   dalberti@feinday.com
5   **FEINBERG DAY ALBERTI LIM &**
    **BELLOLI LLP**
6   1600 El Camino Real, Suite 280
7   Menlo Park, CA 94025
    Tel:  650.618.4360
8   Fax:  650.618.4368
9
10  Attorneys for Nagravision SA and
    OpenTV, Inc.
11                  UNITED STATES DISTRICT COURT
12              CENTRAL DISTRICT OF CALIFORNIA
13  NAGRAVISION SA and OPENTV,        CASE NO. 2:17-CV-03919-AB-SK
14  INC.,
                                      **PLAINTIFFS' OPENING CLAIM**
15            Plaintiffs,             **CONSTRUCTION BRIEF**
16        v.
                                      Date:        July 20, 2018
17  NFL ENTERPRISES, LLC,             Time:        10:00 a.m.
                                      Courtroom:   7B
18            Defendant.              Judge:       Hon. Andre Birotte Jr.
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................... 1

II.   THE LAW OF CLAIM CONSTRUCTION ..................................................... 1

III.   U.S. PATENT NO. 7,996,861 ......................................................................... 4

  A.   Background of the Invention of the '861 Patent ......................................... 4

  B.   "security manager" ..................................................................................... 4

  C.   "the application" ......................................................................................... 6

IV.   U.S. PATENT NO. 7,421,729 ......................................................................... 8

  A.   Background of the Invention of the '729 Patent ......................................... 8

  B.   "address generator" ..................................................................................... 9

  C.   "encoding said video stream with said set of indicators accessed from said database" ..................................................................................................... 11

  D.   "decodes the time code signal and generates a corresponding address signal". .................................................................................................................... 13

V.   U.S. PATENT NO. 7,028,327 ....................................................................... 14

  A.   Background of the Invention of the '327 Patent ....................................... 14

  B.   "timing offsets" ......................................................................................... 15

  C.   "associated with [a / the] broadcast program" ........................................... 16

  D.   "electronic program guide" ....................................................................... 18

VI.   U.S. PATENT NO. 7,950,033 ....................................................................... 21

  A.   Background of the Invention of the '033 Patent ....................................... 21

  B.   "relational metadata" ................................................................................. 21

  C.   "the relationship of the second data to the first data is selected from [a / the] group consisting of: a summary, a correction, a repeat, a highlight, more detailed content, related text, and a related icon" ............................................................ 23

VII.   U.S. PATENT NO. 7,055,169 ....................................................................... 25

i

A.   Background of the Invention of the '169 Patent ........................... 25

B.   "resources" .......................................................................................... 26

C.   "presentation" / "audio, video, and/or graphic presentation" ...................... 28

VIII   U.S. PATENT NO. 7,020,888 ...................................................... 30

A.   Background of the Invention of the '888 Patent ........................... 30

B.   "framework definition" ................................................................. 31

C.   "broadcast stream" ........................................................................ 34

IX.  U.S. PATENT NO. 6,233,736 ...................................................... 36

A.   Background of the Invention of the '736 Patent ........................... 36

B.   "provided [with said / in a] video program" ................................. 37

C.   "electronically extracting said address" ....................................... 39

X.   CONCLUSION ............................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*Avid Tech., Inc. v. Harmonic, Inc.*,
  812 F.3d 1040 (Fed. Cir. 2016) ........................................................................ 35

*Biagro Western Sales, Inc. v. Grow More, Inc.*,
  423 F.3d 1296 (Fed. Cir. 2005) .................................................................... 1, 18

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013) ........................................................................ 36

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004) .......................................................................... 32

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002) .......................................................................... 2

*EcoServices, LLC v. Certified Aviation Services, LLC*,
  No. CV 16-01824-RSWL-SPx, 2017 WL 2783486 (C.D. Cal. May 18, 2017)
  ...................................................................................................................... 10, 11

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
  488 F.3d 982 (Fed. Cir. 2007) ............................................................ 4, 21, 23, 32

*Honeywell Intern., Inc. v. ITT Industries, Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006) ........................................................................ 32

*Housey Pharma., Inc. v. Astrazeneca UK Ltd.*,
  366 F.3d 1348 (Fed. Cir. 2004) .......................................................................... 2

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) .................................................................... 13, 14

*InterDigital Commn's, LLC v. Int'l Trade Com'n*,
  690 F.3d 1318 (Fed. Cir. 2012) ................................................................... passim

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
  383 F.3d 1295 (Fed. Cir. 2004) ......................................................... 3, 21, 23, 31

*Kara Tech. Inc. v. Stamps.com Inc.*,
  582 F.3d 1341 (Fed. Cir. 2009) ................................................................... passim

iii

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) .................................................................. passim

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
  831 F.3d 1350 (Fed. Cir. 2016) ..........................................................23, 24, 25

*Norian Corp. v. Stryker Corp.*,
  363 F.3d 1321 (Fed. Cir. 2004) ....................................................................... 25

*O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
  521 F.3d 1351 (Fed. Cir. 2008) ..........................................................11, 12, 13

*Oatey Co. v. IPS Corp.*,
  514 F.3d 1271 (Fed. Cir. 2008) ................................................................. 28, 30

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ......................................................................... 1

*Scott Envtl. Servs., Inc. v. A to Z Mud Co.*,
  No. 2:13-cv-701-JRG, 2014 WL 4226770 (E.D. Tex. Aug. 26, 2014) ............... 35

*SunRace Roots Enter. Co. v. SRAM Corp.*,
  336 F.3d 1298 (Fed. Cir. 2003) ............................................................ 3, 13, 19

*The Chamberlain Group, Inc. v. Techtronic Industries Co. Ltd.*,
  676 Fed. Appx. 980 (Fed. Cir. 2017) ............................................................... 26

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) .................................................................. passim

*Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016) ....................................................................... 26

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) ....................................................................... 13

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ................................................................. 10, 11

iv

## I.     INTRODUCTION

Claim construction determines the scope of patent claims by ascribing a meaning to the words in the claims.  The Supreme Court and the Federal Circuit provide the rules and tenets courts are to employ in construing claims.  Defendant's constructions repeatedly violate these rules, often "reading in" words and concepts not present in the claims, or "reading out" concepts Defendant does not like.  Defendant does this in an attempt to avoid infringement, but it cannot do so by rewriting the claims.  In Section II Plaintiffs outline the relevant rules of claim construction and highlight those that Defendant routinely violates.  In Section III Plaintiffs apply those rules to the terms at issue, and show why Plaintiffs' constructions are correct and Defendant's constructions are incorrect.

## II.    THE LAW OF CLAIM CONSTRUCTION

When determining the meaning of disputed claim language, courts consider "those sources available to the public that show what a person of skill in the art would have understood [the] disputed claim language to mean." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).  These sources include—in order of importance— (1) "the words of the claims themselves"; (2) "the remainder of the specification"; (3) "the prosecution history"; and (4) "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id*.  Based on these sources, a court should give a disputed claim term the meaning "the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id*. at 1312-13.  "It is elementary that claim construction begins with, and remains focused on, the language of the claims." *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005).  Moreover, "[i]n some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

1

Within this overarching rubric for analyzing claims, there are several tenets of claim construction that Defendant often ignores. As shown below, most of Defendant's constructions violate one or more of the following rules.

***Claim terms are given their plain and ordinary meaning except in limited circumstances***. "When construing patent claims, there is a 'heavy presumption' that the language in the claim 'carries its ordinary and customary meaning.'" *Housey Pharma., Inc. v. Astrazeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004). This is because "[i]t is the claims that define the metes and bounds of the patentee's invention" and the "patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.* at 1365.[1]

***Examples and embodiments of the invention disclosed in the specification should not be read into the claims.*** If the patentee gives examples of embodiments of a claimed invention, the claims are not so limited if the express claim language is broader. "The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Thorner*, 699 F.3d at 1366 ("We do not read limitations from

---

[1] The standard to meet these exceptions is high. "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id.* (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). "The standard for disavowal of claim scope is similarly exacting. Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.* at 1366 (quotations omitted).

2

the specification into claims; we do not redefine words."). This is true even if there is only one embodiment disclosed in the specification. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'") (citations omitted); *see also Thorner*, 699 F.3d at 1365.

*Under the doctrine of claim differentiation it is presumed that limitations that are present in dependent claims are not present in the corresponding independent claim*. "[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarsheim*, 358 F.3d at 910. "The doctrine of claim differentiation is at its strongest … 'where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim.'" *InterDigital Commn's, LLC v. Int'l Trade Com'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) (quoting *id.*); *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) (holding that the presumption is "especially strong" where "the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim.").

*When a term is created by the patentee and lacks any plain and ordinary meaning in the art, the term is construed only as broadly as provided for in the specification*. Sometimes a patentee coins or creates a term to convey a concept or subject matter. In this instance the term is strictly construed in accord with the embodiments disclosed in the specification and construed only as broadly as provided for in the specification. *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (holding that where "a disputed term lacks an accepted meaning in the art … we construe a claim term only as broadly as

3

provided for by the patent itself"); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 991 (Fed. Cir. 2007) ("Without a customary meaning of a term within the art, the specification usually supplies the best context for deciphering claim meaning.").

## III.   U.S. PATENT NO. 7,996,861

### A.   Background of the Invention of the '861 Patent

The '861 patent is titled "Flexible Interface for Secure Input of PIN Code." The '861 patent concerns "interfaces between man and machine such as computer, telephone or television devices, which need a Personal Identification Number (PIN) to authenticate the user running an application." '861 patent, 1:4-7. The '861 patent overcomes problems in the prior art by providing an improved system and method for authorizing a secure way of authentication for access to an application through a PIN code while using the look and feel of the application. *Id.*, 2:4-8. The '861 patent's solution maintains security by keeping the PIN code within a security manager, which "does not relay the key values, … but only relays the fact that a key has been pressed, letting for instance the application display an X for each key pressed, in the PIN entry field." *Id.*, 3:41-45.[2]

### B.   "security manager"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "computer system hardware and/or software that compares a PIN code of a user with a registered PIN code to authenticate a user" | "a computer program separate from the application that authenticates the PIN code of a user but has no control over the display of the PIN entry field, including its look and feel" |

The primary disputes are (1) whether the security manager is limited to a "computer program" (Defendant's position) or may include "computer system

---

[2] A person of ordinary skill in the art for the '861 patent is someone with an undergraduate degree in electrical engineering, computer engineering, or computer science with two years of work or research experience in the field of computer networking or computer security.

4

hardware" (Plaintiffs' position) and (2) whether it "has no control over the display of the PIN entry field, including its look and feel" (Defendant's position).[3]

Plaintiffs' construction is correct because it is consistent with the specification and claims. With respect to the "form" of the security manager, the '861 patent specification teaches that it may include hardware or software. Figure 3 illustrates the overall system 10 of the invention including the "security manager means 13." The specification explains that the security manager may include computer system hardware, *i.e.*, "a small computer system including a central processing unit (CPU), memory and local storage." '861 patent, Fig. 3, 3:23-26. The specification also explains that the security manager may include software as it can be "programmed in order to provide the different steps according to the method of the invention." *Id.*, 3:28-30. This software component is disclosed as the "security manager program" that performs the method in Figure 6. *Id.*, 4:38-40. Therefore, consistent with Plaintiffs' construction, the specification describes the security manager in terms of: "computer system hardware" (the security manager means and/or "software" (the security manager program).

Defendant's attempt to limit the security manager to have "no control over the display of the PIN entry field, including its look and feel" conflicts with the claims and the specification. Nothing in the term "security manager" or its use in the claims requires that the security manager have "no control over the display of the PIN entry field, including its look and feel." The claims and the specification teach the opposite—that the security manager has at least some control over the display of the PIN entry field. For example, claim 9 requires that "information about PIN code entering key-pressing operations received from the security

---

[3] Defendant's construction further states that the security manager is "separate" from the application. The plain language of the claim already specifies that the security manager and application are different limitations. Therefore, Defendant's "separate from the application" language is superfluous.

manager is displayed in the PIN entry field."  The specification explains that by communicating with the application, the security manager controls when and what "information about PIN code key-pressing operations" is displayed in the PIN entry field.  '861 patent, 3:37-45.  The specification also teaches that when a key is pressed the security manager "relays the fact that a key has been pressed, letting for instance the application display an X for each key pressed in the PIN entry field." *Id.*, 3:37-45.  By providing this feedback information to the application, the security manager controls when the application will display information in the PIN field (*i.e.*, when a key is pressed) and what information is displayed (*e.g.*, crypted information, such as an "X").  Defendant's attempt to include a limitation that the security manager has no control over PIN field display contradicts these teachings and should be rejected.  *See Kara Tech.*, 582 F.3d at 1348; *Thorner*, 699 F.3d at 1366; *Liebel-Flarsheim*, 358 F.3d at 906.  This is especially true for "negative" limitations, where Defendant contends the security manager cannot do something. *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322-28 (Fed. Cir. 2003) (reversing the district court's addition of a negative limitation).

### C.    "the application"

| Plaintiffs' Construction | Defendant's Construction |
| --- | --- |
| Plain and ordinary meaning / "A program that enables a user to do something useful with a computer." | "a computer program separate from the security manager that has total control over the display of the PIN entry field, including its look and feel" |

The primary dispute is whether the application "has total control over the display of the PIN entry field, including its look and feel" (Defendant's position), or it does not (Plaintiffs' position).[4]

---

[4] Defendant's construction also states that the application is "separate" from the security manager.  The plain language of the claim already provides this. Therefore, Defendant's "separate" language is superfluous.

6

Plaintiffs' construction is correct because it is consistent with the intrinsic record, whereas Defendant's construction imports limitations from the specification.  Computer "applications" are a well-known and ubiquitous type of computer software that many people use every day.  Consistent with Plaintiffs' construction, examples of applications given in the '861 patent include "a television program," "services on a mobile phone" or "other specific services via Television and/or Internet."  '861 patent, 2:44-45, 5:18-21.  Because the term "application" is well-known, it does not require construction.  *Phillips*, 415 F.3d at 1314 ("the ordinary meaning of claim language . . . may be readily apparent even to lay judges and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").  Moreover, because the patentee did not seek to redefine the term or disavow the full scope of the term, Defendant's limiting of the term is incorrect.  *Thorner*, 669 F.3d at 1367.

Defendant cherry-picks language from the preferred embodiment to argue that an "application" must have "total control over the display of the PIN entry field, including its look and feel."  This is improper as there is no express definition or disavowal of claim scope in the specification.  *Liebel-Flarsheim*, 358 F.3d at 906 ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'").  Defendant's attempt to inject this "total control" limitation into the claim apparently relies on a single sentence that states, "The application having total control over the graphics displayed and their look and feel, the look and feel 16 for PIN entry is provided on display means 17 according to the application."  '861 patent, 3:30-33.  First, this statement is part of the "*description of a particular embodiment given by way of non limiting example*," and therefore, does not constitute an express definition or disavowal of claim scope by the patentee.  *Id.*, 2:65-3:2 (emphasis added).  This statement about a "non-limiting" "embodiment"

7

1   also does not specify having total control over the "*display of the PIN entry field*"

2   which is required by Defendant's proposed limitation.

3        Furthermore, Defendant's additional limitation conflicts with the language of

4   the claims and the specification.  Nothing in the term "application" or its use in the

5   claims requires that the application "has total control over the display of the PIN

6   entry field, including its look and feel."  As explained in Section III.A. above, the

7   language of the claims and the teachings of the specification teach the opposite—

8   that the *security manager* has at least some control over the display of the PIN entry

9   field.  Claim 9 requires that "information about PIN code entering key-pressing

10   operations received from the security manager is displayed in the PIN entry field."

11   The specification also teaches that the security manager provides feedback

12   information to the application, and therefore, controls when the application will

13   display information in the PIN field (*i.e.*, when a key is pressed) and what

14   information is displayed (*e.g.*, crypted information, such as an "X").  *Id.*, 3:37-45.

15   **IV.   U.S. PATENT NO. 7,421,729**

16        **A.   Background of the Invention of the '729 Patent**

17        The '729 patent concerns the use of encoded tags, markers and indicators

18   with a video stream.  '729 patent, 6:41-47.  The prior art only allowed for tagging

19   entire program streams and this invention improved upon the prior art by claiming a

20   way to perform segment-by-segment tagging.  *Id.*, 1:25-29, 1:42-62, 2:63-31, Fig.

21   3, 5:10-7:22.  This is achieved by using a time code signal that is synchronized with

22   a video stream, applying the signal to an address generator that creates an address

23   signal, using the address signal to access indicators, and then encoding the video

24   stream with the indicators.  *Id.*, 5:11-7:22.  The invention provides a repeatable and

25   efficient mechanism to tailor content by encoding tags/markers/indicators based on

26   the time code synchronized with the video stream.  *Id.*, 5:11-6:39.[5]

27   _____

28   [5] A person of ordinary skill in the art for the '729 patent is "someone with a
graduate degree in electrical engineering, computer engineering or computer

8

## B.   "address generator"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "a specialized decoder that decodes the time code signal and generates an address signal based on the time code signal" | Subject to 35 U.S.C. § 112(f) and Indefinite |

The proper construction of "address generator" is readily apparent from the claim itself, the specification, and a modicum of background knowledge that both "decoders" and "address generators" were known computing structures in the art at the time of the invention, August 2000.

One of the steps of claim 1 is "applying the time code signal to an address generator that decodes the time code signal and generates a corresponding address signal."  The plain language of the claim thus requires that the address generator must be able to (1) decode the time code signal and (2) generate an address signal based on the time code signal.  In the specification "decoders" and "address generators" are collectively disclosed and discussed more than twenty times in a manner consistent with the foregoing steps of claim 1 and Plaintiffs' construction. '729 patent, 2:34-37, 2:54-56, 2:57-60, 5:26-30, 5:34-36, 7:59-61, 7:61-8:1, 8:5-9, 10:6-12, 10:38-42, 10:42-45, 11:29-37, 11:38-42, 11:53-64, Figs. 3, 5, 9, 10, 11, claims 1, 5; Ex. 1, ¶¶ 24-35; Ex. 5, ¶¶ 20-23.  Moreover, decoders (and encoders) were well known computer structures at the time of the invention.  '729 patent, 1:41-44 (decoders); Ex. 1, ¶¶ 33-34.  Address generators were also well known. '729 patent, "Other Publications" section listing the art of record (including United States Patent App. Pub. No. US 2001/0018693 entitled "Video Cataloger System with Synchronized Encoders"); Ex. 1, ¶ 35, Ex. 3; Ex. 5, ¶ 20.  Indeed, Intel's Pentium processor – probably the only processor to regularly appear in TV

science (or something equivalent) and at least two years of digital programming or digital signal processing experience."  Ex. 1, ¶ 15.  All cites to Exhibits ("Ex.") are references to the Declaration of Marc Belloli in Support of Plaintiffs' Opening Claim Construction Brief filed concurrently with this Brief.

9

commercials – had multiple address generators.  Ex. 5, ¶ 20, Ex. A ("the original Pentium 4 design called for there to be two address generation units, which are circuits to quickly calculate addresses for memory operations").  Accordingly, consistent with Plaintiffs' construction, claim 1 requires the claimed address generator to function as a decoder to decode the time code signal and to generate an address signal based on the time code signal.

Defendant offers no construction.  Instead, Defendant claims (incorrectly) that the "address generator" is a "means-plus-function" claim limitation that is subject to 35 U.S.C. § 112(f).[6]  This District's recent decision in *EcoServices* is highly instructive as to why "address generator" is <u>not</u> a means-plus-function claim term.  *EcoServices, LLC v. Certified Aviation Services, LLC*, No. CV 16-01824-RSWL-SPx, 2017 WL 2783486, **6-7 (C.D. Cal. May 18, 2017).  First, as acknowledged in *EcoServices*, because this term does not use the word "means" Defendant is presumptively wrong that this is a means-plus-function term.  *Id.* (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  Defendant can only overcome the presumption that means-plus-function analysis does not apply by "demonstrat[ing] that the claim term fails to recite sufficiently definite structure or else recites function without reciting structure for performing that function."  *Id.*  To answer this query "Courts need to also look to whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Id.*

In *EcoServices*, the presumption was not overcome because the plaintiff had evidence that one of skill in the art would have understood the claimed "control unit" to be a "programmable logic controller."  *Id.*  Furthermore, the fact that the "control unit" *could* be defined in functional terms was irrelevant, in light of the evidence concerning what the control unit referred to.  *Id.*

---

[6] 35 U.S.C. § 112(f) was until recently § 112(6) and prior case law makes reference to that numbering scheme, though the statutory provision is the same.

Here, the evidence is even stronger than it was in *EcoServices* that one of ordinary skill would understand the claim term refers to a definite structure. The evidence clearly shows that address generators and decoders were known structures for respectively generating addresses and decoding signals at the time of the invention. '729 patent, 1:41-44 (decoders); Ex. 1, ¶¶ 33-35; Ex. 5, ¶¶ 20-23. Defendant, therefore, cannot "rebut the presumption and definitely convince the Court" that one of ordinary skill would not understand the claim to supply "sufficiently definite structure as to take the overall claim limitation out of the ambit of § 112[f]" when the claim limitation concerns two well-known structures in the art. *EcoServices*, 2017 WL 2783486, **6-7; *Williamson*, 792 F.3d at 1351.

### C. "encoding said video stream with said set of indicators accessed from said database"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "applying the set of indicators accessed from the database to the video stream to enable segment-by-segment marking of the video stream" | Plain and ordinary meaning / "inserting the set of indicators accessed from the database into the video stream" |

The primary issue is whether claim 1 permits segment-by-segment marking of the video stream—a key dispute between the parties. *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). Plaintiffs assert that it does permit such marking. The plain language of claim 1 confirms this. Defendant asserts it does not but fails to support its position. Indeed, as set forth in the background of the invention, and throughout the specification, this invention's segment-by-segment marking of the video stream is a primary distinction over the prior art. '729 patent, 1:25-33, 42-47. To resolve the dispute, the Court can either (1) rule that the plain language of the claim covers segment-by-segment marking (foreclosing Defendant's argument to

the contrary) or (2) adopt the portion of Plaintiffs' construction that reads "to enable segment-by-segment marking of the video stream."

That segment-by-segment marking is covered by claim 1 is self-evident from the plain language of the claim and the "encoding" limitation in particular.  Ex. 1, ¶¶ 45-48.  Claim 1 explicitly requires using multiple indicators, using a database that contains a plurality of indicators concerning the video stream, and finally encoding the video stream with a set of those indicators that are accessed from the database.  Thus, there are different indicators referring to different segments of the video stream and the claim covers segment-by-segment marking of the video stream.  *Id.*, ¶¶ 45-48.  This is the central point of the patent given that the prior art only allowed for the marking of entire program streams.  *Id.*, ¶ 46; '729 patent, 1:25-29.  The invention of the '729 patent improved upon the prior art by allowing for segment-by-segment marking.  '729 patent, 1:42-47, 1:48-62, 2:63-31, Fig. 3, 5:10-7:22; Ex. 1, ¶¶ 46-47.  Thus, the Court should rule that claim 1 covers segment-by-segment marking of the video stream.  *O2 Micro*, 521 F.3d at 1362.

There may or may not be a secondary dispute between the parties with respect to this term.  Plaintiffs agree that no construction of the concept of "encoding" is necessary, as argued by Defendant; however, it is unclear whether Defendant also seeks to exclude certain known forms of encoding, including the forms set forth in the specification, from the scope of the claim.  Notably, at least four different methods of encoding video with tags and markers are disclosed in the specification.  '729 patent, 6:57-7:22; Ex. 1, ¶ 41.  The second of the four methods disclosed (*id.* at 6:66-7:6) is known as "back channel encoding."  In back channel encoding, indicators can be sent to the user over a medium other than one that carries the video signal.  Ex. 1, ¶ 44.  Furthermore, the dependent claims—such as claims 9 and 16—require "back channel encoding."  This is a clear indication that the independent claims from which they depend cover any form of encoding, including back channel encoding.  Similarly, any other claims in the patent that

require encoding must be similarly read broadly enough to cover back channel encoding. *Liebel-Flarsheim*, 358 F.3d at 910; *InterDigital*, 690 F.3d at 1324; *SunRace*, 336 F.3d at 1303. Therefore, so long as Defendant is not trying to "read out" forms of encoding, such as back channel encoding, Plaintiffs agree that the concept of encoding does not require construction. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).

### D. "decodes the time code signal and generates a corresponding address signal"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | "converts the time code signal from one form to another, and then generates an address signal that corresponds to the decoded time signal" |

There are two issues with Defendant's construction, which demonstrate that this term requires no construction at all. The first issue is with Defendant's attempt to construe "generates a corresponding address signal" as "then generates an address signal that corresponds to the decoded time signal." Defendant is simply replacing five words in the claim with twelve words that provide no greater clarity. As such, the clause "and generates a corresponding address signal" requires no construction. *O2 Micro*, 521 F.3d at 1362 ("We, however, recognize that district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings . . . It is not an obligatory exercise in redundancy.").

The second issue is that Defendant's construction rewrites the clause "decodes the time code signal" in an attempt to read limitations into the claim that have no support anywhere in the patent or file history. There are ways to decode signals without converting from "one form to another," and nothing in the specification suggests that a change in form should be required. Ex. 5, ¶¶ 25-28. Curiously, Defendant believes the related word "encoding" in the same claim

13

requires no construction and that it can be "readily understood by a jury."  Dkt. No. 96-1 at 11.  If encoding can be "readily understood by a jury," so can decoding. Moreover, the issue with construing the "decodes" portion of the term as Defendant wishes is that it excludes certain forms of decoding.  The claim should cover all forms of decoding as the patentee did not disclaim any scope, nor did it redefine the word.  *Thorner*, 699 F.3d at 1365-66.  Moreover, Defendant cannot "read out" other forms of decoding.  *Innova/Pure Water*, 381 F.3d at 1119.  Finally, Defendant's construction is also undercut by its technical dictionaries.  Ex. 5, ¶¶ 29-33.

## V.    U.S. PATENT NO. 7,028,327

### A.    Background of the Invention of the '327 Patent

The '327 patent is directed to the automated control of interactivity in synchrony with television broadcast programs.  '327 patent, 1:18-20.  This interactivity is typically delivered in the form of interactive content, such as an interactive application associated with the broadcast program.  *Id.*, 1:25-28.  Prior to the invention described in the '327 patent, the interactive application is often lost or knocked out of synch with the television program by signal path corruption and other technical barriers that may interfere with the conveyance of the interactivity in synchrony with the broadcast program.  *Id.*, 2:66-3:8.

The '327 patent solves this problem by augmenting the broadcast program with the interactive content further along the path and closer to the viewer.  The inventors recognized that the path that begins from the national networks can be unreliable and that the interactive content need not be inserted at that early point. *Id.*, 3:65-4:43.  Synchrony between the interactive application and the broadcast program can be maintained using relative timing offsets.  *Id.*, 5:9-12.  For example, when a commercial break starts in the middle of a program, the interactive application associated with the broadcast program is triggered by a timing offset to

suspend display, yet still retain information the viewer will need when the program and the program's interactive application resume.  *Id.*, 5:32-37.[7]

**B.   "timing offsets"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "synchrony-oriented timing data" | "data that specifies a start or end time for an event or action" |

The dispute is whether the "timing offsets" are any form of "synchrony-oriented timing data" (Plaintiffs' position) or whether they must be one specific type of synchrony-oriented timing data (one that "specifies a start or end time for an event or action") (Defendant's position).  The intrinsic record supports Plaintiffs.

First, the specification is clear that start and stop times are merely one type of "timing offsets" while other types of "timing offsets" exist as well: "Timing offsets generally are synchrony-oriented data such as broadcast program start and stop times **or other timing data useful to the interactive applications**."  '327 patent, 4:64-66.  It would be legal error to require that the timing offsets must specify a start or end time as Defendant posits.  *Kara Tech.*, 582 F.3d at 1348 ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").  This passage also confirms to one of ordinary skill in the art that the term "timing offsets" is not limited to data specifying start and end times and may be any type of synchrony-oriented data.  Ex. 2, ¶¶ 13, 16.

The specification further teaches that timing offsets may be identifiers embedded in the video or close captioning data.  '327 patent, 19:32-38.  To one of ordinary skill in the art, this passage also teaches that timing offsets are not limited to start and stop times for an event or action and encompass all timing data related

---

[7] A person of ordinary skill in the art for the '327 patent is someone with "a four-year degree from an accredited institution in computer science or computer engineering" with "approximately 2 years of professional experience in computer programming or multimedia-based network services."  Ex. 2, ¶ 13.

OPENING CLAIM CONSTRUCTION BRIEF –2:17-CV-3919

to synchronicity.  Ex. 2, ¶ 18.  In yet another embodiment, the timing offsets can refer to an amount of time that is allotted for commercials as opposed to start and stop times for those commercials.  '327 patent, 10:64-11:7; Ex. 2, ¶ 17.

Second, the claims are clear that timing offsets need not specify a start or end time for an event or action.  Indeed, claim 25 includes the following limitation: "responsive to determining from the timing offsets that an element of the interactive application is to be executed at a time relative to a beginning of the television show, generating a command to execute an element of the interactive application at a given time."  A "time relative to a beginning of the television show" is not "a start or end time for an event or action" as proposed by Defendant.  Ex. 2, ¶ 15.

Timing offsets may, but are not required to, specify a start or an end time.  Rather, timing offsets are any form of synchrony-oriented data.  While Defendant can point to passages in the specification where timing offsets do specify a start or an end time, examples from the specification are not to be imported into the claims, even if there were only one example given (which there was not).  *Liebel-Flarsheim*, 358 F.3d at 906; *Thorner*, 699 F.3d at 1365.  This is particularly true here where there are timing offsets disclosed in both the claims and the specification that would not meet Defendant's construction.

**C.   "associated with [a / the] broadcast program"**

| Plaintiffs' Construction | Defendant's Construction |
| --- | --- |
| Plain and ordinary meaning | "associated with the events, situations, or other content of a broadcast program" |

The dispute is whether the plain English phrase "associated with" means that the claimed association must concern "the events, situations, or other content of a broadcast program" (Defendant's position) or whether the association with the broadcast program can be any type of association (Plaintiffs' position).  Defendant's position is wrong because the patentee did not redefine the word

"associated" nor disclaim the scope of that word—"associated" means an association with the broadcast program in any form.

The word "associated" does not have a specialized technical meaning in this art. And Defendant has not alleged that the patentee made an express disclaimer of the full scope of the word "associated" or redefined the word in the intrinsic record. In the absence of an affirmative disavowal of claim scope or redefining a plain English term, "associated with" cannot be construed in any way other than consistent with its plain English meaning which allows for any type of "association." *Thorner*, 699 F.3d at 1365, 1367.

It is apparent that Defendant's construction here is an improper attempt to read in embodiments from the specification because Defendant's construction does not change a single word of the term and instead injects three types of associations into the term. Limiting broader terms to specific embodiments (here, specific types of "associations") described in the specification is improper under black letter Federal Circuit law. *Kara Tech.*, 582 F.3d at 1348; *Thorner*, 699 F.3d at 1366.

Because there is nothing in the specification or the file history that redefines the word "associated" or disavows the full scope of that word, the common understood meaning of the word controls. *Thorner*, 699 F.3d at 1365, 1367.

Defendant's construction is also incorrect because it reads out "associations" that are clearly contemplated by the claims themselves and the specification. For example, in claim 13 the disputed term appears in conjunction with "timing offsets" – *i.e.*, "timing offsets associated with the broadcast program." Moreover, timing offsets may be "measured from the beginning of a broadcast program" or may be "absolute (*e.g.*, 8:06 pm)." '327 patent, 8:45-48, 22:63-67; Ex. 2, ¶ 15. In these instances, the timing offsets have nothing to do with "events, situations, or other content of a broadcast program," and thus would not be "associated" under

17

OPENING CLAIM CONSTRUCTION BRIEF –2:17-CV-3919

1    Defendant's construction even though the timing offsets are "associated" in accord
2    with the plain English meaning of the word.[8]

3         Finally, Defendant's construction is not illuminating of the meaning of the
4    term and introduces vagaries, which results in confusing a phrase that a lay juror
5    could readily understand—"associated with."  A lay juror can readily determine
6    whether something is generally associated with a "broadcast program"; but whether
7    something is associated with a "situation" of a broadcast program (and what is even
8    meant by "situation") is far more vague and less readily apparent.

9         **D.    "electronic program guide"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "an electronic collection of data about available broadcast programs" | "an electronic database that provides schedule information for broadcast programs, including geographic location, local time, and channel information" |

13        Defendant's construction improperly reads limitations from the specification
14   and dependent claims into the claims at issue and violates the doctrine of claim
15   differentiation.  Plaintiffs' construction acknowledges what an "electronic program
16   guide" actually is.

17        Claim construction "begins with, and remains focused on, the language of the
18   claims." *Biagro*, 423 F.3d at 1302.  In asserted claim 13 the electronic program
19   guide is used to determine "an interactive application associated with a broadcast

[8] Similarly, the disputed term appears in claim 13 in conjunction with "interactive
application" – *i.e.*, "interactive application associated with a broadcast program."
But the interactive application may, but need not, concern "events, situations, or
other content" of a broadcast program as the purpose of an interactive application is
to perform an action. '327 patent, 1:28-40 ("The interactivity is displayed on only a
portion of the television screen, so as to allow the viewer to continue to watch the
broadcast program"), claim 5 ("retrieving interactive content from a server on the
Internet referenced by the URL; and performing an action on the retrieved
interactive content").  Here, again, Defendant would be reading out embodiments
contemplated by the specification and the claims by importing separate
embodiments already covered by the claims.

18

program." But there is nothing in claim 13 that mandates that the electronic program guide include or use the geographic location, local time, channel information and schedule information as required by Defendant's faulty construction. *Id.* Claim 13 simply requires that the electronic program guide provide what interactive applications are associated with available broadcast programs. The types of information that Defendant seeks to add to the claim are not required by claim 13, which is a "method of controlling a broadcast and reception of an interactive application."

It is unasserted claim 26 that requires that geographic information, channel, location and schedule information be used as "inputs" into the electronic program guide and this is fatal to Defendant's construction for two reasons. First, un-asserted claim 26 includes the step of "determining, using the timing, channel, and location information ***as inputs to*** the electronic program guide, the interactive application." That these items are "inputs to" the electronic program guide plainly connotes that these features are not necessarily a "part of," or "included in," the electronic program guide. Second, because claim 26 depends from claim 13, Defendant's construction violates the doctrine of claim differentiation because Defendant is trying to take aspects of dependent claim 26 and have them "read into" independent claim 13. *Liebel-Flarsheim*, 358 F.3d at 910; *InterDigital*, 690 F.3d at 1324; *SunRace*, 336 F.3d at 1303; Ex. 6, ¶ 4. The doctrine of claim differentiation is at its strongest where, as here, an infringer attempts to read aspects of dependent claims into independent claims. *Id.*

Defendant's will likely argue that there are portions of the specification where electronic program guides are discussed as using geographic location, local time, channel information and schedule information. But that is irrelevant because those elements are covered by unasserted claims (like claim 26) as discussed above. Moreover, even if all electronic programs guides discussed in the specification have the features Defendant seeks to import into the term (they do not), Defendant still

19

cannot read these features into claims where they do not appear.  *See Liebel-Flarsheim*, 358 F.3d at 906; *Thorner*, 699 F.3d at 1365.  This is particularly true because there are embodiments of the electronic program guide that do not include or use geographic location, local time, channel information and schedule information.  For example, the specification discusses an electronic program guide that "may be broadcast to and stored on a CPE,[9] or be resident on a server on a network such as the Internet and be accessed through a CPE." '327 patent, 4:14-17.  This embodiment says nothing about requiring all of Defendant's "add-ons" to the electronic program guide and would not need these features for programs that are available online for broadcast at any time.   While there is one embodiment that does include the various features of Defendant's construction (*see, e.g.*, 5:49-51[10]), there are other embodiments where these features are in no way required to be part of the electronic program guide. '327 patent, 6:9-12, 11:23-33; Ex. 6, ¶ 5.   There is even one passage of the specification that describes three embodiments in a row; the first of which has the features of Defendant's construction, but the subsequent two do not.  '327 patent, 13:24-50; Ex. 6, ¶ 6.[11]

---

[9] CPE stands for "consumer premise equipment," e.g., televisions, set top boxes, personal computers, and satellite receivers.

[10] "***For example***, in **_one embodiment_** an application server at the local network facility or cable head end uses the EPG to coordinate time, channel and location information with a program identifier."  This is required by claim 26, not claim 13.

[11] Defendant's extrinsic evidence does not support its inclusion of geographic location, local time, channel information and schedule information either. Ex. 6, ¶¶ 7-9.  Indeed, one of the sources Defendant cites says that "the depth of information per programme" is an "editorial decision" made by the provider of the guide. *Id*.  Likewise, one of the definitions Defendant provides from the Jones Cable Television Infrastructure Dictionary provides that "[s]ome electronic program guides are interactive" and can have "on-command" programs. *Id*.  An electronic program guide of "on-command" – *i.e.*, on demand – programs would not have any of the features of Defendant's construction; rather, there would just be a listing of available programs. *Id*.

The evidence shows that the electronic program guide can use geographic location, local time, channel information and schedule information (as in unasserted claim 26) but does not have to (as in asserted claim 13).

## VI.   U.S. PATENT NO. 7,950,033

### A.   Background of the Invention of the '033 Patent

The '033 patent concerns how to use "relational metadata" (a term coined by the patentees for a new type of metadata) to deliver interactive television streams. '033 patent, 10:53-11:10.  The relational metadata defines a relationship between data sets.  *Id.*, 6:5-7, 7:66-8:2, 14:19-21.  As discussed below, such data sets are programs or parts of programs that include interactive content.  *Id.* at 2:21-25; 6:5-17; 14:19-21.  This capability allows for an enhanced viewing experience.  *Id.*, 6:17-25; 14:19-38.[12]

### B.   "relational metadata"

| Plaintiffs' Construction | Defendant's Construction |
| --- | --- |
| "data describing a relationship between two different data sets, where each data set is a program or part of a program" | "data, or information, that describes relationships between two or more sets of data" |

The parties agree that the term "relational metadata" lacks an understood meaning in the art and is a coined term to describe the invention.  Ex. 3, ¶¶ 23-24. Accordingly, the specification necessarily supplies the construction of the term. *Irdeto*, 383 F.2d at 1300; *Honeywell*, 488 F.3d at 991.

The dispute is whether the data sets whose relationships are described by relational metadata must be programs or parts of programs.  Because this term is a coined term, and because all of the embodiments discussed in the patent identify the data sets as programs or parts of programs, Plaintiffs' construction is correct.

---

[12] A person of ordinary skill in the art for the '033 patent is "someone with a masters in computer engineering or computer science (or equivalent degree) and significant industry experience involving computer programming or signal processing."  Ex. 3, ¶ 11.

As the patent states, and the parties agree, generally speaking, metadata is data, or information, about other data. '033 patent, 2:47-48. The specification makes clear that in the context of this patent, the "data" that the metadata describes are programs. *Id.*, 2:49-56. The patent invents a new type of metadata, relational metadata, in order to overcome the deficiencies of ordinary metadata. Relational metadata has the ability to indicate the relationships between programs so that actions may be performed on the programs. *Id.*, 2:56-59. 2:65-3:20. In the specification, whenever an example of a data set is given, it is a program or part of a program. *Id.*, 6:5-11 (data sets that are portions of a broadcast that correspond to highlights or corrections when compared with the other portions of the same broadcast), 9:12-14 (data set is a news story), 9:50-55 (discussing how a user can use a receiving device to "see" and "record" data sets), claim 5 (indicating that one data set is a subset of another); Ex. 3, ¶¶ 26-33. It is clear, therefore, that one of ordinary skill in the art would understand data sets with which relational metadata is concerned are either programs or parts of programs. *Id.*

The whole point of novelty of relational metadata is to create relationships between television programs or parts of programs for use in interactive television viewing. A prime example – discussed in one of the passages above and identified in claim 1 – is a "highlight." The two data sets could be the game (a program) and the highlight (a part of the program) and the relationship between them is that Player 82 made a touchdown catch at the end of the second quarter. The specification even discusses the invention in the context of football games such as Eagles vs. Bears. '033 patent, 16:45-17:18; Fig. 11C.

Because there is no embodiment where the data sets with which relational metadata are concerned are not a program or part of a program, and because coined terms are to be strictly construed in accord with the specification, Plaintiffs'

22

construction of this term is correct and should be adopted. *Irdeto*, 383 F.2d at 1300; *Honeywell*, 488 F.3d at 991.[13]

C.    **"the relationship of the second data to the first data is selected from [a / the] group consisting of: a summary, a correction, a repeat, a highlight, more detailed content, related text, and a related icon"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "the <u>relationship of the second data to the first data must be at least one of</u>:  a summary, a correction, a repeat, a highlight, more detailed content, related text, or a related icon" | This phrase is a closed Markush group. Under relevant Federal Circuit case law, this means it <u>specifies one and only one of the recited relationships</u>, and excludes systems or methods with unrecited relationships. |

This term is a Markush group because the claim includes the phrase "selected from a group consisting of."[14]  There are two disputes with this claim term.  The first dispute is whether the claimed relationship can be more than one of the listed relationship types (Plaintiffs' position) or whether the claimed relationship must be "one and only one of the relationships" (Defendant's position).  *See* underlined portion of the constructions above.

The Federal Circuit's decision in the recent *Multilayer* case proves that Plaintiffs' construction is correct.  *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1362-64 (Fed. Cir. 2016).  In *Multilayer* the claim required "five identifiable inner layers" with "each layer being selected from

---

[13] Subsequent to the submission of the Joint Claim Construction and Prehearing Statement, Plaintiffs came to understand that Defendant criticizes Plaintiffs' construction for only concerning two data sets.  Plaintiffs are willing to add the following underlined words to their construction to address this concern "data describing a relationship between two <u>or more</u> different data sets, where each data set is a program or part of a program," as this is not the crux of the dispute.  The dispute is whether the data sets described by relational metadata are programs or parts of programs (they are).

[14] A Markush group is a particular type of patent claim structure where the elements in the group share some common characteristic.  It is generally used by practitioners to reduce the number of overall claims in the patent by not having to separately claim each member of the group.

23

the group consisting of" four different resins. *Id.* at 1353. The issue was whether each individual layer could be a blend of one or more of the four resins (like Plaintiffs' position here) or each individual layer could only consist of one and only one of the four listed resins (like Defendant's construction here). *Id.* at 1362-64. The Federal Circuit found that the Markush group in *Multilayer* could have more than one listed resin in each layer for several reasons.

First, one of the listed resins "encompasses" another of the listed resins. *Id.* Thus, two of the listed resins could be both classified as one of the listed resins because they "overlap to some extent." *Id.* Second, the specification repeatedly referenced blends of resins. *Id.* The Federal Circuit found that these two things constituted "strong intrinsic evidence" that, in the Markush group at issue, each layer could consist of more than one claimed resin and did not have to be just one of the four claimed resins. *Id.*

Like the Markush group in *Multilayer*, the Markush group here lists relationships that encompass each other and/or overlap, which is strong evidence that the claimed relationship can be one or more of the listed relationships. Indeed, two of the listed relationships are "more detailed content" and "related text." Whenever the more detailed content is text, these relationships would overlap. Claim 1 concerns processing relational metadata in a television system and a relational metadata instruction that includes a relationship identifier between the first and second data set. If the relationship between these two data sets is "related text," it would likely also qualify as "more detailed content." Other claimed relationships overlap as well. A "summary" can also be a "highlight" of a play or plays. The specification also repeatedly sets forth these relationships without making them mutually exclusive, which would be required to make this a closed Markush group under *Multilayer*. '033 patent, 7:66-10:24. The specification even provides that a related icon can be related text. *Id.*, 8:41-47. Here, (1) multiple claimed relationships overlap (as opposed to just two of the listed resins in

*Multilayer*) and (2) neither the claim nor the specification makes these relationships mutually exclusive. Accordingly, this claim term is a Markush group that "must be read as open" to one or more of the claimed relationships being satisfied. *Multilayer*, 831 F.3d at 1362-64.

The second dispute is that the following language at the end of Defendant's construction is improper: "and excludes systems or methods with unrecited relationships." This is because Markush groups are not closed to the elements unrecited in the claim that are "unrelated to the invention" or "irrelevant to the invention." *See*, *e.g.*, *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331-32 (Fed. Cir. 2004). On this basis alone, the Court should reject Defendant's construction. Moreover, Defendant's proposed language which "excludes systems or methods with unrecited relationships" is semantically wrong. The Markush group at issue here—by the plain language of the claim—is concerned with whether and how the first and second data are related, and not with whether entire systems or methods are somehow related. The exclusion that Defendant seeks is not supported. Also unsupported is the blanket exclusion Defendant seeks as to all relationships between the first and second data irrelevant to the invention. Relationships unrelated to the invention are permitted. *Norian Corp.*, 363 F.3d at 1331-32.

## VII. U.S. PATENT NO. 7,055,169

### A. Background of the Invention of the '169 Patent

The '169 patent is titled "Supporting Common Interactive Television Functionality Through Presentation Engine Syntax" and it is directed towards a system and method for controlling display of audio, video, and/or graphic content using "prerequisite directives." Prior art systems used an inefficient "carousel" format to broadcast multiple modules of data to client devices, which could then extract specific modules to present to users. '169 patent,1:43-67. The'169 patent addressed a need for "a new more flexible scheme" to allow reliable delivery of interactive presentations to users. *Id.*, 2:28-29. The use of directives, and in

25

particular prerequisite directives, allowed the systems to efficiently identify the resources needed for a presentation to begin. *Id.*, 2:40-47.[15]

### B. "resources"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "computer hardware, computer software or computer data required for presentation of digital graphics, audio or video content" | "software objects that can be transmitted over a network" |

Plaintiffs' construction acknowledges the various types of "resources" that may be required for a presentation, including computer hardware, computer software, and computer data. Defendant's construction improperly limits "resources" to "software objects" despite contrary teachings in the intrinsic record.

The Federal Circuit has ruled that "[t]he inclusion of a particular limitation in a dependent claim does not suggest that the limitation is eschewed by the claim from which it depends…[r]ather, it compels the opposite conclusion." *The Chamberlain Group, Inc. v. Techtronic Industries Co. Ltd.*, 676 Fed. Appx. 980, 986 (Fed. Cir. 2017) (citing *Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016) (explaining that "construing the independent claim to exclude material covered by the dependent claim would be inconsistent"). Here, dependent claims explicitly state that "resources" can comprise computer hardware. Ex. 4, ¶ 25. In particular, claim 15 states "acquiring said subset of resources comprises said client device **configuring hardware resources** within said client device" (emphasis added). Similarly, claim 6 describes how the acquisition of an audio or video stream involves the acquisition of hardware resources, *i.e.*, configuring hardware to receive the streaming media for

---

[15] A person of ordinary skill in the art for the '169 patent is someone with a "bachelor's degree in computer science, computer engineering, or the equivalent, plus approximately two years of experience in the field of computer engineering or software development, or an equivalent amount of relevant work and/or research experience." Ex. 4, ¶ 10.

presentation.  As such, Defendant's construction improperly excludes at least computer hardware from the scope of "resources."

The specification for the '169 patent confirms that Defendant's construction is improperly limited to software.  Not only does the '169 patent repeatedly describe computer hardware resources, it also discloses specific embodiments in which hardware resources are acquired prior to initiating a presentation – the same concept sought to be claimed in dependent claims 6 and 15.  For example, the '169 specification describes a process called "precreating" where computer hardware resources, such as memory, are allocated prior to rendering and displaying computer data, such as an image:

> [I]t may also be useful to permit the content author to not only dynamically control prefetch priorities but also to indicate that the use of a resource is imminent so that the terminal may wish to 'precreate' the resource (e.g., **allocate resources such as memory**, and decode) instead of simply prefetching that resource.

'169 patent, 49:32-38 (emphasis added); Ex. 4, ¶ 22.

The '169 patent also discusses a mechanism for checking whether necessary computer hardware resources have been acquired.  The '169 patent first defines a concept of "pipes" where "resources" are again described in the context of computer hardware, such as Conditional Access hardware and I/O buffers:

> An abstraction, known as a pipe, may be used used [sic] to embody the association between the source of a stream (e.g., a tuner or a file containing a recording on a hard drive) and the ultimate destination (e.g., the display or a file on the hard drive), including, for example, **any resources that are required between the source and the destination (e.g., Conditional Access hardware, I/O buffers)**.

'169 patent, 12:30-36 (emphasis added); Ex. 4, ¶ 23.

Next, the '169 patent describes realization states to indicate whether all of the hardware required by a pipe are currently allocated to that pipe:

> Because these are abstractions, it is possible to have a defined pipe without having all of the hardware which is required by the pipe

27

currently allocated to that particular pipe. **A defined pipe where less than all of the hardware has been allocated to it is said to be in an 'unrealized state'**. **A pipe is 'realized' when all required hardware has been allocated to that pipe.**

*Id.* at 12:42-49 (emphasis added); Ex. 4, ¶ 23.

At 13:15-44, the '169 patent describes a software property called "realized" that can be used, for example, with the "precreating" function to check whether the computer hardware (*e.g.*, memory) in a pipe has been allocated to that pipe before initiating a presentation (*e.g.*, rendering an image for display). Ex. 4, ¶ 23. These are not casual references to computer hardware resources, but actual embodiments involving computer hardware that go to the heart of the claims.

Plaintiffs' construction is the only construction that acknowledges that "resources" properly includes "computer hardware" and should be adopted. Defendant's proposed construction fails to do so and improperly contradicts the dependent claims, conflicts with the common usage of "resources" in the specification and reads out embodiments relating to the "precreating" function and the realization states of pipes. Ex. 4, ¶¶ 22-29.

### C. "presentation" / "audio, video, and/or graphic presentation"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning / "a selection of one or more of video, audio, and graphics for concurrent display" | "information organized to be played out as a whole" / no further construction needed beyond "presentation" |

The term "presentation," or alternatively "audio, video, and/or graphic presentation," should be accorded its plain and ordinary meaning, rather than Defendant's construction which reads out an embodiment from the claims. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) (holding that "where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary."). Plaintiffs' proffer of the plain and ordinary meaning of the broader "audio, video, and/or graphic presentation" term includes two parts: (1)

28

"a selection of audio, video, and/or graphics (2) for "concurrent display," both of which are consistent with the claims and specification.

As for the first part, the '169 patent at 47:24-25 indicates that the content creator "construct[s] a scene or presentation" using "multiple resources." The natural reading of the claim language "audio, video, and/or graphic presentation" indicates the content creator may "select audio, video, and/or graphics," either alone or in combination, in constructing the presentation. Ex. 4, ¶ 17. A graphic-only presentation may still include multiple graphical elements. *Id.* at 47:25-27.

As for the second part, 47:24-32 explains why the use of "showstoppers" is consistent with displaying elements at the same time, *i.e.*, concurrently. The passage interchangeably uses "presentation" and "scene" in describing the embodiment. *Id.*, 47:24-25 ("[t]he content creator often wishes to use multiple resources in constructing a scene or presentation . . ."); Ex. 4, ¶ 16. "[The content creator] may prefer that the old scene should continue to be displayed until at least the essential resources [of the new scene] have been received and decoded." *Id.*, 47:27-29, 21:9-13, 22:7-10. Content creators do not want to display a non-essential element before an essential element has been acquired. *Id.*, 47:30-32.

The "showstopper" embodiment addresses problems that arise when the presentation elements are designed to be concurrently displayed but may take different amounts of time to acquire. Ex. 4, ¶¶ 15-16. It would not make sense to designate an element as essential if it were not set to be concurrently displayed with non-essential elements that form the "scene or presentation." If non-essential elements were displayed <u>before</u> an essential element, then waiting for the essential element would create unnecessary delay. Conversely, if non-essential elements were set to be displayed <u>after</u> an essential element, there would be no risk of displaying a non-essential element before an essential element. Indeed, any elements that are displayed separately from other elements, essential or not, belong to a different scene or presentation. '169 patent, 22:11-21 describing how to

maintain consistency when transitioning from one scene to another.  Plaintiffs'
proffer of the plain and ordinary meaning of "audio, video, and/or graphic
presentation" is consistent with the claims and specification.

On the other hand, Defendant seeks to neuter the claim by limiting
"presentation" to "information organized to be played out as a whole."  At best,
Defendant's construction is based on creative inferences from a selective reading of
the specification.  The effect of Defendant's construction is (1) the claim is reduced
to a *de minimis* use case and (2) a key embodiment disclosed in the specification is
read out of the claims.  As discussed above, the "showstopper" embodiment
disclosed in the '169 patent at 47:24-32 addresses transitioning from one scene to
another using the claimed invention.  Under its proposed construction, Defendant
could argue that all of the scenes belong to the same "presentation" as long as they
are "organized to be played out as a whole."  Ex. 4, ¶¶ 15-16.  Defendant could then
argue that once the overall "presentation" has been initiated, any subsequent use of
"showstoppers" to transition from one scene to the next can effectively be ignored.
*Id.*  As a result, Defendant could copy the "showstopper" embodiment from column
47 of the '169 patent for scene changes and still argue it does not infringe.

Defendant's attempt to read out a key embodiment from the claims should be
rejected.  *See*, *e.g. Oatey*, 514 F.3d at 1277.

## VIII.   U.S. PATENT NO. 7,020,888

### A.     Background of the Invention of the '888 Patent

The '888 patent is directed to a system and method for organization,
combination, transmission and reception of media from a range of sources, wherein
the media may comprise a plurality of video streams, audio streams, and other
information, such as information accessed via the Internet.  '888 patent, 1:16-21.
Continued expansion of the Internet and adoption of digital transmission formats
allow media such as audio, video, and metadata content, to be combined and
presented to provide viewers with a richer and more diverse media experience.  *Id.*,

1:35-40.  However, systems that existed prior to the invention of the '888 patent did not provide a method by which content of various formats may be grouped, transmitted and displayed.  *Id.*, 1:40-43.

The '888 patent overcomes the limitations of the prior art by providing a system and method that allows a transmission system to organize and transmit a related set of media and for a display platform to organize and render related media information in a manner that reflects the available media and the capabilities of the platform.  *Id.*, 1:49-55.  The claimed invention creates a framework definition that identifies a set of associated content (media) for a broadcast program and compares the format of the media with a transmission format and converts media of other formats to that of the transmission format.  *Id.*, 1:55-59, 1:64-2:11.  The claimed invention further combines the media content into a broadcast stream for transmission to a plurality of receivers.  *Id.*, 2:14-17, 12:58-63.[16]

**B.     "framework definition"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "a designation of the input and output content and metadata formats necessary to build and format various audio, video and metadata streams to enable their delivery and display across multiple receivers with differing capabilities" | "information that identifies a set of associated content for a broadcast program" |

The parties agree that the term "framework definition" lacks an understood meaning in the art and is a coined term of the patentee to describe the invention.  Ex. 1, ¶¶ 61-62.  Accordingly, the specification necessarily supplies the construction of the term.  *See, e.g., Irdeto*, 383 F.2d at 1300 (holding that where "a

---

[16] A person of ordinary skill in the art for the '888 patent is "someone with a graduate degree in electrical engineering, computer engineering or computer science (or something equivalent) and at least two years of digital programming or digital signal processing experience."  Ex. 1, ¶ 15.

disputed term lacks an accepted meaning in the art … we construe a claim term only as broadly as provided for by the patent itself"); *Honeywell*, 488 F.3d at 991.

Defendant's construction is too broad and fails to encompass all aspects of the claimed "framework definition" as taught by the specification. Defendant's construction focuses on just one aspect of the framework definition. In contrast, Plaintiffs' construction flows directly from the specification and the discussion of "the invention." Indeed, the first four sentences of the "Detailed Description of the Invention"—which outlines "the present invention"—comport with Plaintiffs' construction, while Defendant's construction is limited to just one aspect:

> The present invention is directed to allowing the creation of larger, more robust productions with support for interactivity and multiple video, audio, and data streams. A framework definition provides organization of media for transmission, and for rendering of media by a display platform that may comprise a television, interactive television, set-top box, satellite receiver, personal computer or other operable to receive data across a network or airwave and process data according to the method of the present invention. The framework definition allows a media stream or multiple media streams to be packaged together with other content into a single distinct program, hereinafter referred to as an omnimedia package. A content provider may employ the framework definition to specify and deliver a package of related content, encapsulating the information necessary to build, format, transmit and display the content.

'888 patent at 3:17-31; Ex. 1, ¶¶ 63-64.

This passage encompasses all aspects of Plaintiffs' construction, including those missing from Defendant's construction, *i.e.*, that the framework definition provide the "formats necessary to build and format various audio, video and metadata streams to enable their delivery and display across multiple receivers with differing capabilities." *Id.* That this passage repeatedly describes these attributes of the "framework definition" as part of "the present invention" also confirms that this term should be construed in accord with Plaintiffs' construction. *Honeywell Intern., Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004).

Other parts of the intrinsic record confirm Plaintiffs' construction, each identifying one or more aspects of Plaintiffs' construction as part of the claimed "framework definition."  For example, claim 1 requires that the "framework definition" be able to "identif[y] said various stream types in said audio content, said video content and said metadata content associated with a broadcast and attributes of said various stream types including the format of said various stream types."  '888 patent, 12:38-42.  The patent also mandates that the "framework definition" "describe[] all content used in an omnimedia package" and be used to "create an omnimedia package" and in turn "define[] the primary video and audio to be used by non-omnimedia aware platforms, plus initial audio and video for omnimedia package streams," all of which are consistent with Plaintiffs' construction.  *Id.* at 6:20-25.  The patent likewise requires that the "framework definition" be used to "format and organize media components into a stream or streams," which is consistent with Plaintiffs' construction requiring that the framework definition have the tools "necessary to build and format various audio, video and metadata streams."  *Id.* at 8:20-23.  Other passages are in accord.[17]

The whole point of the novel framework definition is to provide a mechanism to deliver and then render various audio, video and metadata streams to various

---

[17] *See id.*, 1:55-56 ("A framework definition identifies a set of associated content (media) for a broadcast program."), 4:14-16 ("Framework definition 110 defines the relationships between different content streams."), 8:39-43 ("Video preprocessor 210 and audio preprocessor 212 access media streams or stored data as specified by framework definition 110 and perform processing to prepare the media for the associated packager."), 8:55-57 ("Metadata preprocessor 214 accesses metadata elements, specified by framework definition 110, and performs processing to prepare these the metadata packager 222."), 9:65-67 ("The metadata preprocessor accesses metadata and places it in a predetermined format as may be specified by framework definition 110."), 9:65-67 ("Omnimenu generator 224 employs framework definition 208 to identify available streams and associates each stream with a button."), 11:33-36 ("Media controller 308 selects the media streams (audio, video and/or data) that are described by the framework definition.").

1   receivers with differing capabilities.  The specification confirms this throughout,

2   and the patentee again confirmed it during prosecution.  Moreover, the various

3   attributes of Plaintiffs' construction are not optional—they are necessary features of

4   the framework definition and the invention as a whole and there are no

5   embodiments that expressly exclude the features set forth in Plaintiffs' construction.

6   **C.    "broadcast stream"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "a flow of related data created in accordance with the framework definition that contains audio, video and metadata content for a broadcast program" | "a flow of data that is simultaneously transmitted to more than one recipient" |

The first issue with Defendant's construction is the incorrect insertion of the word "simultaneously" which is not supported by the claims or the specification. While the claimed "broadcast stream" must be sent to a "plurality of receivers," the claims themselves do not require simultaneous transmission of a stream itself.  '888 patent, claims 1-5.  Nor does the specification support Defendant's injection of the word "simultaneously" as there is no mandate of simultaneous transmission of a stream anywhere in the specification.  While there are embodiments that *could* support simultaneous transmission of a broadcast stream (like analog transmission), there is no embodiment where it is required.  In fact, there are disclosed embodiments of the invention where the claimed broadcast stream is not simultaneously transmitted to multiple receivers—namely transmission over the Internet where different types of "packets" are used for different aspects of the transmission and the packets arrive at different times due to variations in Internet speed, among other things.  '888 patent, 3:54-57, 1:18-21, 1:35-40, 9:27-34; Ex. 1, ¶¶ 54-56.  Thus, the claims and the specification reject Defendant's position.

The extrinsic evidence and the prosecution history do not support Defendant's "simultaneously" construction either.  With respect to Defendant's extrinsic evidence, the definition of "broadcast" that is dated *before* the date of

34

invention (the year 2000), does not support its "simultaneous" argument and only requires that a "broadcast" (not a broadcast stream) be "a transmission sent to more than one recipient." Ex. 10, NFLE00022845. This supports Plaintiffs' argument that a broadcast stream itself need not be transmitted to more than one recipient simultaneously.[18] Ex. 1, ¶ 59. With respect to the prosecution history, in one submission the patentee made a "brief" one paragraph description of what the invention is directed to and referred to the embodiment where the broadcast stream is simultaneously broadcast. Ex. 9, pp. 7. But this is no different than discussing one of the embodiments disclosed in the specification and cannot rise to the level of a "clear and unmistakable" disavowal or disclaimer of claim scope. *See*, *e.g.*, *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045-46 (Fed. Cir. 2016) ("When the prosecution history is used to solely support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one."); *Omega*, 334 F.3d at 1325-26 ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."); *Scott Envtl. Servs., Inc. v. A to Z Mud Co.*, No. 2:13-cv-701-JRG, 2014 WL 4226770, at **9-10 (E.D. Tex. Aug. 26, 2014) ("Contrary to Defendant's assertion, the Court finds that this statement is not an express definition or disavowal . . . but rather is merely an illustration."). Moreover, even if this was the only embodiment disclosed in the specification and the prosecution history, this does not mean it should be imported into the claims and does not constitute a disavowal of claim scope. *Thorner*, 699 F.3d at 1365-66; Ex. 1, ¶ 58. Likewise, a

---

[18] Defendant's expert points to two other definitions of "broadcast" (not "broadcast stream") that *post-date* the invention that use the word simultaneous. These definitions are of no help. First, the meaning of a term is examined at the time of the invention. Second, the fact that a "broadcast" may be transmitted simultaneously does not mean the corresponding stream is simultaneously sent to all receivers. Ex. 1, ¶ 59. The same broadcast could be simultaneously sent to two households (one that is beginning the program and one that is nearing the end of the program) and where the stream is at different states of transmission. *Id.*

35

subsequent statement that the prior art did not have simultaneous broadcast "of messages" is equally irrelevant because this statement was not used as an argument to overcome prior art, did not say the claimed "broadcast _stream_" must "simultaneously transmitted to more than one recipient" and thus is not a disavowal of claim scope either. *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1100 (Fed. Cir. 2013) ("We have long followed the rule that even a poorly-phrased prosecution argument does not a disclaimer make."); Ex. 5, ¶¶ 35-37. This portion of the prosecution history is consistent with the notion that a broadcast could be simultaneously sent to two households (one that is beginning the program and one that is nearing the end of the program) where the stream is at different states of transmission at the two households. Ex. 1, ¶ 59.

The second issue with Defendant's construction is breadth. A broadcast stream is not "any flow" of data that goes to multiple recipients. Rather, per the plain language of the claims, it is created in accord with the framework definition and contains audio, video and metadata content for a broadcast program, consistent with Plaintiffs' construction. '888 patent, claim 1, 8:21-29; Ex. 1, ¶ 57.

## IX.   U.S. PATENT NO. 6,233,736

### A.   Background of the Invention of the '736 Patent

The '736 patent is titled "Media Online Service Access System and Method." Generally, "[t]he media online services access system of the present invention provides a system and process which links video and audio program content with online information signal content." '736 patent, 3:25-28. Prior to the invention of the '736 patent, the methods by which content providers could provide additional information to a user were limited. In the prior art, "television and radio broadcasters [had] begun announcing an Internet address for viewer inquiries during the course of program transmission." *Id.*, 1:25-28. In contrast, the '736 patent teaches a system allowing users to automatically access online information

1  from a video program, directly from the provider of the information, with minimal

2  effort on the part of the user.[19]

3        **B.**    **"provided [with said / in a] video program"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | "embedded or encoded in the electronic signal that represents the video program" |

6        The primary dispute is whether the plain English phrases "provided with"

7  and "provided in" should be construed to mean that information must be

8  "embedded or encoded in the electronic signal that represents the video program."

9  Defendant's construction improperly imports limitations from embodiments into

10  the claims, contradicts Defendant's own admissions in the IPR Petition it filed, and

11  violates the principle of claim differentiation.

12        Defendant cannot read the phrase "embedded or encoded in the electronic

13  signal that represents the video program" into these terms.  This is a classic attempt

14  by a defendant to impermissibly read an embodiment from the specification into the

15  claims.  *Kara Tech.*, 582 F.3d at 1348; *Thorner*, 699 F.3d at 1366; *Liebel-*

16  *Flarsheim*, 358 F.3d at 906.  Reading embodiments from the specification into the

17  claims is improper unless the specification itself disavows a broader scope and

18  constricts the term.  *Thorner*, 699 F.3d at 1365, 1367.  Nothing in the language of

19  the claims, specification or file history disavows the plain and ordinary meaning of

20  the phrases "provided with" or "provided in."

21        The plain language of the phrases "provided with" and "provided in" support

22  Plaintiffs' construction.  The phrases do not have a specialized meaning and

23  therefore are given their plain English meaning.  The plain English meaning of

24  "provided with/in" does not mean that something is "embedded or encoded in a

25

---

26  [19] A person of ordinary skill in the art for the '736 patent is someone "with a
Bachelor's degree or the equivalent in the field of computer science and one to two

27  years experience with software design, computer architecture, and/or networking."
Ex. 7, ¶ 28.

28

signal embedded or encoded in the electronic signal that represents the video program."  The language of the claims does not say information is provided with/in "the **electronic signal that represents the video program**."  *See* '736 patent, claims 1, 8.  The claim language merely says that an address or link is "provided with [or in] a video program."  *Id.*  Therefore, there is no support for Defendant's attempt to import the "electronic signal" into the claim.  Second, the phrases "provided with" and "provided in" mean what they say—*i.e.*, that something is provided with a video program or provided in a video program in any form.

Nothing in the specification or file history redefines these plain English words or disclaims claim scope.  Defendant points to nothing in the specification that disavows any other meaning for the plain English meaning of "provided with" and "provided in."  In contrast, the specification states that the address signal does not have to be "embedded" or "encoded" in the video program electronic signal but can be received broadly "*in conjunction with* a digitally encoded video or audio electronic signal 12."  '736 patent, 6:2-5.  Defendant's own admissions in its IPR Petition concerning the '736 patent further contradict its proposed construction here.  In its IPR Petition, Defendant was required to identify the terms that required construction beyond their plain and ordinary meaning, yet Defendant did not identify the "provided with" and "provided in" terms for construction and therefore admitted that these terms should be given their plain and ordinary English meaning.  Ex. 8, pp. 13-15.  Defendant cannot have it both ways by adopting the broader plain and ordinary meaning in IPR proceedings and a different, narrow meaning when arguing that its products do not infringe in this case.

Moreover, the doctrine of claim differentiation contradicts Defendant's argument that the phrases "provided with" and "provided in," should be redefined from their common English meaning.  The terms-at-issue appear in the preambles of independent claims 1 and 8:

38

Claim 1: "A method of providing to a user of online information services automatic and direct access to online information through an address associated with an online information source <u>provided with a video program</u>"

Claim 8: "A method of providing to a user of online information services automatic and direct access to online information through a link <u>provided in a video program</u>"

In contrast, claim 7 requires the link to be "embedded in" an "electronic signal" representing the video program. '736 patent, claim 7, 10:26-37 (reciting a "video program represented by an electronic signal" and "electronically extracting … an address … from an information signal embedded in said electronic signal"). When the patentee intended to limit the claims to an address or link "embedded or encoded in the electronic signal that represents the video program," it affirmatively stated so in claim 7. In contrast, claims 1 and 8 do not include these limitations and therefore, under the doctrine of claim differentiation, they should not be included in those claims. *Liebel-Flarsheim*, 358 F.3d at 910; *InterDigital*, 690 F.3d at 1324.

## C.    "electronically extracting said address"

| Plaintiffs' Construction | Defendant's Construction |
| --- | --- |
| "detect and decode the address" | "removing or decoding the address from the electronic signal that represents the video program" |

The primary dispute is whether "electronically extracting" should be construed to require information to be extracted from an "electronic signal that represents the video program." Like the term above, the additional limitations Defendant proposes (1) improperly import limitations from embodiments regarding an "electronic signal" into the claims, (2) contradict Defendant's own admissions in the IPR Petition it filed, and (3) violate the doctrine of claim differentiation.

The parties agree that electronically extracting the address involves decoding the address. Plaintiffs' construction also reflects that to decode or extract an address, an address must first be detected. The specification indicates that detection is part of extraction when describing the "address extractor 42" which "may be

39

constructed in any of several existing ways to *detect an address signal which is received in conjunction with a digitally encoded video or audio electronic signal 12*." '736 patent, 6:2-5 (emphasis added).  The specification, therefore, considers detection to be part of the extraction process as reflected in Plaintiffs' construction.  In addition, as noted above in Section IX.B., the specification language makes clear that the address signal may be received broadly "in conjunction with" the video signal and need not be encoded or embedded within the same signal.  *Id.*

Defendant's attempt to insert into the extraction process the limitation of an address embedded in an "electronic signal that represents the video program" also contradicts Defendant's own admissions in its IPR Petition where it chose not to include this limitation in any of its proposed constructions.  Ex. 8, pp. 13-15.

The language of the claims also supports Plaintiffs' construction that does not require the address to be extracted from an "electronic signal that represents the video program."  Claim 1 does not recite an "electronic signal" much less an "electronic signal that represents the video program."  Therefore, by the plain language of the claims "electronically extracting said address" need not be from an "electronic signal that represents the video program."  This is in contrast to other claims where that limitation is specifically recited.  For example, claim 9 recites "a video or audio program *represented by an electronic signal*" and includes "means for *extracting an address* associated with an online information source *from an information signal embedded in said electronic signal*."  '736 patent, 10:53-67 (emphasis added).  When the patentee intended to limit the claims to extracting an address from an electronic signal that represents the video program, it so stated in the claim as in claim 9.  In contrast, claim 1 does not include these limitations and it is black letter law that they should therefore not be included in claim 1.  *Liebel-Flarsheim*, 358 F.3d at 910; *InterDigital*, 690 F.3d at 1324.

## X.   CONCLUSION

For at least these reasons, the Court should adopt Plaintiffs' constructions.

40

1

Dated May 4, 2018

2

FEINBERG DAY ALBERTI LIM &
BELLOLI LLP

3

4

/s/ M. Elizabeth Day
M. Elizabeth Day

5

6

Attorneys for Plaintiffs
NAGRAVISION SA and OPENTV, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41