Hilary L. Preston (*pro hac vice*)
   hpreston@velaw.com
Rachael P. McClure (*pro hac vice*)
   rmcclure@velaw.com
VINSON & ELKINS L.L.P.
666 Fifth Avenue, 26th Floor
New York, NY  10103-0040
Telephone: (212) 237-0129
Facsimile:  (917) 849-5342

Stephen C. Stout (*pro hac vice*)
   sstout@velaw.com
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, TX  78746-7568
Telephone:  (512) 542-8440
Facsimile:   (512) 542-8612

Darryl M. Woo, (CSBN 100513)
   dwoo@velaw.com
VINSON & ELKINS L.L.P.
555 Mission Street, Suite 2000
San Francisco, CA  94105
Telephone:  (415) 979-6980
Facsimile:   (415) 520-5377

Bruce L. Ishimatsu (CSBN 86145)
   bruce@ishimatsulaw.com
ISHIMATSU LAW GROUP P.C.
4712 Admiralty Way, No. 1012
Marina del Rey, CA  90292
Telephone: (310) 200-4060
Facsimile:  (310) 496-1540

Attorneys for Defendant NFL ENTERPRISES LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAGRAVISION SA and<br><br>OPENTV, INC.,<br><br>                Plaintiffs,<br><br>    v.<br><br>NFL ENTERPRISES LLC,<br><br>                Defendant. | Case No.: 2:17-cv-03919-AB-SK<br><br>**RESPONSIVE CLAIM CONSTRUCTION BRIEF OF DEFENDANT NFL ENTERPRISES LLC**<br><br>Date:      July 20, 2018<br>Time:     10:00 am<br>Courtroom:  7B<br>Judge:  Honorable André Birotte Jr. |

1

**TABLE OF CONTENTS**

2

**Page**

I.     PRELIMINARY STATEMENT ........................................................................... 1

II.    U.S. PAT. NO. 6,233,736 ................................................................................... 2

    A.   "provided [with said / in a] video program" ........................................... 3

        1.   The Intrinsic Record Supports NFLE's Proposed
            Construction. ........................................................................... 3

        2.   Plaintiffs' Proposal Violates Multiple Claim Construction
            Tenets. ..................................................................................... 4

    B.   "electronically extracting said address" ................................................. 6

        1.   The Intrinsic Record Supports NFLE's Proposed
            Construction. ........................................................................... 6

        2.   Plaintiffs Rely on a Misapplication of Claim
            Differentiation. ........................................................................ 7

III.   U.S. PAT. NO. 7,020,888 ................................................................................... 8

    A.   "broadcast stream" ................................................................................. 8

        1.   The Prosecution History Requires Simultaneous
            Transmission to Multiple Recipients. ..................................... 8

        2.   NFLE's Proposal Aligns with the Specification and
            Contemporaneous Extrinsic Evidence. .................................... 9

        3.   Plaintiffs Ignore the Clear and Unmistakable Prosecution
            Disclaimer and Import Unnecessary and Redundant
            Limitations. ............................................................................. 10

    B.   "framework definition" ........................................................................ 10

        1.   Plaintiffs Originally Offered NFLE's Proposal. ..................... 11

        2.   The Intrinsic Record Supports NFLE's Proposal. .................. 11

        3.   Plaintiffs' Proposal Contradicts the Specification and
            Renders the Claims Redundant. .............................................. 11

IV.    U.S. PAT. NO. 7,028,327 ................................................................................. 12

    A.   "timing offsets" .................................................................................... 12

        1.   The Intrinsic Record Supports the Start/End Time
            Concept. ................................................................................. 12

NFLE's Responsive Claim Construction Brief           Case No. 2:17-cv-03919-AB-SK

2. The Language "Synchrony-Oriented Data" is Impermissibly Broad and Unhelpful in Delineating the Claim Scope. ...................................................................14

B. "associated with a/the broadcast program" ...........................................14

   1. The Intrinsic Record Supports NFLE's Proposed Construction. ...................................................................15

   2. Plaintiffs' Unhelpful Proposal Relies on Legal & Factual Errors. ...................................................................16

C. "electronic program guide" ...........................................16

   1. The Specification Defines an EPG as an Electronic Database that Provides Schedule Information, and Requires that the Recited EPG Include Location, Time, and Channel Information. ...................................................................17

   2. Plaintiffs' Proposal is Inconsistent with the Intrinsic Record. ...................................................................18

V. U.S. PAT. NO. 7,055,169 ...................................................................19

A. "resources" ...................................................................19

   1. The Intrinsic Record Supports NFLE's Proposed Construction. ...................................................................19

   2. Including "Required for Presentation of Digital Graphics, Audio or Video Content" is Redundant and Contradicts the Patent. ...................................................................21

B. "presentation" or "audio, video, and/or graphic presentation" ...........................................21

   1. The Intrinsic and Extrinsic Record Support NFLE's Proposal. ...................................................................21

   2. Plaintiffs' Unhelpful Proposal Contradicts the Specification. ...................................................................23

VI. U.S. PAT. NO. 7,421,729 ...................................................................23

A. "address generator" ...................................................................23

   1. "Address Generator" Is a Means-Plus-Function Term. ...................................................................24

   2. "Address Generator" Is Indefinite. ...................................................................26

B. "encoding said video stream with said set of indicators accessed from said database" ...................................................................27

   1. The Intrinsic Record Supports NFLE's Proposed Construction. ...................................................................27

2.      Plaintiffs' Vague and Ambiguous Proposal Lacks Support................................................................28

C.    "decodes the time code signal and generates a corresponding address signal".................................................29

VII.   U.S. PAT. NO. 7,950,033 ..............................................................30

A.    "relational metadata"....................................................................30

1.      The Intrinsic Record Compels NFLE's Proposed Construction............................................................30

2.      Plaintiffs' Proposal Includes Extraneous Limitations and Contradicts the Patent Specification..............................31

B.    "wherein the relationship of the second data to the first data is selected from the group consisting of: . . ." (the "Markush group") ........................................................................32

1.      "Consisting of" Excludes Unrecited Relationships. ...................32

2.      "Consisting of" Limits the Group to "One and Only One" of the Recited Relationships. ........................................33

VIII.   U.S. PAT. NO. 7,996,861 ............................................................34

A.    "the application"............................................................................34

1.      The Intrinsic Record Supports NFLE's Proposal.......................34

2.      Plaintiffs' Proposed Construction Ignores Context.....................35

B.    "security manager"/"the security manager"...........................................38

1.      The Intrinsic Record Supports NFLE's Proposed Construction............................................................38

2.      Plaintiffs' Proposal Contradicts the Intrinsic Record..................38

IX.   CONCLUSION ................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Baxter Pharm. Prods., Inc.*,
   334 F.3d 1274 (Fed. Cir. 2003) .................................................................33

*Abbott Labs. v. Sandoz, Inc.*,
   544 F.3d 1341 (Fed. Cir. 2008) .................................................................14

*Abbott Labs. v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009) .................................................................30

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
   830 F.3d 1341 (Fed. Cir. 2016) ................................................ 24, 25, 26-27

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir. 2003) ...........................................................11, 12

*Apple, Inc. v. Ameranth, Inc.*,
   842 F.3d 1229 (Fed. Cir. 2016) .......................................................5, 8, 18

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
   388 F.3d 858 (Fed. Cir. 2004) ...................................................................3

*CommScope Techs. LLC v. Dali Wireless, Inc.*,
   No. 3:16-cv-477, 2017 WL 6549933 (N.D. Tex. Dec. 19, 2017) ........................25

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
   No. CV 16-01824, 2017 WL 2783486 (C.D. Cal. May 18, 2017) ........................25

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009) .............................................................2, 6

*Enercon GmbH v. Int'l Trade Comm'n*,
   151 F.3d 1376 (Fed. Cir. 1998) .................................................................32

*Erbe Elektromedizin GmbH v. Int'l Trade Comm'n*,
   566 F.3d 1028 (Fed. Cir. 2009) .................................................................13

*Farstone Tech., Inc. v. Apple Inc.*,
   No. 8:13-cv-1537, 2015 WL 5898273 (C.D. Cal. Oct. 8, 2015) ........................24

*Halliburton Energy Services, Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) .................................................................39

*Honeywell Int'l, Inc. v. ITT Indus.*,
   452 F.3d 1312 (Fed. Cir. 2006) ..................................................................2

*In re Varma*,
   816 F.3d 1352 (Fed. Cir. 2016) .................................................................18

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
   383 F.3d 1295 (Fed. Cir. 2004) ...........................................................31, 39

iv

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ................................................................1

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
  800 F.3d 1366 (Fed. Cir. 2015) ..........................................................24

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005) .......................................................5, 37

*MSM Invs. Co. v. Carolwood Corp.*,
  259 F.3d 1335 (Fed. Cir. 2001) ..........................................................20

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
  831 F.3d 1350 (Fed. Cir. 2016) .............................................32, 33, 34

*Nystrom v. TREX Co.*,
  424 F.3d 1136 (Fed. Cir. 2005) ..........................................................18

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ...............................................1, 16, 29

*Pall Corp. v. Hemasure Inc.*,
  181 F.3d 1305 (Fed. Cir. 1999) ............................................................5

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...........................1, 2, 28, 37

*Poly-Am., L.P. v. API Indus., Inc.*,
  839 F.3d 1131 (Fed. Cir. 2016) ............................................................2

*Robert Bosch, LLC v. Snap-On Inc.*,
  769 F.3d 1094 (Fed. Cir. 2014) ..........................................................25

*Shire Dev., LLC v. Watson Pharms.*,
  848 F.3d 981 (Fed. Cir. 2017) ............................................................33

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
  511 F.3d 1132 (Fed. Cir. 2007) ..........................................................36

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ..............................................................2

*SPEX Techs., Inc. v. Kingston Tech. Corp., et al.*,
  No. 8:16-cv-07349, 2017 WL 5495149 (C.D. Cal. Oct. 18, 2017) .......24

*Springs Window Fashions LP v. Novo Indus., L.P.*,
  323 F.3d 989 (Fed. Cir. 2003) ..............................................................2

*Tech. Patents LLC v. T-Mobile (UK) Ltd.*,
  700 F.3d 482 (Fed. Cir. 2013) ............................................................37

*Toro Co. v. White Consol. Indus., Inc.*,
  199 F.3d 1295 (Fed. Cir. 1999) ............................................................6

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
 595 F.3d 1340 (Fed. Cir. 2010) ....................................................................2, 6, 7

*V-Formation, Inc. v. Benetton Grp. SpA*,
 401 F.3d 1307 (Fed. Cir. 2005) ..............................................................................1

*Vitronics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed. Cir. 1996) ................................................................................7

*Williamson v. Citrix Online, LLC*,
 792 F.3d 1339 (Fed. Cir. 2015) ...............................................................23, 24, 26

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
 442 F.3d 1322 (Fed. Cir. 2006) ............................................................................14

**Statutes**

35 U.S.C. § 112 ¶ 6 ..................................................................................................23

35 U.S.C. § 112 ¶ 2 ............................................................................................24, 27

1   Defendant NFL Enterprises LLC ("NFLE" or "Defendant") files this Responsive

2   Claim Construction Brief pursuant to ECF No. 68.  NFLE respectfully requests that the

3   Court enter an order construing the disputed terms as proposed by NFLE.  These

4   constructions are mandated by the application of governing Federal Circuit precedent,

5   as explained more fully below.

## I.   Preliminary Statement

7       "The purpose of claim construction is to 'determine the meaning and scope of

8   the patent claims asserted to be infringed.'"  *O2 Micro Int'l Ltd. v. Beyond Innovation*

9   *Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview*

10  *Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996)).

11  "When the parties raise an actual dispute regarding the proper scope" of the asserted

12  claims, and that dispute bears on the issues of their infringement or invalidity, the

13  "court . . . must resolve that dispute."  *Id.*  In resolving those disputes, the Court's claim

14  construction is directed by "established rules of construction" as applied to "the text of

15  the patent and its associated public record."  *Markman*, 52 F.3d at 978-79.

16      While Plaintiffs pay lip service to those established rules, Plaintiffs' proposed

17  constructions do not adhere to them.  Certain of those tenets are relied upon throughout

18  NFLE's brief, and they are summarized here for the Court's ease of reference:

19  **TENET I.**   *Claim terms are given their "ordinary and customary meaning,"*

20  *but that meaning must be ascertained in the context of the intrinsic*

    *record.*  The ordinary meaning of a claim term is not, as suggested

21  by Plaintiffs, "the meaning of the term in the abstract" or in "plain

    English."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir.

22  2005) (en banc).  Rather, it is the meaning "in the context of the

23  entire patent."  *Id.* at 1312-13.

24  **TENET II.**   *The intrinsic record—the claims themselves, the specification, and*

    *the prosecution history—is the best evidence.*  "The intrinsic record

25  in a patent case is the primary tool to supply the context for

26  interpretation of disputed claim terms."  *V-Formation, Inc. v.*

    *Benetton Grp. SpA*, 401 F.3d 1307, 1310-11 (Fed. Cir. 2005).  In

27  particular, "the specification 'is always highly relevant to the claim

28  construction analysis.  Usually, it is dispositive; it is the single best

1

guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315.

**TENET III.**   *Description of "the present invention" may be limiting.*  Statements in the specification characterizing the "present invention" or "the invention" as including a particular feature or characteristic limit the claims accordingly. *See, e.g., Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016), *cert. denied*, 137 S. Ct. 2267 (2017) ("[A]n inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature."); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353 (Fed. Cir. 2010) ("This reference to 'the present invention' strongly suggests that the claimed re-centering command requires a manual input.").

**TENET IV.**   *An absence of alternative embodiments may be limiting.*  That a specification does not disclose any embodiment other than the one characterized as the "present invention" further bolsters the limiting nature of such statements. *See, e.g., Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) ("[T]he only devices described in the specification are intraluminal, supporting an interpretation that is consistent with that description."); *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (rejecting argument that the specification merely described a non-limiting "preferred embodiment" where that embodiment was the only one described).

**TENET V.**   *Limiting statements during prosecution cannot be reneged.*  "The public notice function . . . requires that a patentee be held to what he declares during the prosecution of his patent." *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003).  "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution . . . . Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

## II.   U.S. Pat. No. 6,233,736

The '736 patent is directed to providing links to online information in video programs to allow access to that information.  It purports to provide "direct, automated

access to an online information provider through an address embedded in an electronic signal which carries a program segment." '736 patent, 1:6-12.

### A.    "provided [with said / in a] video program"

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| *Plain and ordinary meaning* | "embedded or encoded in the electronic signal that represents the video program" |

The parties dispute whether these terms should be given their "plain English meaning," as Plaintiffs propose, or their plain and ordinary meaning to a person of ordinary skill in the art at the time of the invention (a "POSA") in the context of the claims, specification, and prosecution history, as NFLE proposes and the law requires.

### 1.    *The Intrinsic Record Supports NFLE's Proposed Construction.*

Properly viewed through the lens of the '736 patent, a POSA would understand the disputed phrases to mean "embedded or encoded in the electronic signal that represents the video program." Ex. 1 ("Jeffay Decl.") ¶¶ 26-34.

*First*, the specification repeatedly invokes the phrase "the invention" and "the present invention" and specifies that it utilizes addresses "embedded in the electronic signal." *Id.*, 1:6-12, 2:63-67, 3:1-4; Jeffay Decl. ¶¶ 29-31. The law is clear that this turn of phrase strongly indicates that the claims are limited to providing an address embedded in the electronic signal. *See* Tenet III.

*Second*, the "Summary of the Invention" portion of the specification also describes the context of providing an address as "*[e]mbedded* in the electronic signal . . . or otherwise *encoded* in the electronic signal." '736 patent, 3:36-41 (emphasis added). Likewise, the Abstract describes the patent as providing access to online information "through an address *embedded* in a video or audio program," and states that the address "is *encoded* in a vertical blanking interval or other non-displayed portion of an electronic signal . . ." (emphasis added). The uniformity of these passages further supports NFLE's proposal. *See* Tenet II; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004), *cert. denied*, 543 U.S. 821 (2004)) (explaining that

NFLE's Responsive Claim Construction Brief                    Case No. 2:17-cv-03919-AB-SK

1    "[s]tatements that describe the invention as a whole," which are often found in the

2    "Summary of the Invention," may be particularly useful in defining the scope of claim

3    terms); Jeffay Decl. ¶¶ 27-31.  Additionally, the fact that embedding or encoding in the

4    electronic signal is the *only* means of providing a video described in the specification

5    further supports NFLE's proposed construction.[1]  *See* Tenet IV; Jeffay Decl. ¶ 32.

6         *Third*, the prosecution history of the '736 patent confirms that NFLE's proposal

7    is correct.  Jeffay Decl. ¶¶ 33-34; Tenet V.  Here, during prosecution, the inventor

8    submitted an affidavit describing his invention as relying on "address data [e]mbedded

9    in the video picture or the picture's associated signals and/or data" and stated that "the

10   address is read from the . . . signal."  Ex. 5, 9/15/1995 Inventor Affidavit, at *1.  The

11   inventor also specified in hand-written notes on diagrams accompanying that

12   declaration that the "address is transmitted in vertical interval, sync, or elsewhere *in

13   signal*."  *Id.* at 4 (emphasis added).  With these clear statements, a POSA would

14   understand the invention to be limited to providing an address embedded or encoded

15   in the electronic signal that represents the video program.  Jeffay Decl. ¶¶ 33-34.  This

16   Court should reject Plaintiffs' effort in this litigation to advance an irreconcilably

17   broader scope.  *See* Tenet V.

18        **2.    *Plaintiffs' Proposal Violates Multiple Claim Construction Tenets.***

19        *It is Improper to Ignore the Context of the Patent.*  Plaintiffs' position that the

20   phrases "provided [with said / in a] video program" "do not have a specialized meaning

21   and therefore are given their plain English meaning," Op. Br. at 37, reflects a basic

22   misunderstanding of the law, as claim construction should never be divorced from the

23   context of the patent.  *See* Tenets I-II.  The Federal Circuit rejected a similar effort in

24

25   [1] Plaintiffs point to the specification's statement that that an "address signal" may be
     received "in conjunction with a digitally encoded video" (Op. Br. at 38; '736 patent,
26   6:1-7), but that sentence does not teach any method of providing an address signal that
     NFLE's construction would exclude.  The specification also uses "in conjunction with"
27   in the preceding paragraph to refer to an address "embedded" in an "analog video
     signal."  *Id.*, 5:45-49.  A POSA would simply understand from these disclosures that
28   the claims apply to analog video signals and digital video signals.  Jeffay Reb. ¶ 61.

NFLE's Responsive Claim Construction Brief                    Case No. 2:17-cv-03919-AB-SK

*Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313 (Fed. Cir. 2005).  There, the court rejected a proposal—nearly identical to Plaintiffs' here—to "look at the words of the claim with no context."  401 F.3d at 1319.  That court explained that it has "repeatedly rejected that approach" because "[w]e cannot look at the ordinary meaning of the term . . . in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."  *Id.*  Here, Plaintiffs' invitation to the Court to look at the "provided with/in" phrases in a vacuum, with no context of what a link is and how it is "provided," should similarly be rejected.

*Plaintiffs' claim differentiation argument is also misplaced.*  Plaintiffs' position that claims 1 and 8 cannot be interpreted to require that the link/address be embedded in the electronic signal of the video without violating the concept of claim differentiation, *see* Op. Br. at 38-39, is premised on their inaccurate representation that claim 7 recites a link embedded in an electronic signal.  *Id.* at 39.  However, claim 7 actually recites "electronically extracting . . . an address . . . *from an information signal embedded in said electronic signal*" (emphasis added), and therefore requires two levels of embedding or encoding: (i) the address in the information signal, and (ii) the information signal in the electronic video signal. Ex. 3 ("Jeffay Reb.") ¶ 59.  NFLE's construction, on the other hand, only requires that the address be embedded or encoded in the electronic video signal; it does not require the additional "information signal" of claim 7.  Because NFLE's proposal does not render claim 1 or claim 8 redundant to claim 7, claim differentiation does not support Plaintiffs' position.  *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1238 (Fed. Cir. 2016) (explaining that claim differentiation is not implicated if "claims are not otherwise identical in scope.").[2]

---

[2]  Plaintiffs also argue that by not identifying the "provided with/in" phrases for construction in its '736 patent IPR Petition, NFLE somehow "admitted that these terms should be given their [broader] plain and ordinary English meaning." Op. Br. at 38. Not so. The only issue in the IPR is whether the claims are invalid.  The meaning of these phrases is relevant to issues in this litigation, including whether the accused products infringe, so they must be construed.  *See Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1308 (Fed. Cir. 1999) ("Analysis of patent infringement starts with 'construction' . . . whereby the court establishes the scope and limits of the claim.").

Moreover, "claim differentiation does not serve to broaden claims beyond their meaning in light of the specification . . . and does not override clear statements of scope in the specification and the prosecution history."  *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999); *see also Edwards*, 582 F.3d at 1332.  Here, the '736 patent specification and prosecution history clearly limit "provided [with said / in a] video program" to "embedded or encoded in the electronic signal that represents the video program."  Jeffay Reb. ¶ 59.

### B.   "electronically extracting said address"

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "detect and decode the address" | "removing or decoding the address from the electronic signal that represents the video program" |

Like the "provided with" and "provided in" terms above, the key dispute with these terms is whether "electronically extracting said address" refers to extraction (i.e., removing or decoding) from the electronic signal that represents the video program. Plaintiffs' proposal is again overly broad and inconsistent with the intrinsic record.

### 1.   *The Intrinsic Record Supports NFLE's Proposed Construction.*

The patent Abstract states that "[t]he online information provider address is *detected and decoded from the electronic signal*," and the specification explains that "it is an object of the invention to provide a system for extracting an address of an online information provider *from an electronic signal which carries an video* or audio program."  '736 patent, 3:1-4 (emphasis added).  These characterizations compel NFLE's construction.  *See, e.g.*, *Trading Techs.*, 595 F.3d at 1353-54.  Further, the patent does not describe extracting an address from anywhere other than from the electronic signal that represents the video program.  Jeffay Decl. ¶ 38; *see* Tenet IV.

The prosecution history confirms that NFLE's proposal is correct.  In an affidavit that that the inventor submitted during prosecution, he specifically stated that "the

1   address is read from the television [i.e., electronic video] signal."[3]  Ex. 5, 9/15/1995

2   Inventor Affidavit, at *1.  A POSA is entitled to rely on this statement, *see* Tenet V,

3   and would understand from it that "electronically extracting said address" means

4   "removing or decoding the address from the electronic signal."[4]  *See Vitronics Corp. v.*

5   *Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("The claims, specification,

6   and file history . . . constitute the public record of the patentee's claim, a record on

7   which the public is entitled to rely.")

8        Plaintiffs argue that NFLE's proposal is too limiting because claim 1 does not

9   explicitly recite "an electronic signal."  Op. Br. at 40.  However, the intrinsic record

10  allows no other interpretation.  In *Trading Techs.*, the Federal Circuit considered

11  whether a term should be construed to require "manual entry" even though the adjective

12  "manual" was not stated in the claim language.  595 F.3d at 1353.  The court relied on

13  the fact that the specification only discussed manual commands, along with

14  representations about "the present invention" requiring manual re-entry,  to conclude

15  that the claims were so limited.  *Id.* at 1354.  Here, the similarly limiting statements in

16  the '736 patent specification and inventor affidavit can only be interpreted as limiting

17  the claims to extraction "from the electronic signal."  *See* Tenet IV.

## 2.   *Plaintiffs Rely on a Misapplication of Claim Differentiation.*

18

19       Plaintiffs again attempt to rely on claim differentiation to improperly broaden

20  the scope of claim 1.  Plaintiffs argue that "[w]hen the patentee intended to limit the

21  claims to extracting an address from an electronic signal that represents the video

22  program, it so stated in the claim as in claim 9." Op. Br. at 40.  But this either carelessly

23  or deliberately mischaracterizes the scope of claim 9, which does not claim "extracting

24  an address from an electronic signal," but rather recites "means for extracting an

25  address . . . *from an information signal embedded in* said electronic signal."  As

---

[3] The inventor defined "television signal" to refer to an analog or digital video signal.
*See* Ex. 5, 9/15/1995 Inventor Affidavit, at *1.

[4] Extrinsic evidence available at the time of the invention supports NFLE's proposed
language "removing or decoding."  Jeffay Decl. ¶ 39.

1   explained above for claim 7, extracting an address from an information signal
2   embedded in an electronic video signal is not the same as extracting the address from
3   the electronic video signal. Jeffay Reb. ¶ 63. Claim differentiation therefore does not
4   support Plaintiffs' position. *See Apple*, 842 F.3d at 1238.

5   **III.   U.S. Pat. No. 7,020,888**

6          The '888 patent is directed to "organization, combination, transmission and
7   reception of media from a range of sources." '888 patent, 1:16-21.

8          **A.     "broadcast stream"**

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "a flow of related data created in accordance with the framework definition that contains audio, video and metadata content for a broadcast program." | "a flow of data that is simultaneously transmitted to more than one recipient" |

14         For "broadcast stream," the parties dispute whether: (a) the patent applicants'
15  clear and unmistakable arguments during prosecution limit the meaning of this term—
16  they do—and (b) whether the language that Plaintiffs improperly incorporate from
17  other claim limitations should be included here—it should not.

18                 **1.    *The Prosecution History Requires Simultaneous Transmission to*
19                         *Multiple Recipients.***

20         During prosecution of the '888 patent, the applicants disclaimed any meaning of
21  "broadcast stream" that would include non-simultaneous transmission to multiple
22  recipients. Ex. 2 ("Smith Decl.") ¶¶ 74-76. On August 6, 2003, the Patent Office
23  rejected then-pending independent claim 1 as being "clearly anticipated" by prior art
24  said to disclose a "broadcast stream . . . for transmission to a plurality of receivers."
25  Ex. 6, 8/6/2003 Office Action, at *3-5. In response, to overcome that rejection, the
26  applicants argued that the "broadcast stream" of "the present invention" is
27  "*simultaneously* broadcast to a plurality of receivers," whereas the prior art instead
28  "provide[d] user-to-server communication and d[id] not broadcast messages

8

*simultaneously* to a plurality of receivers." Ex. 7, 11/5/2003 Response & Amendment, at *7 (emphasis added).  The applicants further stated:

- "The M-3 box [of the prior art] provides user-to-server communications and does not broadcast messages *simultaneously* to a plurality of receivers." *Id.* (emphasis added).

- "Nowhere does Heuer teach or suggest 'transmitting said menu to said plurality of receivers that are capable of checking said stream type to determine which streams may be used by said receivers' as recited in claim 1.  Heuer transmits the menu to individual receivers." *Id.* at *8 (emphasis in original).

- "The methods of the cited reference (Heuer) are directed to messaging which comprises single user-to-server communication.  The present invention is directed to broadcast to a plurality of receivers . . . ." *Id.* at *10 (emphasis in original).

These statements clearly and unmistakably limited the scope of the claimed invention to broadcasting simultaneously to more than one recipient, and disavowed any construction that would encompass single user-to-server communication. Accordingly, as set forth *supra* in Tenet V, the law requires that "broadcast stream" be construed to require simultaneous transmission to more than one recipient.

## 2.   *NFLE's Proposal Aligns with the Specification and Contemporaneous Extrinsic Evidence.*

When the '888 patent application was filed, "broadcast" was a term of art, meaning to simultaneously transmit from one source to many receivers.  Smith Decl. ¶¶ 73-74.  Consistently, the patent uses "broadcast stream" to refer to a data stream that is simultaneously transmitted from one source to many receivers.  For example, Figure 1 refers to a "Delivery System" that transmits the broadcast stream and may include a "transmission apparatus such as employed by cable, satellite, terrestrial, and other broadcast systems."  '888 patent, 8:24-27.  At the time, cable/satellite/terrestrial broadcast systems employed transmissions methods that simultaneously delivered information from one source to many receivers.  Smith Decl. ¶ 77.

NFLE's Responsive Claim Construction Brief                                    Case No. 2:17-cv-03919-AB-SK

1
2

      **3.**     ***Plaintiffs Ignore the Clear and Unmistakable Prosecution Disclaimer and Import Unnecessary and Redundant Limitations.***

3
4
5
6
7
8
9

     Plaintiffs' proposed construction is primarily wrong because it would encompass the single user-to-server transmissions that the patent applicants, during prosecution, clearly and unmistakably stated are not within the scope of the claimed invention. *See* Tenet IV. Plaintiffs' argument that the '888 patent contemplates non-simultaneous transmissions because a POSA would understand the disclosure of "packets" to refer to transmission over the Internet, *see* Op. Br. at 34, is therefore irrelevant. Moreover, that argument is also incorrect. Ex. 4 ("Smith Reb.") ¶¶ 30-33.

10
11
12
13
14
15
16

     Additionally, Plaintiffs' proposal should be rejected because it is unhelpfully redundant. Claim 1 already requires "combining said audio content, said video content, and said metadata content into a broadcast stream," so there is no reason to import "that contains audio, video and metadata content for a broadcast program" into the definition of "broadcast stream," as Plaintiffs propose. Likewise, the framework definition is required elsewhere in claim 1 and there is no reason to define "broadcast stream" as "created in accordance with the framework definition." Smith Reb. ¶¶ 35-38.

17

    **B.**    **"framework definition"**

18
19
20
21
22
23

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "a designation of the input and output content and metadata formats necessary to build and format various audio, video and metadata streams to enable their delivery and display across multiple receivers with differing capabilities" | "information that identifies a set of associated content for a broadcast program" |

24
25
26
27

     The parties dispute whether the specification compels: (a) NFLE's proposed construction (originally proposed by Plaintiffs), or (b) the self-serving construction that Plaintiffs now present.

28

NFLE's Responsive Claim Construction Brief          Case No. 2:17-cv-03919-AB-SK

### 1.    *Plaintiffs Originally Offered NFLE's Proposal.*

In their February 23, 2018 Rule 4-2 Disclosures, Plaintiffs offered a construction of "framework definition" that is identical to NFLE's proposal here. Ex. 13. After this Court noted "potential questions" regarding the scope of this term in its March 9, 2018 Order (ECF No. 93, at *25)—suggesting that the asserted claims would fail under Section 101 unless "framework definition" were specific enough to add an inventive concept—Plaintiffs changed course. Plaintiffs' transparent effort to rewrite this term to save the claims from patent-ineligibility should be rejected.

### 2.    *The Intrinsic Record Supports NFLE's Proposal.*

The first paragraph under "Summary of the Invention" provides that "[a] framework definition identifies a set of associated content (media) for a broadcast stream." '888 patent, 1:55-56. The specification explains that "[a] wide range of information types and formats may be employed" in the framework definition; "[t]he present invention is not limited to any specific types of information . . . ." *Id.*, 3:33-36. Thus, a framework definition is no more specific than "information that identifies a set of associated content for a broadcast program." Smith Decl. ¶ 81-86.

NFLE's proposed construction is also consistent with the prosecution history, in which the patent applicants stated that "[a] framework definition describes all the content in an omnimedia package." Ex. 7, 11/5/2003 Response & Amendment, at *7.

### 3.    *Plaintiffs' Proposal Contradicts the Specification and Renders the Claims Redundant.*

First, Plaintiffs' proposed construction would improperly exclude a preferred embodiment. "[I]t is axiomatic that a claim construction that excludes a preferred embodiment . . . is rarely, if ever correct." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003). Here, Plaintiffs contend that a "framework definition" must "designate the input and output format content and metadata formats necessary to build and format various audio, video and metadata streams." However, the exemplary framework definition supplied by the specification

does *not* designate any "input format" or "metadata formats." '888 patent, 7:55-8:19; Smith Reb. ¶ 36.   Because Plaintiffs' proposal would exclude that exemplary embodiment, it must be rejected. *Anchor Wall*, 340 F.3d at 1308.

Plaintiffs' proposal also renders the claims redundant and, therefore, confusing. Claim 1 already plainly requires that the framework definition identify "attributes of said various [audio, video, and metadata] stream types including the format of said various stream types."  Therefore, Plaintiffs' reference to "formats" is redundant, if not nonsensical.  Likewise, because claim 1 already requires transmission "to a plurality of receivers that are capable of checking said stream type to determine which streams may be used," Plaintiffs' proposed language "to enable their delivery and display across multiple receivers with differing capabilities" is misplaced in this term.

## IV.   U.S. Pat. No. 7,028,327

The '327 patent "relates generally to the field of interactive television, and more particularly to the automatic control of interactivity in synchrony with television broadcast programs."  '327 patent, 1:16-20.  It relies on "timing offsets" to do so.

### A.   "timing offsets"

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "synchrony-oriented timing data" | "data that specifies a start or end time for an event or action" |

The key dispute here is whether "timing offsets" should be defined so broadly and vaguely as to capture timing data such as allotment or duration, as Plaintiffs propose.  That effort should be rejected because it broadens this term beyond its meaning in view of the patent claims and specification, and could not provide any meaningful guidance to the jury.

#### 1.   *The Intrinsic Record Supports the Start/End Time Concept.*

*The Claims*.  Claim 13 relies on "timing offsets" to: (a) determine when there is a break in a television show and when the break ends, and (b) generate commands "to suspend execution of the interactive application" and "to resume execution"

1    accordingly.  As such, timing offsets must: (a) specify start and end times for breaks
2    such as commercials (i.e., events), and (b) specify start and end times for suspending
3    or resuming interactivity (i.e., actions).  Tenets I-II; Jeffay Decl. ¶¶ 186-91.

4        *The Specification*.  The specification explains that timing offsets "help an
5    interactive application know when to execute and terminate batch interactive
6    applications . . . so that each element of the interactive application associated with [a]
7    broadcast program will temporally coincide with appropriate triggering events in the
8    broadcast program."  '327 patent, 5:1-8.  The specification repeatedly and exclusively
9    discusses "timing offsets" as start/end times or execute/terminate times.  *Id.*, 4:64-66,
10   5:18-22, 5:39-44, 12:8-11, 19:5-10.  These disclosures confirm that a timing offset is a
11   time that specifies when an event or action starts or stops.  Jeffay Decl. ¶¶ 187-90.

12       Plaintiffs argue that "timing offsets can refer to an amount of time that is allotted
13   for commercials" (Op. Br. at 16), but the portion of the specification that Plaintiffs cite
14   does not provide support.  Jeffay Reb. ¶ 34.  Moreover, that argument actually
15   contradicts other portions of the specification, which specifically distinguish amounts
16   of time ("durations") from "timing offsets."  Jeffay Decl. ¶ 190.  The specification
17   explains that "each timing offset object preferably containing three pieces of data: a
18   timing offset . . . an application object . . . and an action."  '327 patent, 8:25-27.  The
19   "timing offset" specifies a time, the "application object is either interactive content or
20   a reference to interactive content," and the "action" is "an action to take on the
21   application object (such as execute, execute for a duration, suspend, resume, or
22   terminate)."  *Id.*, 8:25-27.  If "that action is to execute for a duration," then the "timing
23   offset object" may *also* include "a *fourth piece of data specifying the duration*."  *Id.*,
24   8:39-42 (emphasis added).  Based on this disclosure a POSA would understand that a
25   time allotment or duration is something different than, and is *not*, a "timing offset."
26   *See Erbe Elektromedizin GmbH v. Int'l Trade Comm'n*, 566 F.3d 1028, 1034-37 (Fed.
27   Cir. 2009) (distinguishing "fixed optics" from a "working channel" where the patent
28   identified each concept using different figures and labels); Jeffay Decl. ¶ 190.

2.     *The Language "Synchrony-Oriented Data" is Impermissibly Broad and Unhelpful in Delineating the Claim Scope.*

Plaintiffs' proposal should also be rejected because "synchrony-oriented" is vague and would be unhelpful to a jury in delineating the claim scope. *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1360 (Fed. Cir. 2008) (citing *Multiform Dessicants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998), for the precept that "claims are construed as an aid to the decision-maker, by restating the claims in non-technical terms"); Jeffay Reb. ¶¶ 39-40.  Notably, Plaintiffs themselves describe timing offsets as triggering the interactive application to "suspend display" (i.e., stop) "when a commercial breaks starts in the middle of a program," and later "resume" (i.e., start).  Op. Br. at 14-15.  In other words, Plaintiffs also describe "timing offsets" as data that specifies start and end times for events and actions.[5]

**B.     "associated with a/the broadcast program"**

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| *Plain and ordinary meaning* | "associated with the events, situations, or other content of a broadcast program" |

The dispute for this term is whether this Court should endorse Plaintiffs' effort to kick the can down the road by clinging to "plain and ordinary meaning."  The Court should reject this approach because the parties clearly dispute the meaning of this phrase, as evidenced by Plaintiffs' allegations that the slider bar on a video player satisfies this limitation.[6]  A video slider bar is far afield from the interactivity that is

---

[5] Plaintiffs incorrectly argue that "a 'time relative to a beginning of a [TV] show' is not 'a start or end time for an event or action,'" Op. Br. at 16, and thus NFLE's position must be rejected. Not so. A time "relative" to the beginning of a show still serves the purpose of prescribing a "start" time for a commercial or the like, and is thus consistent with NFLE's proposal. Jeffay Reb. ¶ 32; '327 patent, 8:45-48.

[6] While claims should be construed without reference to the accused products, Plaintiffs' infringement allegations are useful here to illuminate the dispute between the parties. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006) ("[I]f the litigants cannot themselves inform a trial court of the specific issues presented by the infringement inquiry . . . then a trial court may refer to the accused product or process for that context during the process.").

14

associated with the substance or content of a broadcast program, as required by the intrinsic record, and the parties' dispute should be addressed now.

### 1.    *The Intrinsic Record Supports NFLE's Proposed Construction.*

The claims require "an interactive application associated with a broadcast program."   The specification explains that "[a]n interactive application allows the viewer to participate, often in conjunction with *events or situations* arising in the broadcast program." '327 patent, 1:24-30 (emphasis added).  "For example, a broadcast game show may be accompanied by interactivity that allows the viewer to play along and input answers to questions being posed during the show."  *Id.*, 1:30-34.  The interactive application is suspended during commercials because "the interactivity for the show is not associated with the commercial, and its appearance may confuse the viewer," i.e., because the interactive application is not associated with the *content* of the commercial.  *Id.*, 2:7-15.  This core feature of interactivity requires that "associated with a broadcast program" means "associated with the events, situations, or other content of the program."  Jeffay Decl. ¶¶ 165-69.  To construe it otherwise guts any meaning from these claims.  Jeffay Decl. ¶¶ 170-74.

Critically, Plaintiffs have not and cannot articulate any type of "association" that is contemplated by the claims or specification but not covered by NFLE's construction. Jeffay Reb. ¶¶ 43-44.  Plaintiffs' suggestion that "timing offsets" are not associated with the events, situations, or content of a broadcast program, *see* Op. Br. at 17, falls flat; the specification could not make the connection clearer: "Timing offset objects trigger the processor that executes interactive content to initiate time-sensitive elements of the interactive content *so that the elements will coincide with events taking place in the broadcast program*." '327 patent, 5:18-22 (emphasis added).  For example, "when a game show host is about to reveal the answer, a timing offset triggers termination of

NFLE's Responsive Claim Construction Brief                              Case No. 2:17-cv-03919-AB-SK

the 'viewer answer window' interactive application, and the interactive window in which the viewer could have responded is removed from display." *Id.*, 5:28-32.[7]

### 2.   *Plaintiffs' Unhelpful Proposal Relies on Legal & Factual Errors.*

"Plain and ordinary meaning" is inappropriate because the parties clearly dispute the scope of this term, such that its meaning should be resolved at this stage of the case. *See O2 Micro*, 521 F.3d at 1361 (ordering "'plain and ordinary meaning' may be inadequate when . . . 'ordinary' meaning does not resolve the parties' dispute.").

Further, Plaintiffs' apparent interpretation of "plain and ordinary meaning" would inappropriately encompass any alleged "association" between a generic video player and a broadcast program, even though the player is not related to the substantive content of the program. Jeffay Decl. ¶¶ 170-72.  That scope is irreconcilable with what a POSA would understand, that is, that the interactive application in the asserted claims—which is provided "by a broadcaster or other program or content supplier" and transmitted to a viewer "concurrent with the broadcast of the program" ('327 patent, 11:13-15, 11:60-65)—cannot be a video player component.  Jeffay Decl. ¶¶ 173-74.

### C.   "electronic program guide"

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "an electronic collection of data about available broadcast programs" | "an electronic database that provides schedule information for broadcast programs, including geographic location, local time, and channel information" |

The parties dispute whether an electronic program guide ("EPG") is a database and whether it must include schedule information and, specifically, location, time, and channel information.  The claims and specification compel NFLE's construction.

---

[7] Plaintiffs argument that "the purpose of an interactive application is to perform an action" and that this somehow contradicts NFLE's proposal, *see* Op. Br. at 18, n.8, appears to misunderstand the specification.  The only "actions" in the patent are actions taken on the interactive application itself.  *See* Jeffay Reb. ¶ 44.

1

2    **1.    *The Specification Defines an EPG as an Electronic Database that Provides Schedule Information, and Requires that the Recited EPG Include Location, Time, and Channel Information.***

3

4    The first sentence of the Abstract states, "[i]n a broadcasting system, an

5    electronic program guide (EPG) is used to determine what broadcast program is on a

6    given *channel* at a given *time* in a given *location.*" (emphasis added).  An EPG cannot

7    make that determination if it does not, in fact, include geographic location, local time,

8    and channel information. Jeffay Decl. ¶ 179.  The specification also explains that "[t]he

9    Electronic Program Guide is a database (also called 'the EPG database')" that

10   "coordinates geographic location, local time, and channel information with a

11   corresponding broadcast program." *Id.*, 4:21-26; Jeffay Decl. ¶¶ 177-78.

12   Plaintiffs' argument that NFLE's proposal improperly reads in limitations from

13   the specification is incorrect.  NFLE properly relies on the specification to inform how

14   a POSA would understand the claim language.  *See* Tenets II, IV; Jeffay Decl. ¶¶ 176-

15   78.  The specification repeatedly and exclusively describes the EPG as an electronic

16   database (*e.g.*, '327 patent, 4:21-26, 7:60-65, 8:11-16) that includes geographic

17   location, local time, and channel information. *Id.*, 4:21-26, 7:60-65.

18   NFLE's construction also does not improperly read in limitations from the

19   dependent claims, as Plaintiffs' argue with respect to claim 26.  Claim 26 requires

20   determining timing, channel, and broadcaster-location information of the broadcast

21   program, and then "determining, using the timing, channel, and location information

22   as inputs to the electronic program guide, the interactive application."  Plaintiffs argue

23   that the fact that time, channel, and location are "inputs" into the EPG somehow

24   contradicts NFLE's construction. Op. Br. at 19.  On the contrary, this actually supports

25   NFLE's position.  To effectively use time/channel/location inputs into the EPG—the

26   EPG must first actually include time, channel, and location information that can be

27

28

NFLE's Responsive Claim Construction Brief                                    Case No. 2:17-cv-03919-AB-SK

1  searched.  Jeffay Decl. ¶ 179.  If it did not, those three pieces of information would be

2  meaningless inputs.[8]  *Id.*

3       Plaintiffs' claim differentiation point also fails because NFLE's proposal does

4  not render claims 13 and 26 redundant, as Plaintiffs posit.  Using NFLE's construction,

5  claim 13 does not limit the type of information that must be used to determine the

6  interactive application; it merely says that the application must be determined "using

7  an [EPG]."  Claim 26 more narrowly requires the use of all three inputs together to

8  make the determination.  Jeffay Reb. ¶ 47.  Thus, the two claims have different scope

9  and there is no claim differentiation concern.  *See Apple*, 842 F.3d at 1238.

10       **2.**    ***Plaintiffs' Proposal is Inconsistent with the Intrinsic Record.***

11       Plaintiffs do not even require that the EPG be a database that includes scheduling

12  information, let alone that it include the requisite location, time, and channel

13  information. Jeffay Decl. ¶¶ 182-84.[9]  As such, Plaintiffs' proposal would improperly

14  encompass *any* data or information about a broadcast program, including, for example,

15  a movie review, closed captioning, or a parental guidance rating.  This is wholly

16  inconsistent with the meaning of EPG in the '327 patent.  Jeffay Decl. ¶¶ 183-84.

17       Plaintiffs cannot rely on NFLE's extrinsic evidence to support their proposal,

18  *see* Op. Br. at 20, n.11, because "it is improper to read [a] term to encompass a broader

19  definition simply because it may be found in a dictionary, treatise, or other extrinsic

20  source." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005).  NFLE's sources

21  confirm that an EPG is a "database" with schedule information.  Jeffay Decl. ¶¶ 180-

22  81.  While the depth of information included may generally be an "editorial decision,"

23  here, the patent claims and specification at issue clearly require geographic location,

24  local time, and channel information.  Jeffay Decl. ¶ 179; Jeffay Reb. ¶ 47.

---

25  [8] EPG must be construed to have the same meaning in the asserted claims as in claim
26  26. *In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016) ("[T]he principle that the same
    phrase in different claims . . . should have the same meaning is a strong one.").

27  [9] Plaintiffs' arguments regarding the EPG storage location, *see* Op. Br. at 20, are
28  misplaced because there is no correlation between storage location and the types of
    information that the EPG must include.  Jeffay Reb. ¶ 48.

# V.    U.S. Pat. No. 7,055,169

The '169 patent is directed to a presentation put together from various resources and played out as a whole for the user.  The presentation, or its initiation, is prohibited until certain "prerequisite" resources are acquired.

## A.    "resources"

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "computer hardware, computer software or computer data required for presentation of digital graphics, audio or video content" | "software objects that can be transmitted over a network" |

The parties agree that the "resources" of the asserted claims include computer software or data.  The parties dispute whether (1) the claimed "resources" can include computer hardware, and (2) this construction should redundantly specify that the "resources" are "required for presentation of digital graphics, audio or video content."

### 1.    *The Intrinsic Record Supports NFLE's Proposed Construction.*

NFLE's construction is consistent with the context of the asserted claims and the specification, which speak in terms of software objects for a presentation that may need to be fetched over a network.  Jeffay Decl. ¶¶ 116-26.  The patent describes "tak[ing] actions to prefetch these resources." '169 patent, Abstract; *see also id.*, 2:55-57; 47:63-65.  Similarly, the specification discusses delaying display of a presentation to a user "until at least a subset of the resources . . . have been downloaded." *Id.*, 21:9-13; *see also id.*, 21:45-47.  It would not make sense to "prefetch" or "download" computer hardware in the context of the asserted claims.  Jeffay Decl. ¶ 119.

NFLE acknowledges that portions of the specification and certain dependent claims refer to particular "hardware resources," but, critically, the patent specification uses the word "resource" differently in different contexts and the "resources" recited in claims 1, 2, 22, and 23 are software objects, not hardware.  Jeffay Decl. ¶¶ 120-21.  Where the hardware resources are discussed, they are ancillary to fetching or

NFLE's Responsive Claim Construction Brief                    Case No. 2:17-cv-03919-AB-SK

1  downloading of the necessary "resources" of claims 1, 2, 22, and 23, confirming that
2  they are different than the software "resources." *Id.*

3      Plaintiffs misread the passage of the specification which states that "the terminal
4  may wish to 'precreate' the resource (*e.g.*, allocate resources such as memory, *and*
5  *decode*) instead of simply prefetching that resource." '169 patent, 49:35-38 (emphasis
6  added). *See* Jeffay Reb. ¶ 52. Plaintiffs erroneously focus on the word "memory," but
7  the clear import of this passage is that, as an alternative to simply fetching an already
8  decoded resource (i.e., a decoded software object), the software object can first be
9  downloaded and then decoded. *Id.* The memory allocation is simply a subordinate
10 action that facilitates the "precreation" (i.e., decoding) of the "resource." *Id.* Memory
11 hardware is not the "resource" being prefetched or precreated, nor would prefetching
12 or precreating hardware make any sense in the asserted patent claims' context.[10] *Id.*

13     Plaintiffs' reliance on the specification's discussion of "pipes" is also misplaced.
14 Op. Br. at 27-28. A patent can describe multiple different inventions. *MSM Invs. Co.*
15 *v. Carolwood Corp.*, 259 F.3d 1335, 1340 (Fed. Cir. 2001). The "pipes" portion of the
16 specification discusses "Tuning and Stream Selection," '169 patent, 9:9, and bears little
17 relation to the claimed invention. Jeffay Reb. ¶ 55. That unclaimed disclosure
18 concerns hardware that facilitates data transmission and does not describe the software
19 "resources" that are required for the claimed presentation. *Id.*; *see also* '169 patent,
20 12:51-58 ("select a pipe . . . select the components of a stream that will be sent to the
21 destination"); 12:63-64 ("[T]he programmer may determine which pipe is being used
22 for a given image . . . .")).

23
24
_____
25 [10] Claim 6 similarly uses "resource" in two different ways—first to refer to the "subset
   [of resources]," and then to refer to "configuring hardware resources." Jeffay Reb.
26 ¶ 53. The subset refers to software objects because the claim specifies that the "subset
   [of resources] comprises streaming audio and/or video." *Id.* The verb "configuring"
27 preceding the later reference to "hardware resources" confirms that hardware resources
   are not included in the subset of resources; instead, "configuring hardware resources"
28 is an ancillary step to facilitate "acquisition" of the software-object resources. *Id.*

1

2

### 2.    *Including "Required for Presentation of Digital Graphics, Audio or Video Content" is Redundant and Contradicts the Patent.*

3

4

5

6

7

Plaintiffs' proposed language, "required for presentation of digital graphics, audio or video content," is improper.  *First*, the claims already state that the "audio, video and/or graphic presentation . . . requires a set of resources," so that language here would be redundant.  Jeffay Decl. ¶ 123.  *Second*, Plaintiffs import the word "digital," which contradicts the patent's discussion of analog signals.  *E.g.*, '169 patent, 5:56-6:2.

8

### B.    **"presentation" or "audio, video, and/or graphic presentation"**

9

10

11

12

13

14

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| *Plain and ordinary meaning*, or alternatively, the plain and ordinary meaning of the larger term "audio, video, and/or graphic presentation" is "a selection of one or more of video, audio, and graphics for concurrent display" | "information organized to be played out as a whole"<br><br>For "audio, video, and/or graphic presentation," no further construction needed beyond "presentation." |

15

16

17

18

19

20

21

The parties do not dispute that an "audio, video, and/or graphic presentation" can be made up of "one or more of video, audio, and graphics."  After all, the specification states that a "content creator often wishes to use multiple resources in constructing a scene or presentation . . . ." '169 patent, 47:24-25.  The parties do dispute whether a "presentation" is "a selection of one" of those resources "for concurrent display," or whether the "presentation" is "organized to be played out as a whole."

22

### 1.    *The Intrinsic and Extrinsic Record Support NFLE's Proposal.*

23

24

25

26

27

28

By explaining that "multiple resources" may be used in "constructing a . . . presentation," the specification indicates that a "presentation" is the completed whole created by organizing the various information or resources together.  *Id.*, 47:24-25; Jeffay Decl. ¶¶ 105-06.  For example, the specification describes a "CNN TV channel and all of its component streams," including a video stream, an audio stream, and subtitles and teletext.  *Id.*, 11:25-36.  There, the "CNN TV channel" is the

1    "presentation," and its "component streams" are the various information organized
2    together to create the whole of that presentation.  Jeffay Decl. ¶ 107.

3    NFLE's construction is also consistent with the ordinary meaning of the word
4    "presentation."  A slide presentation is an apt example: one would not identify each
5    slide as a separate presentation.  Jeffay Decl. ¶ 110.  Rather, the slides are organized to
6    be perceived one after another as part of an intended whole that is observed by the user
7    as the presentation.  *Id.*  A movie or TV show is similarly a "presentation," but the
8    individual frames that make up the show are not.  *Id.*  Plaintiffs' proposed language
9    "selection of one or more of," rather than a whole, would divide that presentation into
10   multiple subparts, contrary to the plain meaning of the term.  Jeffay Decl. ¶ 109.

11   Extrinsic evidence from the time of the '169 patent application also supports
12   NFLE's proposal.  For example, the Synchronized Multimedia Integration Language
13   ("SMIL") specification—which addresses the same interactive media technology space
14   as the '169 patent (Jeffay Decl. ¶¶ 111-13)[11]—defines "an XML-based language that
15   allows authors to write interactive multimedia presentations."  Ex. 12, SMIL 2.0,
16   Abstract.  The SMIL specification consistently uses the term "presentation" to refer to
17   information organized to be played out as a whole.  It describes, for example, the syntax
18   for a presentation in which "each image is successively displayed and remains
19   displayed until the end of the presentation," Ex. 12, SMIL 2.0 § 7.4.2; it also describes
20   how "alternative parts designed for screens with different resolutions and bit-depths"
21   are nevertheless contained within a single presentation.  Ex. 12, SMIL 2.0 § 4.2.1.  The
22   SMIL specification confirms that a POSA would have understood "presentation" to
23   refer to "information organized to be played out as a whole," rather than each
24   identifiable piece (such as "each image" or the "alternative parts").  Jeffay Decl. ¶ 113.

25
26
27
28   _____
[11] Plaintiffs' expert does not dispute that the SMIL specification would have been
known to a POSA.  *See* Surati Decl. (ECF No. 103-5) ¶ 18.

NFLE's Responsive Claim Construction Brief                                    Case No. 2:17-cv-03919-AB-SK

2.    ***Plaintiffs' Unhelpful Proposal Contradicts the Specification.***

Plaintiffs' construction of "presentation" as "a selection" of resources "for concurrent display" introduces added uncertainty rather than clarity.  Contrary to the specification, "a selection of one or more of" would allow for a subset of one of the presentation elements to be the "presentation," rather than the whole of all of the elements. Jeffay Decl. ¶ 109.  Plaintiffs' expert claims that "a selection" "simply refers to content choices made by the content creator in putting together the presentation," *see* Surati Decl. (ECF No. 103-5) ¶ 17, but this is really another way of saying "information organized to be played out as a whole."[12]

## VI.    U.S. Pat. No. 7,421,729

The '729 patent is directed to "generating and inserting indicators into a video stream" to display information such as content descriptions, or "advertising, emergency messages, [or] games to play along with a video broadcast." *Id.*, 12:22-25.

### A.    "address generator"

| Plaintiffs' Proposal | NFLE's Proposal |
| --- | --- |
| "a specialized decoder that decodes the time code signal and generates an address signal based on the time code signal"<br><br>Plaintiff does not believe this term requires construction under 35 U.S.C. § 112(6). | *Means-plus-function term.*<br><br>Function:  "receive a time code signal, decode the time code signal, and generate an address signal"<br><br>Structure:  The specification fails to disclose adequate structure corresponding to the function. |

Means-plus-function claiming, permitted by 35 U.S.C. § 112 ¶ 6,[13] "allow[s] patentees to express a claim limitation by reciting a function to be performed rather

---

[12] Additionally, the phrase "concurrent display" inappropriately implies that at least two resources must be displayed together as a "presentation," when a presentation can be made up of a single resource.  Jeffay Decl. ¶ 108.

[13] Plaintiffs incorrectly refer to the operative statutory provision as Section 112(f), *see* Op. Br. at 10, but there is no substantive difference.  The subsections of Section 112 were renamed by amendment in 2012, and 112 ¶ 6 became 112(f) without change to the text. Because the '729 patent application was filed before the 2012 amendments,

(Footnote Cont'd on Following Page)

than by reciting structure for performing that function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-48 (Fed. Cir. 2015).  When used, however, means-plus-function claim terms are construed to cover "only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Id.*  Consequently, "[i]f the patentee fails to disclose adequate corresponding structure, the claim is [invalid as] indefinite" under Section 112 ¶ 2.  *Id.* at 1352-53.

Here, "address generator" is a means-plus-function term because the term does not have a sufficiently definite meaning as the name for structure.  Smith Decl. ¶ 61.  And it is indefinite because the specification fails to disclose any structure corresponding to the address generator's claimed function.  *Id.*, ¶¶ 62-65.

## 1.   *"Address Generator" Is a Means-Plus-Function Term.*

To determine whether a claim term is a means-plus-function term, "the essential inquiry is . . .  whether the words of the claim are understood by [a POSA] to have a sufficiently definite meaning as the name for structure." *Williamson,* 792 F.3d at 1348.  To be sure, terms that do not use the word "means" are presumed to not be means-plus-function terms.  *Id.* at 1349.  But that presumption is overcome (and often has been[14]) when—as here—"the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  *Id.*

The Federal Circuit's *Advanced Ground* decision is on point.  The term at issue there, "symbol generator," earned means-plus-function treatment because it "fail[ed] to describe a sufficient structure and otherwise recite[d] abstract elements 'for' causing actions . . . or elements 'that can' perform functions." *Advanced Ground Info. Sys.,*

---

the appropriate citation is to Section 112 ¶ 6.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1343 n.2 (Fed. Cir. 2015).

[14] *E.g.*, *Williamson,* 792 F.3d at 1351 (distributed learning control module); *Advanced Ground*, 830 F.3d at 1348 (symbol generator); *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015) (compliance mechanism); *Farstone Tech., Inc. v. Apple Inc.*, No. 8:13-cv-1537, 2015 WL 5898273, at \*4 (C.D. Cal. Oct. 8, 2015), *aff'd*, 668 F. App'x 366 (Fed. Cir. 2016) (backup/recovery module); *SPEX Techs., Inc. v. Kingston Tech. Corp., et al.*, No. 8:16-cv-07349, 2017 WL 5495149, at \*10 (C.D. Cal. Oct. 18, 2017) (security module).

1   *Inc. v. Life360, Inc.*, 830 F.3d 1341, 1348 (Fed. Cir. 2016).   Here, the similar

2   problematic claim language—"address generator"—is described only as something

3   that performs that address-generation function.   "Address generator" appears as an

4   empty box in Figures 3 and 5, and the specification describes those empty boxes with

5   nothing more than a reformulation of the address generator's function as recited in the

6   claims.   *E.g.*, '729 patent, 5:27-28 ("an address generator 314 that decodes the time

7   code signal and generates a corresponding address signal 316"); 7:64-65 ("Address

8   generator 511 generates an address signal 514 in response to the time code signal

9   512."); *see also* Smith Decl. ¶ 64.   In short, the term is "simply an abstraction that

10  describes the function being performed," i.e., generating an address signal and, as such,

11  should be treated as a means-plus-function term.   *Advanced Ground*, 830 F.3d at 1348;

12  *see also CommScope Techs. LLC v. Dali Wireless, Inc.*, No. 3:16-cv-477, 2017 WL

13  6549933, at *10-12 (N.D. Tex. Dec. 19, 2017) (treating "address data former" as a

14  means-plus-function term).

15       Plaintiffs' reliance on *EcoServices* is misplaced.   Op. Br. at 10-11.   In that case,

16  the specification provided a detailed explanation of what a "control unit" was,

17  including the types of data that it included.   *See EcoServices, LLC v. Certified Aviation

18  Servs., LLC*, No. CV 16-01824, 2017 WL 2783486, at *7 (C.D. Cal. May 18, 2017).

19  Here, Plaintiffs cannot point to any disclosure in the specification of what the claimed

20  "address generator" actually is.   Plaintiffs note that the term appears multiple times in

21  the specification, *see* Op. Br. at 9, yet not one of those instances describes what an

22  "address generator" is.   *See Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099-

23  1100 (Fed. Cir. 2014) (treating term as means-plus-function where "specification does

24  not contain a single reference to the structure [of the term]; all of the proffered citations

25  from the specification merely explain its function.")

26       Plaintiffs' argument that "address generators," as used in the claims, would be

27  understood as a well-recognized structure also fails.   Op. Br. at 9-10.   The term "address

28  generator" was not a standard term in the pertinent art.   Smith Decl. ¶ 61.   To support

their argument, Plaintiffs point to a patent application, U.S. Pub. No. 2001/0018693, that they wrongly assert is cited in the "Other Publications" section of the '729 patent. *See* Op. Br. at 9.  The application in fact appears nowhere in the '729 patent and, in any event, it does not refer to any "address generator."  Ex. 11.  Plaintiffs' assertion that Intel's "address generation unit" circuitry would be recognized as the "address generator" recited here is also wrong.[15]  Smith Reb. ¶ 14.  That technology, completely unrelated to the '729 patent's video processing technology, is used to optimize the internal workings of a microprocessor and has no bearing on the meaning of "address generator" here.  *Id*.  Moreover, that technology was not capable of receiving and decoding a time code signal, and generating a corresponding address signal to be used as a database input, as required by the '729 Patent.  *Id*.  That Plaintiffs resorted to misstating the record and relying on a completely unrelated field highlights that no viable support exists for Plaintiffs' position.

## 2. *"Address Generator" Is Indefinite.*

Plaintiffs do not, and cannot, identify any disclosure in the specification corresponding to the claimed "address generator" functions of receiving a time code signal, decoding a time code signal, and generating an address signal.  Consequently, the claim is invalid as indefinite.  *Williamson*, 792 F.3d at 1352-53.  As discussed above, the specification only describes the "address generator" in terms of its intended functions and fails to disclose any operative structure or algorithm for carrying out the claimed functions.  Smith Decl. ¶¶ 62-64; '729 patent, 5:26-29, 7:61-64.  Any general disclosure of a computer in the specification is not sufficient: "[a] patentee cannot claim a means for performing a specific function and subsequently disclose a 'general purpose computer as the structure designed to perform that function.'"  *Advanced*

---

[15] At the very least, Plaintiffs cannot have it both ways.  If "address generator" was a well-known circuitry type as Plaintiffs contend, then *that* is how the term should be construed, not as some "specialized decoder" that Plaintiffs instead propose.

NFLE's Responsive Claim Construction Brief                                     Case No. 2:17-cv-03919-AB-SK

1    *Ground*, 830 F.3d at 1349.  Accordingly, the asserted claims must be held invalid as

2    indefinite.  *Id.* at 1349-50; 35 U.S.C. § 112 ¶ 2.

3    **B.    "encoding said video stream with said set of indicators accessed from said database"**

4

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "applying the set of indicators accessed from the database to the video stream to enable segment-by-segment marking of the video stream" | "inserting the set of indicators accessed from the database into the video stream" |

10    The primary dispute here is whether "encoding said video stream" means

11   "inserting" the set of indicators into the video stream, as NFLE proposes, or "applying"

12   the set indicators to the video stream, as Plaintiffs propose.  NFLE's proposal does not,

13   as Plaintiffs suggest, prohibit "segment-by-segment marking"; it simply recognizes

14   that that extraneous limitation does not belong in this term.

15          **1.    *The Intrinsic Record Supports NFLE's Proposed Construction.***

16          The preamble of claim 1 recites "a method of generating and *inserting* indicators

17   into a video stream."  '729 patent, 12:59-60 (emphasis added).  The specification offers

18   further support: the very title of the invention is "Generation and *Insertion* of Indicators

19   Using an Address Signal Applied to a Database." (emphasis added).   The patent

20   Abstract begins, "Disclosed is a system for *inserting* indicators, such as tags and

21   markers, in a video stream."  And the patent repeatedly refers to "the present invention"

22   as comprising a system and method for "inserting indicators" in a video stream.  *Id.*,

23   1:42-51, 1:63-65, 2:5-10, 2:12-14.[16]  Those words are limiting.  *See* Tenet III.

24          NFLE's proposal does not, as Plaintiffs contend, exclude "back channel

25   encoding."  Op. Br. at 12.  The specification explains that back channel encoding

26   simply means that data is sent by "a separate frequency channel."  '729 patent,

27   ───────────────
[16] The specification also describes "inserting indicators" at 1:36-38, 3:26-27, 3:59-67,

28   4:1-9, 5:11-13, 5:18-21, 5:41-47, 5:55-58, 7:34-37, 8:28-33, 8:42-44, 9:4-10, 9:23-25, 9:42-45, 11:1-2, 12:8-17, 12:18-20, 12:25-27.

NFLE's Responsive Claim Construction Brief                    Case No. 2:17-cv-03919-AB-SK

7:4-6.  Because the claims still require "encoding *said video stream* with said set of indicators," "back channel encoding" simply means that the indicators are inserted into the video stream at a separate frequency.  Smith Reb. ¶¶ 20-21.  And indeed, the specification later distinguishes a back-channel approach from sending data separately via the Internet.  '729 patent, 11:44-47.  Accordingly, a POSA would understand that "encoding *said video stream* with said set of indicators" encompasses back channel encoding of the video stream—i.e., inserting the indicators into the video stream at a separate frequency—but does not encompass transmitting indicators separately from the video stream, as Plaintiffs appear to contend.  Smith Reb. ¶ 21.

### 2.   *Plaintiffs' Vague and Ambiguous Proposal Lacks Support.*

Plaintiffs' proposed construction should also be rejected because the word "apply" is not helpful in delineating the scope of the claims.  Smith Reb. ¶ 21.  Although the specification uses the word "apply" in some contexts—*e.g.*, "applying the time code signal to an address generator" and "applying the . . . address signal to a database"—it never uses "apply" in the context of encoding the video stream with indicators.  As such, a POSA would not understand "encoding" a video stream with indicators to mean "applying" indicators to the video stream.  Smith Reb. ¶ 18.

Plaintiffs' proposed language "to enable segment-by-segment marking of the video stream" should also be rejected because the specification contemplates encoding that is *not* on a segment-by-segment basis.  For example, the specification provides that "[t]he present invention . . . [c]an be used for any desired purpose" including providing "advertising, emergency messages," "local sports scores, local weather conditions, or any supplemental information that may vary from region to region."  '729 patent, 12:18-43.  None of those purposes require "segment-by-segment marking of the video stream."  As such, a POSA would not understand the term to require segment specific marking and Plaintiffs' proposed construction would improperly restrict the claim scope.  *See Phillips*, 415 F.3d at 1326-27 ("The fact that the written description . . . sets

1    forth multiple objectives to be served by the baffles recited in the claims confirms that

2    the term 'baffles' should not be read restrictively . . . .").

3         **C.    "decodes the time code signal and generates a corresponding address**

4              **signal"**

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| Plain and ordinary meaning | "converts the time code signal from one form to another, and then generates an address signal that corresponds to the decoded time signal" |

9         Based on their infringement contentions, Plaintiffs appear to take the position

10   that "decoding" should be construed so broadly as to mean doing nothing at all.  In

11   other words, Plaintiffs suggest that the "plain and ordinary" meaning of "decodes the

12   time code signal and generates a corresponding address signal" is simply "generates a

13   corresponding address signal" (ignoring the decoding requirement).  NFLE disagrees.

14        The phrase "decodes the time code" requires that, prior to the address signal

15   being generated, the time code signal must be converted from one form to another.

16   Smith Decl. ¶ 55-56.  Plaintiffs' own expert appears to agree, as he opined that a

17   "decoder" is "a device used to alter data from one coded form to another."[17]  Williams

18   Decl. (ECF No. 103-2) ¶ 33.  In other words, a decoder "converts" data from one form

19   to another.  Here, that data is the "time code signal."  Plaintiffs argue that "there are

20   ways to decode signals without converting from 'one form to another," Op. Br. at 13,

21   but offer no explanation of what those other ways are.

22        Plaintiffs' "plain and ordinary meaning" proposal should be rejected because it

23   does not resolve the dispute.  *O2 Micro*, 521 F.3d at 1361.  Specifically, Plaintiffs'

24   Infringement Contentions completely gloss over the phrase "decodes the time code,"

25   in an apparent attempt to construe "decodes the time code signal and generates a

26   corresponding address signal" as simply "generates a corresponding address signal."

27   _____

28   [17] To the extent that "convert" is unclear, NFLE alternatively proposes "alters the time code signal from one coded form to another."

NFLE's Responsive Claim Construction Brief                    Case No. 2:17-cv-03919-AB-SK

1    *See* Ex. 14, at *6-10.  Plaintiffs' proposal should also be rejected because they appear

2    to improperly read "decodes the time code signal" out of the claims.  *See Abbott Labs.*

3    *v. Sandoz, Inc.*, 566 F.3d 1282, 1293 (Fed. Cir. 2009) ("Each element contained in a

4    patent claim is deemed material to defining the scope of the patented invention.'").

5    **VII.       U.S. Pat. No. 7,950,033**

6          The '033 patent is directed to systems and methods for "delivering and

7    processing relational metadata in a television system."  '033 patent, Abstract.

8          **A.       "relational metadata"**

9

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "data describing a relationship between two different data sets, <u>where each data set is a program or part of a program</u>" | "data, or information, that describes relationships between two or more sets of data" |

13         The parties agree that (a) "metadata" means "data or information about other

14   data," Op. Br. at 22, and (b) "relational metadata" is data describing relationships

15   between two sets of data.  Despite this, Plaintiffs curiously argue that the adjective

16   "relational" somehow requires limiting the two sets of data involved to only "a program

17   or part of a program."  There is no basis for that position.

18         **1.     *The Intrinsic Record Compels NFLE's Proposed Construction.***

19         While "relational metadata" does not have a commonly understood meaning in

20   the art, the claim term itself suggests only that "relational metadata" refers to metadata

21   that is relational, i.e., data describing relationships with other data.  Jeffay Decl. ¶ 68.

22   Nothing in the claim term suggests that the involved "data" must be any particular type

23   of data, much less "a program, or part of a program."  Jeffay Reb. ¶¶ 19-20.

24         The specification compels the same conclusion.  It repeatedly explains what

25   "relational metadata" is, and none of those explanations require that the two data sets

26   must be "a program or part of a program."  Jeffay Decl. ¶ 169.  For example:

27   • "[R]elational metadata includes information which identifies two
28       sets of data and a relationship between them." '033 patent, Abstract.

- "[R]elational metadata is metadata which indicates a relationship between two or more sets of data." '033 patent, 6:5-7.

- "[R]elational metadata describes relationships between two or more sets of data." '033 patent, 6:67-7:2.

- "[R]elational metadata may be used to describe relationships between two or more sets of data." '033 patent, 14:20-21.

A POSA would understand from these repeated descriptions that "relational metadata" means only what those descriptions say and does not require the data to be "a program, or part of a program." Jeffay Decl. ¶ 71; *Irdeto Access, Inc. v. Echostar Satellite Corp*., 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("[A]bsent an accepted meaning . . . [t]he duty falls on the patent applicant to provide a precise definition for the disputed term.").

The prosecution history compels the same result. During prosecution, on an appeal of a rejection of the then-pending claims, the Patent Trial and Appeal Board expressly defined "relational metadata" as "metadata which indicates a relationship between two or more sets of data." Ex. 8, Decision on Appeal, at *5. There is no basis to depart from that definition. Jeffay Decl. ¶ 72.

## 2. *Plaintiffs' Proposal Includes Extraneous Limitations and Contradicts the Patent Specification.*

Plaintiffs' proposal is also objectionable because it inappropriately attempts to construe claim terms *other than* "relational metadata." Jeffay Reb. ¶ 19. All of the asserted claims recite "first data" and "second data." *See, e.g.*, '033 patent, claims 1, 22, 27, and 35; Jeffay Reb. ¶ 20. Plaintiffs' proposed construction effectively seeks to construe the recited "first data" and "second data" as "a program or part of a program." Jeffay Reb. ¶ 20. Plaintiffs' attempt to inappropriately read that limitation into the claims via the Court's construction of "relational metadata" should be rejected.

Plaintiffs' argument that the claims should be limited by examples in the patent that involve data sets that are "a program or part of a program" also fails. The patent specifies that each such embodiment is an "example." *See, e.g.*, '033 patent, 6:7 ("For example . . ."), 9:12 ("In the example . . ."), 9:40 ("FIG. 5 illustrates another example

31

1  . . ."); Jeffay Reb. ¶ 21.  The Federal Circuit has "repeatedly stated that while claims

2  are to be construed in light of the specification, they are not necessarily limited by the

3  specification."  *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir.

4  1998).  Here, the specification clearly sets out a meaning of "relational metadata," *see*

5  *supra*, and it does not require that each data set be "a program or part of a program."

6  Jeffay Reb. ¶ 19.

7      **B.**     **"wherein the relationship of the second data to the first data is**
         **selected from the group consisting of: . . ." (the "Markush group")**

8

9

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "the relationship of the second data to the first data <u>must be at least one of</u>: a summary, a correction, a repeat, a highlight, more detailed content, related text, or a related icon" | This phrase is a closed Markush group. Under relevant Federal Circuit case law, this means it specifies one and only one of the recited relationships, and excludes systems or methods with unrecited relationships. |

10

11

12

13

14

15      The parties agree that this phrase is a Markush group, but disagree about whether

16  it is (i) a "closed" Markush group (ii) limited to "one and only one" of the recited

17  relationships.  Plaintiffs tellingly fail to acknowledge that the Markush group's use of

18  "consisting of"—which Plaintiffs seek to read out of the claims—triggers presumptions

19  that the group is both closed and limited to one and only one alternative.  Neither

20  presumption is overcome here.

21          **1.**     ***"Consisting of" Excludes Unrecited Relationships.***

22      When, as here, a patentee employs the phrase "consisting of" in a Markush

23  group, that group is "closed"; that is, it "excludes any elements . . . not specified in the

24  claim."  *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp*., 831 F.3d

25  1350, 1358-59 (Fed. Cir. 2016).  The phrase "consisting of" triggers an "exceptionally

26  strong presumption" that the Markush group is closed and, to overcome that

27  presumption, "the specification and prosecution history must *unmistakably* manifest an

28  alternative meaning." 831 F.3d at 1358-59 (emphasis added).  The presumption is so

strong that the Federal Circuit recently explained that it is "unaware of *any case* that has construed a patent claim's use of 'consisting of' to have the same open meaning as 'comprising.'" *Id.* at 1358-59 (emphasis added).[18]

Plaintiffs have not and cannot identify any such unmistakable evidence in the intrinsic record here. Nowhere does the specification explain that "consisting of" means something unusual. On the contrary, the patentee amended the claims during prosecution to add the Markush group and secure their allowance over the prior art, effectively disclaiming coverage of any unrecited relationships. *See* Ex. 9, Notice of Allowance, at *2-3; *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1281 (Fed. Cir. 2003) (finding that an amendment to include a Markush group "disclaimed any coverage for [alternatives] other than the six listed members").

### 2.   *"Consisting of" Limits the Group to "One and Only One" of the Recited Relationships.*

"Consisting of" also triggers a second presumption: mixtures and combinations are prohibited. "If a patentee desires mixtures or combinations of the members of the Markush group, the patentee would need to add qualifying language while drafting the claim." *Abbott*, 334 F.3d at 1281. Consequently, "[i]f a claim recites 'a member selected from the group consisting of A, B, and C,' the claim is presumed to permit the member to be one and only one of A, B, or C, and to exclude mixtures or combinations of A, B, and C." *Multilayer*, 831 F.3d at 1363 (citing *Abbott*, 334 F.3d at 1281).

The intrinsic evidence here is nowhere near the "unequivocal" intrinsic evidence that overcame this second presumption in *Multilayer*. *See* 831 F.3d at 1363-64. In *Multilayer*, a dependent claim expressly recited blends *and* the specification "repeatedly and consistently reference[d] blends" *and* the specification described three

---

[18] That closed Markush groups do not exclude elements unrelated to the invention, Op. Br. 25, does not mean the group here is open as Plaintiffs would allow. *Shire Dev., LLC v. Watson Pharms.*, 848 F.3d 981, 986 (Fed. Cir. 2017). NFLE's explanation that the Markush group "excludes systems or methods with unrecited relationships" merely states the consequence of the closed Markush group.

1  embodiments containing blends.  *Id.*  Here, there are no such dependent claim in the

2  '033 patent directed to more than one relationship.  And there is no description or

3  example in the specification of a relationship identifier identifying more than one type

4  of relationship.  Without this type of express disclosure, Plaintiffs' bare assertion that

5  a couple of categories overlap falls far short of the "unequivocal" evidence required to

6  overcome the presumption that mixtures and combinations are prohibited.

7  Accordingly, this Markush group should not be construed as anything other than what

8  it is always presumed to mean, i.e., that it is closed and limited to only a single member.

9  **VIII.  U.S. Pat. No. 7,996,861**

10  The '861 patent is directed to authenticating a user's access to an application

11  using a separate security manager.  The PIN entry field is presented to the user by the

12  application, with the look and feel of the application, but, as Plaintiffs acknowledge,

13  the PIN code is kept within the security manager.  Op. Br. at 4.

14  **A.  "the application"**

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| *Plain and ordinary* / "A program that enables a user to do something useful with a computer." | "a computer program separate from the security manager that has total control over the display of the PIN entry field, including its look and feel" |

20  The parties dispute whether "the application" must have "total control over the

21  display of the PIN entry field, including its look and feel."  It must.

22  **1.  *The Intrinsic Record Supports NFLE's Proposal.***

23  The patent criticizes and distinguishes the claimed invention over prior art

24  systems, in which either an "application" would handle the PIN codes for user

25  authentication, and thus be less secure; or a system separate from the application would

26  handle PIN code authentication, which would be more secure, but would lack the look

27  and feel of the application.  Smith Decl. ¶¶ 27-31.  As set forth in the specification, one

28  type of prior art (Fig. 1) allows "the application" to have "*total control*" of the display

1    of the PIN entry field, but PIN codes are not protected because they are transmitted to

2    "the application." '861 patent, 1:41-53.  The other type of prior art (Fig. 2) provides

3    protection of PIN codes as the codes remain within the security manager, but "the

4    application" has "*no control*" over the look and feel ("the look and feel is here *totally*

5    *under* [security manager] system control").  *Id.*, 1:56-2:3 (emphasis added).

6         The '861 patent purports to overcome these drawbacks by combining the *total*

7    *control* of the display from Fig. 1 and the *secure protection* of PIN codes from Fig. 2.

8    *Id.*, 2:4-8; FIG. 3; Ex. 10, 5/7/2007 Appeal Brief, at *10; Smith Decl. ¶¶ 27-32.  It does

9    this by separating the "application" from a "security manager," giving the application

10   "total control over the graphics displayed and their look and feel," as well as "the look

11   and feel for PIN entry."  '861 patent, 3:31-34.  Yet, security is maintained because the

12   application "does not learn about the PIN," *id.*, 3:46-47, but displays only "crypted

13   information" corresponding to "information about PIN code entering key-pressing

14   operations" that is "received from the security manager."  *Id.*, 6:46-49.   The

15   specification further explains that the security manager "only relays [to the application]

16   the fact that a key has been pressed, letting the application display, for instance, an X

17   for each key pressed in the PIN entry field."  *Id.*, 3:41-45; 6:39-41, 46-49.  "This way

18   the application does not learn about the PIN, but can give user feedback 19 to the

19   display means 17."  *Id.*, 3:46-47.  Thus, the PIN code remains securely protected within

20   the security manager, while a user is provided with a PIN entry field under the total

21   control of the application, so as to have the latter's look and feel.  This context compels

22   NFLE's proposed construction.  Smith Decl. ¶¶ 27-32.

23              **2.    *Plaintiffs' Proposed Construction Ignores Context.***

24        Plaintiffs' proposed construction is incorrect in all respects.  Plaintiffs assert that

25   the term "application" is well-known, but their "plain meaning" proposal improperly

26   divorces the term from the context of the claims and specification, resulting in

27   overbroad patent scope.  *See* Tenets I-II.

28

As shown above, the context of the claimed invention—as repeatedly and consistently expressed in the claims, specification, and prosecution history, as well as explicit comparison to the prior art—does not permit the wide-open, untethered construction advocated by Plaintiffs.  Ex. 10, 5/7/2007 Appeal Brief, at *10; Smith Decl. ¶¶ 27, 29.   Lexicographer-like, the specification expressly states that "the application" has "*total control* over the graphics displayed and its look and feel." '861 patent, 3:30-33 (emphasis added).  *See Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) ("Our opinions have repeatedly encouraged claim drafters who choose to act as their own lexicographers to clearly define terms used in the claims in the specification.").  The express claim language confirms that the "entered PIN code is not supplied to the application." '861 patent, 6:41-42.  Instead, the application receives "information . . . about PIN code entering key-pressing operations" and "display[s] in the PIN entry field" "crypted information corresponding to said information about PIN code entering key-pressing operations received from the security manager." *Id.*, 6:46-50.

Plaintiffs acknowledge the need for the application to be separate from the security manager, *see* Op. Br. at 5, n.3,[19] but despite express language in the specification stating that the application has "total control over the graphics displayed," '861 patent, 3:31-34, they improperly allow the separate security manager "some" control over "when and what information" is displayed in the PIN entry field.  Op. Br. at 5-6.  However, nothing in the patent states that the security manager controls the timing or content of the graphics display.  Rather, the only control recited by the patent over the graphics displayed is by the application.  *E.g.*, '861 patent, 3:31-34, 41-47;

---

[19] Contrary to Plaintiffs' assertion, the word "separate" is not superfluous, but is needed to avoid jury confusion.  Claim 9 expressly requires that "the entered PIN code is not supplied to the application." '861 patent, 6:42; *see also id.*, at 3:41-45. In order to preclude "the application"  from being supplied with the PIN code, "the application" must be separate from "the security manager" and cannot be in or part of the security manager.  Smith Decl. ¶¶ 30-32.

1   6:46-50.  Even the passage cited by Plaintiffs recites having "the application display

2   an X."  Op. Br. at 6.

3        In any event, the timing of when information is displayed is not meaningful to

4   the invention.  The object of the invention is PIN code security and the application's

5   look and feel, not how the security manager might have some incidental and indirect

6   effect on the timing of when the application displays the X.  Indeed, because the

7   specification states unequivocally that the application has "total control" over the

8   graphics displayed, including the look and feel for PIN entry, Plaintiffs' argument

9   directly contradicts the specification.  *E.g.*, '861 patent, 3:31-34, 6:39-41, 6:46-50.

10       Plaintiffs' alternative construction for "the application" is overbroad,

11  ambiguous, and most importantly, ignores the intrinsic record and the very purpose of

12  the invention—the application having "total control" of the display of the PIN entry

13  field while remaining ignorant of the PIN code itself, yet giving user feedback.

14  Plaintiffs' amorphous construction of "application" does not separate it from the

15  security manager and does not provide it with total control over the graphics displayed.

16  As such, it would fail to achieve the objectives specified and claimed by the '861

17  patent.  *Phillips*, 415 F.3d at 1313; *Medrad*, 401 F.3d at 1319.  If, as Plaintiffs suggest,

18  the application lacked total control over the graphics displayed, the separateness

19  mandated by the intrinsic record would be violated, blurring the security manager with

20  the application's claimed function, which is to control the graphics displayed and their

21  look and feel.  Not only would Plaintiffs' proposed construction read on the prior art

22  expressly criticized by the patent, it would also be contrary to the claims and

23  specification.  *Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482, 493-94 (Fed.

24  Cir. 2013) (reading a limitation into a term because to construe otherwise would cover

25  the system that the patent criticized); *see also Phillips*, 415 F.3d at 1313.

26

27

28

## B.      "security manager"/"the security manager"

| Plaintiffs' Proposal | NFLE's Proposal |
|---|---|
| "computer system hardware and/or software that compares a PIN code of a user with a registered PIN code to authenticate a user" | "a computer program separate from the application that authenticates the PIN code of a user but has no control over the display of the PIN entry field, including its look and feel" |

As with "the application," the key dispute here relates to control of the display of the PIN entry field.

### 1.      *The Intrinsic Record Supports NFLE's Proposed Construction*

Because "the application" has *total control* over the PIN entry field display and its look and feel, "the security manager" would necessarily have *no control* over the displayed PIN entry field and its look and feel. '861 patent, 2:1-8; *compare id.* FIG. 2 *with* FIG. 3; Smith Decl. ¶ 35.  NFLE's proposed construction accurately reflects this exclusive nature of the control over the displayed PIN entry field based on the intrinsic record.  As explained above for "the application," the separateness between "the security manager" and "the application" with respect to control of the display of the PIN entry field would be violated and contrary to the claims and specification if, as Plaintiffs suggest, the security manager had *some control* over the graphics displayed.

Plaintiffs do not dispute that the role of "the security manager" is to authenticate the PIN code of a user, nor may they reasonably do so.  The intrinsic record consistently shows that "the security manager" authenticates the PIN code of a user.  *See* '861 patent, 3:37-40 (security manager analyzes PIN inputs for user authentication), 3:48-50 (security manager recognizes PIN and informs the application that the user/viewer has been authenticated); *see also id.*, 4:22-5:13, Figs. 5-6; Smith Decl. ¶ 37.

### 2.      *Plaintiffs' Proposal Contradicts the Intrinsic Record.*

Plaintiffs' argument that the security manager has "some control" over the graphics displayed is incorrect and contrary to the claims and specification for the reasons discussed above.  As they did for "the application," Plaintiffs' construction of

38

"security manager" ignores the very purpose of the claimed invention: precluding the application from receiving the PIN while still giving it total control over the look and feel of the PIN entry field, by having PIN authentication handled by a separate security manager that passes only information "about" key pressing operations to the application, so that the latter displays the crypted "X."  Smith Decl. ¶¶ 27-32, 35-36.

Further, the second part of Plaintiffs' proposal—"compares a PIN of a user with a registered PIN code to authenticate a user"—is superfluous because claim 9 already recites "give authorization to run said application if the PIN code of the user matches the registered PIN code."  Removing that unnecessary language from Plaintiffs' proposed construction leaves only "computer system hardware and/or software," which would effectively include all types of computer systems.  But "the security manager," a term which does not have an accepted meaning in the relevant art,[20] can only be construed "as broadly as provided for by the patent itself."  *Irdeto*, 383 F.3d at 1300. While the patent permits implementation of the claimed method in hardware, and does not limit hardware to a particular type, it does limit the security manager to have no control over the display, not provide the PIN code to the application, and instead provide only information "about" key-pressing operations.  *E.g.*, '861 patent, 6:33-49. These descriptions should control.  *Irdeto*, 383 F.3d at 1300.

---

[20] "Security manager" also lacks antecedent basis (the claim recites "the" security manager without first introducing "a" security manager), so the claim is invalid unless antecedent basis may be supplied by construing "a security manager" to perform the recited steps of "receive a request for user authentication from the application;" "supply information to the application about PIN code entering . . . wherein the entered PIN code is not supplied to the application;" and "give authorization . . . if the PIN code of the user matches the registered PIN code."  *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("[A] claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable").

**IX.    CONCLUSION**

For the reasons set forth above, Defendant respectfully requests that each of its proposed constructions of disputed clam terms be adopted by the Court.


Dated: May 18, 2018                                VINSON & ELKINS L.L.P.

                                                   By: /s/ *Hilary L. Preston*
                                                       Hilary L. Preston (*pro hac vice*)

                                                   *Attorneys for Defendant*
                                                   *NFL Enterprises LLC*

1

**ATTESTATION**

2

   I hereby attest that all persons whose signatures are listed herein, and on whose

3

behalf this filing is submitted, concur in this filing's content and have authorized this

4

filing.

5

6

Dated:  May 18, 2018

7

By: */s/ Bruce L. Ishimatsu*
Bruce L. Ishimatsu

8

9

10

**CERTIFICATE OF SERVICE**

11

   The undersigned certifies that on May 18, 2018, the foregoing document was

12

electronically filed with the Clerk of the Court for the UNITED STATES DISTRICT

13

COURT, CENTRAL DISTRICT OF CALIFORNIA, using the Court's Electronic Case

14

Filing (ECF) system.  The ECF system routinely sends a "Notice of Electronic Filing"

15

to all attorneys of record who have consented to accept this notice as service of this

16

document by electronic means.   Any party not receiving the Court's electronic

17

notification will be sent a copy of the foregoing document.

18

19

Dated:  May 18, 2018

20

By: */s/ Bruce L. Ishimatsu*
Bruce L. Ishimatsu

21

22

23

24

25

26

27

28

NFLE's Responsive Claim Construction Brief                                      Case No. 2:17-cv-03919-AB-SK