1  M. ELIZABETH DAY (SBN 177125)
   eday@feinday.com
2  MARC BELLOLI (SBN 244290)
   mbelloli@feinday.com
3  DAVID ALBERTI (SBN 220265)
4  dalberti@feinday.com
5  **FEINBERG DAY ALBERTI LIM &**
   **BELLOLI LLP**
6  1600 El Camino Real, Suite 280
7  Menlo Park, CA 94025
   Tel:  650.618.4360
8  Fax:  650.618.4368
9
10 Attorneys for Nagravision SA and
   OpenTV, Inc.
11                 UNITED STATES DISTRICT COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13 NAGRAVISION SA and OPENTV,      CASE NO. 2:17-CV-03919-AB-SK
   INC.,
14                                 **PLAINTIFFS' REPLY CLAIM**
15          Plaintiffs,            **CONSTRUCTION BRIEF**

16      v.                         Date:      July 20, 2018
17 NFL ENTERPRISES, LLC,           Time:      10:00 a.m.
                                   Courtroom: 7B
18          Defendant.            Judge:     Hon. Andre Birotte Jr.
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.   U.S. PATENT NO. 7,996,861 ................................................................. 1

   A.   "security manager"................................................................................ 1

   B.   "the application" ................................................................................... 2

II.  U.S. PATENT NO. 7,421,729 ................................................................. 3

   A.   "address generator" .............................................................................. 3

   B.   "encoding said video stream with said set of indicators accessed from said

   database" ....................................................................................................... 5

   C.   "decodes the time code signal and generates a corresponding address signal"

   5

III. U.S. PATENT NO. 7,028,327 ................................................................. 6

   A.   "timing offsets"..................................................................................... 6

   B.   "associated with [a / the] broadcast program" ................................... 7

   C.   "electronic program guide" .................................................................. 8

IV.  U.S. PATENT NO. 7,950,033 ................................................................. 9

   A.   "relational metadata".............................................................................. 9

   B.   "the relationship of the second data to the first data is selected from [a / the]

   group consisting of: a summary, a correction, a repeat, a highlight, more detailed

   content, related text, and a related icon".................................................... 11

V.   U.S. PATENT NO. 7,055,169 ............................................................... 12

   A.   "resources"............................................................................................ 12

   B.   "presentation" / "audio, video, and/or graphic presentation" ....................... 13

VI.  U.S. PATENT NO. 7,020,888 ............................................................... 15

   A.   "framework definition" ....................................................................... 15

   B.   "broadcast stream" .............................................................................. 16

VII. U.S. PATENT NO. 6,233,736 ............................................................... 18

   A.   "provided [with said / in a] video program" ....................................... 18

   B.   "electronically extracting said address"............................................. 20

i

# TABLE OF AUTHORITIES

**Cases**

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.,*
   830 F.3d 1341 (Fed. Cir. 2016) ............................................................ 4

*Biogen Idec, Inc. v. GlaxoSmithKline LLC,*
   713 F.3d 1090 (Fed. Cir. 2013) .......................................................... 18

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
   388 F.3d 858 (Fed. Cir. 2004) ............................................................ 16

*Dynacore Holdings Corp. v. U.S. Phillips Corp.,*
   363 F.3d 1263 (Fed. Cir. 2004) ............................................................ 7

*EcoServices, LLC v. Certified Aviation Services, LLC,*
   No. CV 16-01824-RSWL-SPx, 2017 WL 2783486 (C.D. Cal. May 18, 2017)..... 4

*Honeywell Intern., Inc. v. ITT Industries, Inc.,*
   452 F.3d 1312 (Fed. Cir. 2006) .......................................................... 16

*In re Morris,*
   127 F.3d 1048 (Fed. Cir. 1997) .......................................................... 10

*In re Rambus, Inc.,*
   694 F.3d 42 (Fed. Cir. 2012) .............................................................. 18

*InterDigital Commn's., LLC v. Int'l Trade Com'n,*
   690 F.3d 1318 (Fed. Cir. 2012) ............................................................ 8

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
   383 F.3d 1295 (Fed. Cir. 2004) ............................................... 9, 10, 15

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.,*
   831 F.3d 1350 (Fed. Cir. 2016) .......................................................... 11

*Norian Corp. v. Stryker Corp.,*
   363 F.3d 1321 (Fed. Cir. 2004) .......................................................... 11

*O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.,*
   521 F.3d 1351 (Fed. Cir. 2008) ............................................................ 7

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) ...................................... 10, 12, 15, 18

*PODS, Inc. v. Porta Stor, Inc.,*
   484 F.3d 1359 (Fed. Cir. 2007) .......................................................... 12

*Poly-America, L.P. v. API Industries, Inc.,*
   839 F.3d 1131 (Fed. Cir. 2016) .......................................................... 13

*TVIIM, LLC v. McAfee, Inc.,*
   851 F.3d 1356 (Fed. Cir. 2017) .......................................................... 18

REPLY CLAIM CONSTRUCTION BRIEF –2:17-CV-3919

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ............................................................... 6

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ............................................................ 1, 2

*Willamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ............................................................... 4

REPLY CLAIM CONSTRUCTION BRIEF –2:17-CV-3919

## I. U.S. PATENT NO. 7,996,861

### A. "security manager"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "computer system hardware and/or software that compares a PIN code of a user with a registered PIN code to authenticate a user" | "a computer program separate from the application that authenticates the PIN code of a user but has no control over the display of the PIN entry field, including its look and feel" |

The Court should adopt Plaintiffs' construction because: (1) the "security manager" may be implemented in hardware and (2) the security manager does have at least some control over if, when and what type of information is displayed in the PIN entry field.  For point (1), Defendant *admits* that the "patent permits implementation of the claimed method in hardware, and does not limit hardware to a particular type." Dkt. No. 104 at 39.  Defendant's construction, which excludes this preferred embodiment of the patent, is therefore not correct. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).  For point (2), Defendant fails to address the fact that the specification and claims teach that the security manager has at least some control over when and what information is displayed in the PIN entry field.  By communicating with the application, the security manager controls when "information about PIN code key-pressing operations" is displayed in the PIN entry field.  '861 patent, claim 1.  By controlling if and when information is displayed in the PIN entry field, the security manager has some control over the display of that field.  The specification also teaches that when a key is pressed the security manager "relays the fact that a key has been pressed, letting for instance the application display an X for each key pressed in the PIN entry field." *Id.*, 3:37-45.  By providing only generic feedback information to the application and not the actual PIN code, the security manager controls what information is displayed in the PIN entry field, *e.g.*, crypted information, instead of

1

the actual PIN code.  Defendant does not dispute any of these facts.  Defendant's construction contradicts the claim language, and the specification.

### B.   "the application"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning / "A program that enables a user to do something useful with a computer." | "a computer program separate from the security manager that has total control over the display of the PIN entry field, including its look and feel" |

The Court should adopt Plaintiffs' construction because an application is a well-known, ubiquitous type of computer software, and there is no disavowal of claim scope mandating a narrower construction.

The application does not have "total control" over the display of the PIN entry field.  The application does not have "total control" over the display of the PIN entry field.  The "security manager" has at least some control over if, when and what type of information is displayed in the PIN entry field.  Defendant's attempt to add the "total control" limitation boils down a single sentence describing "a particular embodiment given by way of non limiting example." '861 patent, 2:65-3:2; 3:30-33.  However, "non-limiting" exemplary statements regarding a "particular embodiment" do not constitute "lexicography" or disavowal of claim scope.  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012).  The statement Defendant cites refers to the application having control over the "look and feel" of "graphics"—not "total control" of all display functionality, which would include issues such as timing.  Timing issues are controlled—in part—by the security manager providing critical feedback information to the application. '861 patent, 3:37-45.  Defendant's "total control" construction, improperly excludes the preferred embodiment. *Vitronics Corp.* 90 F.3d at 1583.

Defendant also relies on statements from the specification regarding Figures 1 and 2.  Dkt. No. 104 at 34-35.  But these statements describe the prior art—not

2

the claimed invention.[1]  Therefore, these statements do not circumscribe or disavow the scope of the claimed application.

Defendant also relies on a statement from the prosecution history.  Dkt. No. 104 at 35.  However, the actual cite in the Appeal Brief does **not** use the term "total control."  Furthermore, the very same paragraph explains the security manager's important feedback function, which controls if and when information is displayed in the PIN entry field.  In particular, the paragraph states:

> [A]s the application does not receive the entered PIN information, the application has no feedback to provide a user who is inputting a PIN. Therefore, the security manager is configured to provide the application with information concerning key pressing operations of the user - without providing the PIN - so that the application can provide feedback to the user concerning their input.

Dkt. No. 104-11 at 10.  Defendant's prosecution argument is misplaced.

Lastly, Defendant's argument that Plaintiffs' construction would read on the "prior art" is similarly unavailing particularly when Defendant fails to explain how Plaintiffs' construction would read on the prior art.

## II.     U.S. PATENT NO. 7,421,729

### A.     "address generator"

| Plaintiffs' Construction | Defendant's Construction |
| --- | --- |
| "a specialized decoder that decodes the time code signal and generates an address signal based on the time code signal" | Subject to 35 U.S.C. § 112(f) and Indefinite |

Defendant cannot overcome the presumption that the claimed "address generator" is not a means-plus-function term.  The address generator of the claims must function as both an address generator and a decoder (*see* claim 1), both of which were known structures in the art.  Because both address generators and decoders were known structures, the claimed "address generator" is not a means-

---

[1] Moreover, the statement regarding the prior art application refers to the application having control over the "look and feel"—not having "total control" of all display functionality as required by Defendant's construction.

3

plus-function term. *EcoServices, LLC v. Certified Aviation Services, LLC*, No. CV 16-01824-RSWL-SPx, 2017 WL 2783486, **6-7 (C.D. Cal. May 18, 2017).

Defendant does not dispute that decoders were known, nor could it. Rather, Defendant disputes that address generators were known. That is belied, however, by a bushel of evidence, much of which Defendant does not address. First, Intel's Pentium processor had multiple address generators. Ex. 5, ¶ 20 (citing paper concerning the Pentium from 2000).[2] Second, a textbook discloses a known Digital Signal Processor with address generators from 1990. *Id*. Third, two U.S. Patents that pre-date the '729 patent by a number of years disclose and discuss address generators. *Id*. (citing U.S. Patent Nos. 4,985,848 and 5,524,223).

Because Defendant cannot rebut that address generators were known, it argues that the address generators cited by Plaintiffs are irrelevant to the subject matter of the '729 patent. Dkt. No. 104 at 25-26. That is both wrong and a misstatement of the law. The address generators cited by Plaintiffs are highly relevant to the subject matter of the '729 patent, as they all involve address generators in computers. Moreover, the address generator in the book about a Digital Signal Processor is in the same general field as the '729 patent because the '729 patent is all about ***signal processing*** in computers. Indeed, the title of the '729 patent is "Generation and Insertion of Indicators Using an Address Signal Applied to a Database" and the word "signal" appears in the patent more than 200 times. Furthermore, the legal inquiry for whether a term is a means-plus-function term is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Willamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). This is clearly so here.[3]

---

[2] Ex. 1-15 are the exhibits attached to Plaintiffs' Opening and Reply Briefs.

[3] Two minor points. First, Defendant's citation to *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1348 (Fed. Cir. 2016) is inapposite because the term at issue there was a coined term and not something that was a known structure as here. Second, Defendant's claim that Plaintiffs misrepresent U.S. Pub. No.

4

### B.    "encoding said video stream with said set of indicators accessed from said database"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "applying the set of indicators accessed from the database to the video stream to enable segment-by-segment marking of the video stream" | Plain and ordinary meaning / "inserting the set of indicators accessed from the database into the video stream" |

The segment-by-segment portion of Plaintiff's construction is not "extraneous" as Defendant posits.  Claim 1 expressly requires encoding of the video stream with multiple indicators, which is segment-by-segment marking.  Dkt. 103 at 12.  As noted in Plaintiff's Opening Brief, this is a primary distinction over the prior art, which only allowed for the marking of entire program streams.  *Id.*  Defendant's response is the conclusory argument that the specification "contemplates" encoding that is not segment-by-segment.  This is untrue and besides the point.  The language of the claims defines the bounds of the invention and Defendant fails to rebut that claim 1 requires segment-by-segment encoding.

On the issue of whether Defendant is seeking to exclude certain forms of encoding, Defendant says that it is not, but argues otherwise.  There are forms of encoding that do not involve "insertion," and "back channel encoding" is one of them.  Moreover, contrary to Defendant's assertion, in back channel encoding, indicators can be sent to the user over a medium other than the one that carries the video signal.  Ex. 14, ¶¶ 4-6; Ex. 1, ¶¶ 41-44.  Because there are forms of encoding that do not involve "insertion," and because there was no unambiguous disclaimer of forms of encoding other than those that involve insertion, the claim cannot be construed to require encoding that only involves insertion.

### C.    "decodes the time code signal and generates a corresponding address signal"

---

2001/0018693 is incorrect.  Plaintiffs' citation here is to show that decoders were known (which Defendant does not contest) and Plaintiffs meant to point out that this publication appeared on the '033 patent, not the '729 patent.

5

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | "converts the time code signal from one form to another, and then generates an address signal that corresponds to the decoded time signal" |

Defendant does not rebut the two issues Plaintiffs raised with Defendant's construction.  Again, construing the phrase "generates a corresponding address signal" as "then generates an address signal that corresponds to the decoded time signal" makes no sense.  Defendant is simply replacing five words in the claim with twelve words that provide no greater clarity, which is improper. *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rearranging words to say the same thing does not resolve any purported dispute.

Defendant also cannot rewrite the phrase "decodes the time code signal." There are ways to decode signals without converting from "one form to another," and nothing in the specification suggests that a change in form should be required. Ex. 5, ¶¶ 25-28.  Indeed, signals can be decoded and remain in the same form such as substitution cypher which is a centuries-old technique routinely applied in computer science. *Id.*, ¶ 25 (citing and attaching the relevant texts).  Neither Defendant, nor its expert, rebut this.  Defendant cannot "read-in" this "one form to another" requirement that is unsupported.

## III.    U.S. PATENT NO. 7,028,327

### A.    "timing offsets"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "synchrony-oriented timing data" | "data that specifies a start or end time for an event or action" |

The principal issue is whether "timing offsets" are any form of "synchrony-oriented timing data" (Plaintiffs' position) or whether they must "specif[y] a start or end time for an event or action") (Defendant's position).  The specification is clear that timing offsets can be any form of synchrony-oriented timing data, and

6

1    Defendant does not meaningfully address or rebut the following unambiguous

2    statement in the specification: "Timing offsets generally are synchrony-oriented

3    data such as broadcast program start and stop times **or other timing data useful to**

4    **the interactive applications**."  '327 patent, 4:64-66.  It would be legal error to

5    further limit this term.  *Kara Tech.*, 582 F.3d at 1348.  While the specification gives

6    two examples of timing offsets that do not specify a start or end time (Dkt. No. 103

7    at 15-16), even if the specification gave no examples, it would be improper to

8    further limit this term from what is set forth in the '327 patent at 4:64-66.  *Liebel-*

9    *Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

10        **B.    "associated with [a / the] broadcast program"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | "associated with the events, situations, or other content of a broadcast program" |

13        Defendant's construction is a blatant attempt to take the plain English words

14   "associated with," which any lay person can understand, and limit them to three

15   instances of Defendant's liking ("events, situations or other content").  This is *per*

16   *se* improper and the claim must be construed to cover all associations.  *Kara Tech.*,

17   582 F.3d at 1348.  While the Court is required to resolve disputes of claim scope

18   (*i.e.*, what the words in the claim mean), it is not required to resolve factual issues

19   during claim construction; whether something is "associated" with a "broadcast

20   program" is a question of fact reserved for the trier of fact.  *Dynacore Holdings*

21   *Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263 (Fed. Cir. 2004) (holding that

22   infringement is a two-step process with the first step being claim construction and

23   the second step being the "factual question" of comparing the properly construed

24   claims to the allegedly infirming device).  The only claim construction dispute here

25   is whether or not the claims cover all associations.  They do, because there has not

26   been a clear and unambiguous disavowal of the full scope of this term, which does

27   not have a specialized meaning in the art.  *Thorner*, 699 F.3d at 1365-67.

28

7

1  Moreover, the specification provides that associations concerning "events" or

2  "situations" are permissive, not mandatory.  '327 patent, 1:28-30.

3      **C.**     **"electronic program guide"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "an electronic collection of data about available broadcast programs" | "an electronic database that provides schedule information for broadcast programs, including geographic location, local time, and channel information" |

7      An electronic program guide is any electronic guide conveying available

8  programs and does not have to have "geographic location, local time, and channel

9  information."  Take "on-demand" or "on-command" programming—which was

10  known at the time of invention—for instance.  In those examples, the electronic

11  program guide lists programs available to anyone at any time.  Defendant's

12  restriction of this term is contradicted by the evidence.

13      First, it is contradicted by the claims, where Defendant's construction

14  violates the doctrine of claim differentiation.  *InterDigital Commn's., LLC v. Int'l*

15  *Trade Com'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012).  Defendant is trying to read

16  limitations from dependent claim 26 into independent claim 13, which are simply

17  not present.  Defendant's arguments to the contrary are not availing.  Claim

18  differentiation dictates that all of the "add-ons" of claim 26—*i.e.*, the "determining"

19  of "timing information" "channel information" and "location information" and then

20  using that information as inputs into the electronic program guide—are not part of

21  claim 13.  Thus, the add-ons are not a required part of the electronic program guide.

22      Next, it is contradicted by the specification, which sets forth embodiments

23  where the electronic program guide is not a database (for example when it is sent to

24  and then stored on a user's computer) and does not have the other "add-ons" of

25  Defendant's construction.  '327 patent, 4:14-17, 6:9-12, 11:23-33, 13:39-50; Dkt.

26  No. 103 at 18-20.  This conclusion is buttressed by Defendant's own extrinsic

27  evidence—three dictionary definitions that do not require geographic location, local

28

8

time, or channel information.  Exs. 6, ¶¶ 7-9, 11-13.  The industry did not require Defendant's "add-ons" and neither does the intrinsic record.

## IV.   U.S. PATENT NO. 7,950,033

### A.   "relational metadata"

| Plaintiffs' Construction | Defendant's Construction |
| --- | --- |
| "data describing a relationship between two different data sets, where each data set is a program or part of a program" | "data, or information, that describes relationships between two or more sets of data" |

The problem with Defendant's construction is that it ignores the fact that the term "relational metadata" is a term coined by the patentees.  Coined terms are treated differently than non-coined terms.  Because "relational metadata" is a coined term—as the experts for the parties agree—it is construed "only as broadly as provided for by the patent itself" and limited to the exemplary embodiments.  *See Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300-01 (Fed. Cir. 2004); Ex. 3 at ¶¶ 23-24; Dkt. Nos. 104-2 at ¶ 68 and 104-4 at ¶ 15.  As such, relational metadata necessarily describes a relationship between data sets "where each data set is a program or part of a program."

Defendant cannot distinguish the *Irdeto* case, which is on-point, instructive and counter to Defendant's arguments.  In *Irdeto*, the Federal Circuit considered whether the coined term "group key" could be associated with an entire subscriber base or was necessarily associated with a subset of the total subscriber base.  *Id.* Even though all examples of a group key in the specification were "permissive rather than mandatory," "illustrative rather than exhaustive," and did not "necessarily or explicitly exclude a group made up of all subscribers," the Federal Circuit nevertheless limited the term to a subset of the total subscriber base because "every example in the specification" (*i.e.*, every embodiment) of a group key concerned a subset.  *Id.*  The same is true here.  Plaintiffs highlighted that every single example of relational metadata concerns data sets that are "a program or part of a program."  Dkt. No. 103 at 21-22.  Defendant in response points to three

9

passages of the specification to argue (like the incorrect party in *Irdeto*) that nothing in the descriptions of relational metadata mandates that it concern programs or parts of programs.  Dkt. No. 104 at 30-31.  Defendant's argument thus highlights why Plaintiffs are correct.  First, Defendant does not rebut that the only examples of relational metadata concern data sets that are programs or parts of programs.  Under *Irdeto*, this failing is fatal to Defendant's argument.  Second, each of the three passages Defendant cites are immediately followed by numerous examples of relational metadata, ***all*** of which concern data sets that are programs or part of programs.  '033 patent, 6:5-26, 6:67-7:17, 14:20-56 (Defendant cites only 6:5-7, 6:67-7:2, 14:20-21 and ignores all the examples).  Because every example of relational metadata in the '033 patent concerns data sets that are programs or parts of programs, this is a necessary part of the construction for this coined term.

Defendant's argument concerning the prosecution history is also incorrect for several reasons.  Dkt. No. 104 at 31.  The Board of Patent Appeals did not conduct a claim construction analysis of relational metadata and, if it had, the analysis would have been under the "broadest reasonable interpretation" standard of claim construction (*In re Morris*, 127 F.3d 1048, 1053-1055 (Fed. Cir. 1997)), a different standard than the *Markman*/*Phillips* standard that applies here.  *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).  The Board, therefore, was not applying the holdings of *Irdeto*—the case that is directly on-point when a patent is construed in the district court.  Second, the sentence that follows the one quoted by Defendant gives an example where relational metadata is a program or part of a program, again proving that the only examples that anyone can find, including the Board of Patent Appeals, are consistent with Plaintiffs' construction.  Dkt. No. 104-9 at 5.

Finally, Defendant's argument in Section VII.A.2. concerning the *Enercon* case is inapposite because while non-coined terms—like the word "rotating" in *Enercon*—are "not necessarily limited by the specification," coined terms *are* necessarily limited by the examples in the specification per *Irdeto*.

10

**B.   "the relationship of the second data to the first data is selected from [a / the] group consisting of: a summary, a correction, a repeat, a highlight, more detailed content, related text, and a related icon"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "the <u>relationship of the second data to the first data must be at least one of</u>:  a summary, a correction, a repeat, a highlight, more detailed content, related text, or a related icon" | This phrase is a closed Markush group. Under relevant Federal Circuit case law, this means it <u>specifies one and only one of the recited relationships</u>, and excludes systems or methods with unrecited relationships. |

Defendant miscasts the dispute.  The primary dispute is whether the claimed relationship can be "at least one of" or must be "one and only one" of, the listed relationships.  Because the listed relationships overlap, including as articulated in the patent (*e.g.*, "a related icon" can also be "related text," *see* '033 patent, 8:41-47), the *Multilayer* case is directly on-point.  *See also id.*, 7:66-10:24 (setting forth the relationships without mutual exclusivity).  The claimed relationship can, therefore, be one or more of the listed relationships consistent with Plaintiffs' construction.  *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1362-64 (Fed. Cir. 2016) (holding that because two of the four listed resins in the Markush group overlapped, more than one resin could be used in each claimed layer).  Because the listed relationships are not mutually exclusive, and will often overlap (which Defendant fails to rebut), Defendant's "one and only one" construction is incorrect.  Dkt. No. 103 at 23-25.  Thus, this Markush group is "open" to multiple relationships recited within the claims.

What this Markush group is "closed" to is unrecited relationships that are relevant to, or related to, the invention.  *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331-32 (Fed. Cir. 2004).  Plaintiffs have not advanced a position that the Markush group is open to all unrecited relationships.  Markush groups are generally closed to unrecited elements.  *Id.*  However, they are not closed to elements unrecited in the claim that are "unrelated to the invention" or "irrelevant to the

11

1   invention." *Id.*  Because exceptions exist, the part of Defendant's construction that
2   reads "excludes systems or methods with unrecited relationships" is incorrect.

3   **V.   U.S. PATENT NO. 7,055,169**

4        **A.   "resources"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "computer hardware, computer software or computer data required for presentation of digital graphics, audio or video content" | "software objects that can be transmitted over a network" |

9        The principal dispute is whether "resources" may be computer hardware,
10  software or data (Plaintiffs' position) or whether they must be software only
11  (Defendant's position).  Defendant's circumscription of this term is contradicted by
12  the intrinsic record at every turn.

13       First, Defendant's construction is contradicted by the claims.  Dependent
14  claims 6 and 15 specifically disclose that the "resources" can be hardware.  Dkt.
15  No. 103 at 26-27; Ex. 4, ¶25.  Although *Phillips* teaches us to first look to the
16  claims, Defendant hides from the claims and addresses them in a footnote.
17  Defendant incorrectly assumes that, as to claim 6, the open-ended "subset [of
18  resources] comprises" language somehow excludes the later-referenced "hardware
19  resources."  Dkt. No. 104 at 20 n.10.  Even assuming the "hardware resources" are
20  not part of the "subset," they are still part of the "set of resources" recited in the
21  independent claims.  The claimed "hardware resources" are utilized in order to
22  make the presentation and cannot be ignored.  Defendant also fails to address
23  dependent claim 15, which is immune to this flawed argument.  The breadth of
24  "resources" in claim 15 thus extends to the other claims.  *PODS, Inc. v. Porta Stor,*
25  *Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007).

26       Next, Defendant's construction is contracted by the specification, which
27  repeatedly teaches that "resources" can include hardware.  Dkt. No. 103 at 27-28;
28  Ex. 4, ¶¶ 22-23.  If Defendant wishes to argue that the scope of "resources" is

12

narrower than the use of the term in the patent itself, *i.e.*, excludes hardware, Defendant must prove a clear and unambiguous disavowal of claim scope, but fails to do so. *Poly-America, L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). Instead, Defendant attempts in vain to explain away the "precreating" and "pipes" embodiments, which tie hardware "resources" to the claimed inventions. As to "precreating," Defendant argues that "[m]emory hardware is not the 'resource' being prefetched or precreated, nor would prefetching or precreating hardware make any sense in the asserted patent claims' context." However, no one is arguing that memory is prefetched or precreated. "Prefetching" a graphic might only involve downloading the graphic ('169 patent, 47:38-48:3), but "precreating" the graphic would involve downloading the graphic plus allocating hardware resources like memory in order to quickly display the graphic (*id.*, 49:32-41). Ex. 4, ¶ 22. In other words, "prefetching" treats the software resource as a prerequisite, whereas "precreating" treats the software and associated hardware resources as prerequisites. *Id.* Moreover, "Plaintiffs' reliance on . . . pipes" is not "misplaced," but rather an extension of the "precreating" embodiment. Ex. 4, ¶ 23. "Pipes" can be in a realized or unrealized state which can indicate to a "precreating" function whether all the hardware in a pipe are ready to, *e.g.*, display the graphic. *Id.* These embodiments all explicitly teach that "resources" can comprise hardware.

### B.   "presentation" / "audio, video, and/or graphic presentation"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning / "a selection of one or more of video, audio, and graphics for concurrent display" | "information organized to be played out as a whole" / no further construction needed beyond "presentation" |

The principal issue with this term is that there is no support for Defendant's assertion that a presentation must be something "played out as a whole."

On p. 21 of its brief, Defendant cites to 47:24-25 of the '169 patent to argue that "'multiple resources' may be used in 'constructing a . . . presentation.'" This citation misleadingly excises language equating a "presentation" with a "scene." A

13

single "scene" (as one of many) being equated to a "presentation" contradicts Defendant's requirement that the scenes be "played out as a whole."  Dkt. No. 103 at 29-30, Ex. 4 at ¶ 16.

Defendant then uses the notion of "constructing . . . a presentation" as a basis to search for alleged support, and it settles on 11:25-36 of the '169 patent, which describes an exemplary URL for the CNN channel.  This passage does not use "presentation" to describe the CNN channel.  Defendant simply concludes that because a "presentation" can be constructed using multiple resources, and the CNN channel appears to have different resources, they must be one and the same.  This logic is flawed – the CNN channel may contain multiple presentations both over time (*i.e.*, different television shows), and at the same time (*i.e.*, using different languages or display resolutions like SD and HD), and the specification does not care to draw such fine lines in defining "presentation."  Indeed, the patent describes addressing a "specific elementary stream" like the CNN channel with English audio using "broadcast://cnn.com;audio=eng."  '168 patent, 11:38-42.  Under Defendant's view, this individually addressable stream would inexplicably not qualify as a "presentation."  Defendant does not address any of these issues, instead resorting to a single conclusory statement.  Dkt. No. 104 at 21:28-22:2.

On p. 22, Defendant argues that in a slide presentation, the slides cannot also be presentations.  However, just as the patent describes that a scene can be a presentation, so can a slide.  Ex. 4, ¶¶ 15-16.  The claimed invention is concerned with ensuring the necessary resources for whatever is to be displayed next have been acquired, whether it be a slide or a scene.  Dkt. No. 103 at 29-30.  Defendant's argument is an improper attempt to avoid infringement by drawing the largest circle it can around "presentation" and then arguing that use of the claimed invention for anything less does not amount to infringement.  Dkt. No. 103 at 30; Ex. 4, ¶16.

Later on p. 22, Defendant argues that the SMIL specification also supports its construction.  Defendant is motivated to improperly put the SMIL specification on

14

equal footing as the intrinsic evidence, because it repeatedly relies on the SMIL specification in its invalidity contentions. However, as extrinsic evidence, SMIL should not be relied upon if it contradicts the teachings of the patent. *Phillips*, 415 F.3d at 1318. To the extent SMIL teaches that a "scene" cannot be a "presentation," it is irrelevant because it contradicts the teachings of the patent.

On p. 23, Defendant argues that the use of "selection" in Plaintiffs' construction somehow allows for a subset of "presentation elements" to be the "presentation." This does not make sense – the selection of elements for display make up the presentation elements. Defendant's confusion rests with its improperly rooted understanding of "presentation" in the context of bundling information together "to be played out as a whole." This also highlights the inexplicable result where Defendant would not consider an individually addressable "specific elementary stream" to be a "presentation." '169 patent, 11:38-42.

## VI.   U.S. PATENT NO. 7,020,888

### A.   "framework definition"

| Plaintiffs' Construction | Defendant's Construction |
| --- | --- |
| "a designation of the input and output content and metadata formats necessary to build and format various audio, video and metadata streams to enable their delivery and display across multiple receivers with differing capabilities" | "information that identifies a set of associated content for a broadcast program" |

As discussed above and in Plaintiffs' Opening Brief, coined terms are treated differently than non-coined terms. Coined terms are construed "only as broadly as provided for by the patent itself" and limited to the exemplary embodiments. *Irdeto*, 383 F.3d at 1300-01. The parties' experts agree that "framework definition" is a coined term. Ex. 1 at ¶¶ 61-62; Dkt. Nos. 104-3 at ¶ 82.

Defendant fails to acknowledge or address that the first four sentences of the "Detailed Description of the Invention"—which outlines "the present invention"—comport with Plaintiffs' construction and define the coined term "framework

definition." '888 patent, 3:17-31; Ex. 1, ¶¶ 63-64; *Honeywell Intern., Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004).  Defendant's argument concerning the specification (Dkt. No. 104 at 11) ignores this section, and ignores that this is a coined term that must be construed strictly in accord with the patent's disclosure.  It may not be given broader effect, as would be the case with non-coined terms.  Defendant's argument also ignores the numerous other sections that are in accord with Plaintiffs' construction.  '888 patent, 1:55-56, 4:14-16, 6:20-25, 8:20-23, 8:39-43, 8:55-57, 9:65-67, 9:65-67, 11:33-36, 12:38-42.

Defendant's argument concerning the prosecution history is also incorrect and irrelevant.  Further in the same document after the "[i]n brief" description that Defendant cites the patentee described and again confirmed various aspects of the claimed framework definition on pages 8-9, which Defendant ignores:

> [The prior art] does not teach or suggest 'a <u>framework definition module</u> that interfaces with said <u>framework controller</u> and <u>defines all content</u> to be used in said omnimedia package[4], said content comprising various stream types for <u>transmission to a plurality of receivers that are capable of checking said various stream types to determine which streams of said various stream types may be used</u> by said receivers.

Dkt. No. 104-8 at 8-9 (underlining in original).

Contrary to Defendant's assertion (Dkt. 104 at 11-12), Plaintiffs' construction does not exclude any embodiments.  The XML code set forth in the specification at 7:55-8:19 has the capacity of including all of the various stream types in addition to the example stream provided.  Ex. 14, ¶¶ 7-8.  One of ordinary skill in the art would understand that this XML code exemplifies one of the various stream types that are disclosed in the specifications and required by the claims.  *Id.*

### B.    "broadcast stream"

---

[4] The omnimedia package represents the "video source(s) 102, audio source(s) 104, and metadata sources 106, which may comprise and may be associated with a primary broadcast." '888 patent, 3:65-4:2.

16

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "a flow of related data created in accordance with the framework definition that contains audio, video and metadata content for a broadcast program" | "a flow of data that is simultaneously transmitted to more than one recipient" |

The principal dispute is whether a broadcast stream must be simultaneously transmitted to multiple recipients.  There is no dispute as to whether the broadcast stream goes to multiple recipients; indeed, as stated in Plaintiffs' Opening Brief, that limitation is elsewhere in the claims.  *See* '888 patent, claims 1-5.

However, nothing in the claims or the specification requires simultaneous transmission of the broadcast stream (that word is not used) and there are embodiments where transmission of the broadcast stream is not simultaneous.  Dkt. No. 103 at 34-46.  Moreover, the extrinsic evidence does not mandate that a "broadcast stream" be simultaneously transmitted, as a "broadcast" could be simultaneously sent to two households (one that is beginning the program and one that is nearing the end of the program) where the "stream" is at different states of transmission.  *Id.*; Ex. 1, ¶ 59.

Defendant's erroneous "simultaneous" argument is grounded in three statements the patentee made to the patent office that Defendant cites on page 9 of its brief.  The second and third of these statements (concerning the Heuer reference) do not say anything about the broadcast stream being transmitted "simultaneously"; rather, they note what is already in the claims—that the broadcast itself (*i.e.*, the broadcast program) and the claimed "menu" must be transmitted to a plurality of receivers.  Dkt. No. 104-8 at 8 and 10.  The first statement—which reads "[t]he M-3 box provides user-to-server communications and does not broadcast messages simultaneously to a plurality of receivers"—does not mean or even argue that *all* broadcast streams contemplated in the patent involve simultaneous transmission.  *Id.* at 7.  The statement that a prior system did not have simultaneous broadcast of "messages" is irrelevant to whether all "broadcast *streams*" must be simultaneously

17

transmitted and was not used to overcome prior art; it is just a statement of fact about an inability of one prior art system.  This irrelevant statement is not, in any way, a "clear and unmistakable" disclaimer of the full scope of "broadcast stream," which need not be simultaneously transmitted.  *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1100 (Fed. Cir. 2013).

## VII.   U.S. PATENT NO. 6,233,736

### A.   "provided [with said / in a] video program"

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | "embedded or encoded in the electronic signal that represents the video program" |

These terms, which have no specialized meaning to persons of skill in the art, must be given their plain and ordinary meaning because there has been no disavowal of claim scope.  *Thorner*, 699 F.3d at 1367.  Defendant *admitted* in its IPR Petition that these terms should be given their plain and ordinary meaning under the *Phillips* standard because the '736 patent is expired.  Dkt. No. 103 at 38; Ex. 15 at 4 (citing *In re Rambus, Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012)).  Defendant's only response to its unmistakable admission is to incorrectly claim that "[t]he only issue in the IPR is whether the claims are invalid."  Dkt. No. 104 at 5, n. 2.  But it is black letter law that claims must be construed "the same way for the purpose of determining invalidity and infringement."  *TVIIM, LLC v. McAfee, Inc.*, 851 F.3d 1356, 1362 (Fed. Cir. 2017).  And the first step in any IPR proceeding (as evidenced by Defendant's own IPR Petition) is to perform claim construction.  Ex. 8, p. 13.  Defendant's claim construction analysis did not identify these terms as needing construction, and therefore admitted they should be given their plain and ordinary meaning.  *Id.*  The Patent Office agreed.  Ex. 15 at 4-7.

Defendant's selective citation to embodiments of the specification does not constitute disavowal of claim scope.  *Kara Tech. Inc.*, 582 F.3d at 1348; *Thorner*, 669 F.3d at 1365.  While certain embodiments of the specification refer to ways of

18

embedding addresses in an electronic signal, nowhere does the specification state that the invention should be limited to those embodiments.  Furthermore, the specification states that an address need only be provided broadly "*in conjunction with* a digitally encoded video or audio electronic signal 12."  '736 patent, 6:2-5.  Defendant's only response to this embodiment is to incorrectly claim without support that it "does not teach any method of providing an address signal that NFLE's construction would exclude."  Dkt. No. 104 at footnote 1.  But there are many ways of providing an address signal "in conjunction with" a video program that would <u>not</u> involve *embedding* that signal into the video program.  For example, the address signal could be provided as a separate signal in parallel with, or sequential to, the video program.  Defendant's proposed construction would improperly exclude these ways of providing an address signal in conjunction with a video program.  *Kara Tech.*, 582 F.3d at 1348; *Liebel-Flarsheim*, 358 F.3d at 906.

Defendant's citation to the inventor's declaration in the prosecution history is incomplete, misleading, and actually proves that its proposed construction is incorrect.  When read in full, the inventor does not limit his invention to embedding an address into an "electronic signal representing the video program," as proposed by Defendant.  Instead, the inventor more broadly states that "the consumer requests 'more information' from the on line provider(s) specified by address data imbedded *in the video picture or the picture's associated signals <u>and/or</u> data* (as defined below)."  Dkt. No. 104-6, 9/15/95 Disclosure Document at 1 (emphasis added).  Here, the inventor provides clear alternatives to embedding the address within an electronic signal representing the video program, including embedding the address in the video picture itself or the data associated with the video program.

Finally, Defendant's attempt to side-step the issue of claim differentiation further highlights its improper attempt to inject limitations from other claims into claims 1 and 8.  Defendant claims that claim 7 requires "two levels of embedding or encoding: (i) the address in the information signal, and (ii) the information signal in

19

the electronic video signal."  However, all these levels of "embedded signals" are explicitly set forth in claim 7, which recites "a video program represented by an electronic signal" and "an information signal embedded in said electronic signal."  Claims 1 and 8 do not recite any electronic signals, information signals, or embedded signals.  Defendant's construction improperly introduces these limitations from other claims into claims where they do not exist.

**B.**     **"electronically extracting said address"**

| Plaintiffs' Construction | Defendant's Construction |
|---|---|
| "detect and decode the address" | "removing or decoding the address from the electronic signal that represents the video program" |

Defendant's attempt to read into this term "the electronic signal that represents the video program" fails for the same reasons set forth above.  First, it contradicts Defendant's own admissions in its IPR Petition where it chose not to include this limitation in any of its proposed constructions.  Ex. 8, pp. 13-15.  Second, the intrinsic record does not limit the claims to embodiments where the address is embedded within an electronic signal that represents the video program, but instead contemplates embodiments where the address is more generally provided "***in conjunction with*** a digitally encoded video or audio electronic signal."  See Section VII.A.  Third, as the inventor himself explained in the Affidavit cited by Defendant, the address does not have to be embedded within the electronic signals associated with the video program, but can alternatively be embedded in the "**video picture**" and/or its "**data**."  Dkt. No. 104-6, 9/15/95 Disclosure Document at 1 (emphasis added).  Finally, as explained above, claim 1 does not recite an "electronic signal representing the video program," which is found in other claims.  Defendant's construction improperly injects this limitation from other claims into claims where they do not exist.

REPLY CLAIM CONSTRUCTION BRIEF –2:17-CV-3919

1   Dated May 25, 2018

2                                           FEINBERG DAY ALBERTI LIM &
                                            BELLOLI LLP
3

4                                           /s/ M. Elizabeth Day
                                            M. Elizabeth Day
5

6                                           Attorneys for Plaintiffs
                                            NAGRAVISION SA and OPENTV, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY CLAIM CONSTRUCTION BRIEF –2:17-CV-3919